**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
(Northern Division)

| | |
|---|---|
| **GREEN & HEALTHY HOMES INITIATIVE, INC.** | * |
| 2714 Hudson Street | |
| Baltimore, Maryland 21224, | * |
| | |
| **THE MINNEAPOLIS FOUNDATION** | * |
| 800 CDS Center S. 8th Street | |
| Minneapolis, Minnesota 55402, | * |
| | |
| and | * |
| | Case No.: |
| **PHILANTHROPY NORTHWEST** | * |
| 600 University Street, Suite 1725 | |
| Seattle, Washington 98101, | * |
| | |
| Plaintiffs, | * |
| | |
| v. | * |
| | |
| **ENVIRONMENTAL PROTECTION AGENCY** | * |
| 1200 Pennsylvania Avenue, N.W. | |
| Washington, D.C. 20460 | * |
| | |
| | * |
| Also serve on: | |
| Kelly O. Hayes | * |
| United States Attorney for the District of Maryland | |
| 36 S. Charles Street, 4th Floor | * |
| Baltimore, MD 21201 | |
| | * |
| | |
| The Hon. Pamela Bondi, Attorney General | |
| U.S. Department of Justice | * |
| 950 Pennsylvania Avenue, NW | |
| Washington, DC 20530-0001 | * |
| | |
| and | * |
| | |
| **LEE ZELDIN, in his official capacity as** | * |
| **ADMINISTRATOR, UNITED STATES** | |
| **ENVIRONMENTAL PROTECTION AGENCY** | * |
| 1200 Pennsylvania Avenue, N.W., | |
| Washington, D.C. 20460 | * |
| | |
| Defendants. | * |

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

<u>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**</u>

## INTRODUCTION

1.      Plaintiffs Green & Healthy Homes Initiative, Inc. ("GHHI"), the Minneapolis Foundation, and Philanthropy Northwest (collectively, "Plaintiffs" or the "Plaintiff Organizations") are non-profit organizations located in Baltimore, Minneapolis, and Seattle, respectively. In December 2023, Defendant, the U.S. Environmental Protection Agency ("EPA"), named each of the organizations a Regional Grantmaker under the Agency's Thriving Communities Grantmaking Program, and, in 2024, EPA awarded to each of the Plaintiff Organizations an $8 million "initial grant" intended to facilitate further grantmaking under the Thriving Communities program, as well as to oversee and provide support to Thriving Communities subgrantees. The EPA later awarded to each organization a $52 million "subsequent grant," most of which the organizations are to award to Thriving Communities subgrantees to support community-based environmental protection projects.

2.      EPA established the Thriving Communities program at the direction of Congress, which, in amendments to the Clean Air Act codified in 2022 through the enactment of the Inflation Reduction Act, appropriated $3 billion to the EPA for "climate and environmental justice block grants" and mandated that the Agency "shall use" those funds to support activities that monitor, prevent, and remediate pollution and mitigate climate risks in "disadvantaged communities." 42 U.S.C. § 7438.

3.      On February 21 and 22, 2025, EPA terminated its Thriving Communities initial grant awards to the three Plaintiff Organizations, issuing to each organization a memorandum containing an identical or nearly identical statement of purported reasons for the Agency's termination decision. That statement provided several vague, unsubstantiated reasons on which the termination decision was based.

4.      Specifically, EPA stated that each organization's grant was terminated (1) because EPA has declared it an "Agency priority" to withhold funds "from organizations that promote or take part in diversity, equity and inclusion ('DEI') initiatives [or] 'environmental justice' initiatives"; (2) because the Plaintiff Organizations' grant-funded programs may not be "free from fraud, abuse, waste, or duplication"; *or* (3) because the organization's programs may "otherwise fail to serve the best interests of the United States."

5.      Based on the vague, unsubstantiated statement in the termination memoranda, it is not possible to understand the specific reason for the Agency's termination of the initial grants. The Agency did not, in the case of any of the three Plaintiff Organizations, make any determination, identify any evidence, or articulate any reasoning to substantiate any of the identified grounds for termination.

6.      In terminating the initial grants, EPA violated a number of federal statutes and regulations, including the Clean Air Act, as amended by the Inflation Reduction Act, and the Executive Branch's own regulations governing federal grants set forth at 2 C.F.R. Part 200. In particular, EPA's actions seek to nullify the Clean Air Act's unambiguous direction to the Agency to use appropriated funds to support environmental protection activities in disadvantaged communities.

7.      Moreover, one of the grounds that EPA has identified for terminating the three Plaintiff Organizations' grants—that the Plaintiffs may "promote or take part in" certain types of "initiatives" that the Agency now disfavors— is plainly unconstitutional, in that it infringes on the organizations' First Amendment rights by punishing them for what the EPA perceives to be inappropriate viewpoints on issues of social and environmental concern (albeit without undertaking any examination of the Plaintiff Organizations' actual work or views).

8.    Around the time that EPA terminated the Plaintiff Organizations' $8 million initial grants, the Agency also suspended the organizations' access to the $52 million in additional Thriving Communities grant funds from which the organizations are to make subgrant awards to community organizations.

9.    The frozen funds are intended to support hundreds of environmental projects in rural, suburban, and urban communities across the Mid-Atlantic, Great Lakes, and Northwest regions. Already, as of the filing of this Complaint, GHHI, the Minneapolis Foundation, and Philanthropy Northwest have collectively awarded more than 100 subgrants in their respective regions to support, among other things, the remediation of lead and toxic chemical contamination in parks and other community venues, the modernization of wastewater treatment processes in rural communities, and reductions in severe wildfire risk in fire-prone areas, among other critical work.

10.    Immense and irreparable harm will flow to the Plaintiff Organizations from EPA's actions, and that harm has already begun to accrue as of the filing of this Complaint. If Plaintiffs' grants are not reinstated and their access to funding not immediately restored, among other things, they will have to lay off dozens of staff members. The relationships Plaintiffs have built with partner organizations and community leaders will be severely damaged as a result of Plaintiffs' inability to administer the Thriving Communities program as promised. Meanwhile, the programs themselves would be largely or entirely shuttered, and environmental protection work and investments undertaken in anticipation of Thriving Communities grants by Plaintiffs and by hundreds of non-profit organizations and local and tribal government agencies would be wasted and come to an end.

11.     In defiance of congressional direction, and for reasons that are unconstitutional, EPA has placed under threat hundreds of vital programs; has upended months of programmatic and fiscal planning and financial investment by the three Plaintiff Organizations and their non-profit and governmental subgrantees undertaken in reliance on the Agency's grant award; has interfered with the organizations' ongoing operations; and has disrupted the lives of dedicated environmental scientists and engineers, health professionals, educators, and other workers whose plans for the next one to two years focused on projects funded by the Thriving Communities program. Mass cancellation of programs and termination of employment is imminent, and Plaintiffs' organizational missions will be threatened.

12.     As discussed below, the Court should exercise its authority under the Administrative Procedure Act ("APA") to set aside EPA's arbitrary, illegal, and unconstitutional actions. To remedy the EPA's unlawful actions and infringement of the Plaintiff Organizations' constitutional rights, the Court should further grant preliminary and permanent injunctive relief directing EPA to immediately reinstate the terminated initial grants and prohibiting the Agency from terminating or suspending any of the Plaintiff Organizations' Thriving Communities grants or freezing any grant funding.

## JURISDICTION AND VENUE

13.     Plaintiffs bring this action under the United States Constitution, the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.*, and the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.*

14.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. § 1346 (action asserted against United States).

15.    Venue is proper in this judicial district under 28 U.S.C. § 1391(e)(1), because a substantial part of the events or omissions giving rise to the claims asserted in this action occurred in the district, and because Plaintiff GHHI resides in the district.

**PARTIES**

16.    Plaintiff Green & Healthy Homes Initiative, Inc., formerly the Coalition to End Childhood Lead Poisoning, is a 501(c)(3) non-profit organization based in Baltimore, Maryland. GHHI seeks to protect public health and advance housing stability in economically challenged communities.  GHHI is one of the largest healthy housing organizations in the United States. Our work has long focused on addressing the housing-based causes of lead poisoning, asthma, household injury, and energy inefficiency by creating affordable homes that are healthy, safe, and resilient. We provide services directly to families and communities.  We also provide advisory services to other organizations focused on the creation of effective and efficient systems to improve public health and economic outcomes.

17.    Plaintiff Minneapolis Foundation is a Minnesota nonprofit corporation that is tax-exempt as a public charity described in Section 501(c)(3) of the Internal Revenue Code. It is organized and operated exclusively for charitable and other tax-exempt purposes. The Minneapolis Foundation was established in 1915 and has over a century of experience responding to community needs and administering charitable grantmaking programs. In furtherance of its charitable purposes, the Minneapolis Foundation partners with and provides technical assistance to small nonprofit organizations. The Minneapolis Foundation also facilitates grantmaking by soliciting and accepting funding from private donors and government entities, and administers grant funding to address emerging and ongoing community needs.

18.    Plaintiff Philanthropy Northwest is a regional philanthropic network comprising 150 funders across Alaska, Idaho, Montana, Oregon, Washington, and Wyoming with a mission

5

to "grow philanthropy's capacity to do transformative work toward redistributing resources and power to underinvested communities in the Northwest and beyond." Philanthropy Northwest is a non-partisan organization, and its network includes private, public, and community foundations; corporate philanthropy; and nonprofit and public sector funders supporting urban, rural, and tribal communities. Founded in 1976, Philanthropy Northwest seeks to facilitate philanthropic and cross-sector collaboration to serve and strengthen the region's communities. To effectuate its mission, Philanthropy Northwest manages and distributes pooled philanthropic and/or public resources to organizations serving underinvested communities.

19.    Defendant U.S. Environmental Protection Agency is a federal Executive Branch Agency headquartered in Washington D.C.

20.    Defendant Lee Zeldin is sued in his official capacity as the Administrator of the U.S. Environmental Protection Agency.

## FACTUAL BACKGROUND

**A. Pursuant to Congressional Direction in the Clean Air Act, EPA Establishes the Thriving Communities Grantmaking Program and Designates the Plaintiff Organizations as Regional Grantmakers.**

21.    In the Inflation Reduction Act of 2022, Congress amended Part A of the Clean Air Act and appropriated $3 billion to EPA for "climate and environmental justice block grants." 42 U.S.C. § 7438. Congress further mandated that the Administrator of the EPA "shall use" the appropriated amounts "to award grants for periods of up to 3 years" to carry out certain environmental protection activities "that benefit disadvantaged communities." *Id*. § 7438(a)&(b)(1). The activities eligible for support include "community-led air and other pollution monitoring, prevention, and remediation," "investments in low- and zero-emission and resilient technologies and related infrastructure," and "mitigating climate and health risks from urban heat islands, extreme heat, wood heater emissions, and wildfire events." *Id*. § 7438(b)(2).

22.     In 2023, EPA established the Thriving Communities Grantmaking Program, which seeks to facilitate the flow of the climate and environmental justice funds appropriated in the Inflation Reduction Act to small non-profit organizations and local and tribal governments, in part by designating a Regional Grantmaker in each of EPA's ten regions. Regional Grantmakers are responsible for awarding grants to subgrantees to support community-based environmental protection projects to be undertaken over periods of one to two years. As EPA explained when it launched the Thriving Communities Program, projects eligible for support include community cleanup projects and environmental job training, as well as projects that monitor or address, for example, linkages between air quality and asthma, effluent discharges from industrial facilities, community food access, stormwater issues and green infrastructure, lead and asbestos contamination, pesticides and other toxic substances, illegal dumping activities, or emergency preparedness and disaster resiliency.

23.     In response to a request for applications, GHHI, the Minneapolis Foundation, and Philanthropy Northwest applied to serve as Regional Grantmakers in their respective regions. In December 2023, EPA designated the three organizations as Regional Grantmakers—GHHI for EPA Region 3, which encompasses Delaware, Maryland, Pennsylvania, Virginia, West Virginia, and Washington, D.C., as well as seven federally recognized tribes; Minneapolis Foundation for EPA Region 5, which encompasses Illinois, Indiana, Michigan, Minnesota, Ohio, and Wisconsin, as well as 37 federally recognized tribes; and Philanthropy Northwest for EPA Region 10, which encompasses Alaska, Idaho, Oregon, and Washington, along with 271 federally recognized tribes and tribal villages.

24.     In May and June of 2024, EPA awarded each organization an $8 million Thriving Communities "initial grant." EPA designated these initial funds to support the hiring of Thriving

Communities staff, outreach to community-based organizations concerning the Thriving Communities program, the development and administration of a subgrant application process in each region, as well as to provide technical assistance and initial oversight to subgrantees. These grants were to cover work performed by the Plaintiff Organizations for a three-year period.

25.    Later, EPA awarded each Plaintiff Organization a Thriving Communities "subsequent grant" in the amount of $52 million. In their role as Regional Grantmakers, the organizations, after administering regional subgrantee application processes, are to use the bulk of the $52 million subsequent grant to award subgrants to support projects undertaken by non-profit organizations and local and tribal governments selected through those application processes.

26.    Each of the Thriving Communities grants awarded to the three Plaintiff Organizations is governed by a Cooperative Agreement, and each Cooperative Agreement references General Terms and Conditions and specific regulatory requirements that govern the grants. With respect to the Plaintiff Organizations' $8 million initial grant awards, the applicable General Terms and Conditions allow for unilateral termination of the grants by EPA, but only under two sets of circumstances: first, "[i]f a recipient fails to comply with the terms and conditions of the award including statutory or regulatory requirements"; and second—the provision that EPA has invoked here—"[i]f the award no longer effectuates the program goals or Agency priorities."

27.    Importantly, EPA's General Terms and Conditions identify three circumstances when the Agency may terminate an award because it "no longer effectuates the program goals or Agency priorities." These are circumstances when:

      i.     EPA *obtains evidence* that was not considered in making the award that reveals that specific award objective(s) are *ineffective at achieving program*

*goals* and EPA *determines* that it is in the government's interest to terminate the award;

ii.   EPA *obtains evidence* that was not considered in making the award that causes EPA to significantly question the *feasibility of the intended objective(s) of the award* and EPA *determines* that it is in the government's interest to terminate the award;

iii.  EPA *determines* that the objectives of the award are no longer consistent with *funding priorities for achieving program goals*.

(Emphasis added.)

28.    Thus, under the General Terms and Conditions applicable to the Plaintiff Organizations' initial grant awards, in each circumstance when EPA invokes "program goals or Agency priorities" as the basis for unilateral termination of a grant award, it must "obtain evidence that was not considered in making the award" and/or make a "determin[ation]" supporting its action. Moreover, the General Terms and Conditions nowhere permit EPA simply to declare its adoption of *new* "program goals" or "Agency priorities," least of all goals and priorities that are both unconstitutionally vague and in violation of law, and then unilaterally terminate a grant on that basis. Any discretion reserved by EPA, in its Cooperative Agreements with the Plaintiff Organizations, was limited only to determining that an award no longer effectuates the "program goals" or "Agency priorities" under which EPA awarded the grant in the first place.

29.    As further discussed below, the U.S. Office of Management and Budget ("OMB") has promulgated regulations governing federal grant awards, including grant termination by Executive Branch agencies, and EPA acknowledges that it is bound by these regulations. Under the OMB federal award regulations, a federal agency terminating a grant "must provide written notice of termination to the recipient," and this notice must include "the reasons for termination." 2 C.F.R. § 200.341(a). Like EPA's General Terms and Conditions, OMB's regulations anticipate that an Agency may terminate a grant, "to the extent authorized by law, if the award no longer

effectuates the program goals or Agency priorities." *Id*. § 200.340(a)(4). However, the

regulations further provide that all grounds for termination must be "*clearly and unambiguously*

*specif[ied]* . . . in the terms and conditions of the Federal award." *Id*. § 200.340(b)(1) (emphasis

added).

**B.  The Plaintiff Organizations, in Their Roles as Thriving Communities Regional Grantmakers, Begin to Identify and Support Community-Based Environmental Protection Programs in Their Respective Regions.**

30.     In reliance on their status as Regional Grantmakers and the terms of the initial

grants, GHHI, the Minneapolis Foundation, and Philanthropy Northwest undertook substantial

work to develop, and had planned additional work to implement, the Thriving Communities

program in their respective regions. Plaintiffs hired new staff, built capacity, developed

partnerships, and, in recent months, have reached out to hundreds of groups across their

respective regions to offer support for community-based environmental protection work.

31.     Because the Thriving Communities program is new (as a result of the 2022

amendments to the Clean Air Act contained in the Inflation Reduction Act), each Plaintiff

recruited, hired, and trained multiple new employees to develop and administer the program.

32.     GHHI hired nine employees to work full-time under the Thriving Communities

program for the three-year period, and it has eight additional staff members who spend at least a

portion of their time supporting the program.

33.     The Minneapolis Foundation has employed 26 full-or-part-time employee

positions allocated to its work under the Thriving Communities program.

34.     Philanthropy Northwest has seven staff fully funded by the initial $8 million grant

as well as eight staff members who partially contribute their time to the administration of the

Thriving Communities program.

35.    Plaintiffs have spent considerable time developing infrastructure for the Thriving

Communities program in their regions. They conducted outreach, designed the application

process, and began reviewing submissions from subgrantees.

36.    For instance, Philanthropy Northwest invested a cumulative total of over 8,800

staff hours working on the program in calendar year 2024.

37.    Throughout the development phase of the program, Plaintiffs had regular and

extensive communications with EPA officials in their respective regions regarding their work

under the Thriving Communities program. Plaintiffs worked directly and iteratively with the EPA

and received its approval on various components of their grantmaking programs, including

public communications, emergency information collection review forms, contracts with partner

organizations, conflict-of-interest checks with regional advisory committee members, and quality

assurance reviews.

38.    Plaintiffs also had substantial work planned over the remainder of their three-year

project periods. This planned work includes evaluating applications and awarding subgrants,

providing ongoing support to subgrantees as they implement their projects, and ensuring their

subgrantees' compliance with reporting and subgrant requirements.

39.    In developing their programs, Plaintiffs invested significant time building

relationships with community leaders, partner organizations, and prospective subgrantees.

40.    Each Plaintiff recruited individuals to join advisory boards to support the Thriving

Communities program. For example, The Minneapolis Foundation recruited local community

leaders to join its Regional Advisory Committee to conduct outreach to prospective applicants

and provide effective technical assistance support to applicants and subgrantees, as well as to

assist with finalizing the grant application process, decision-making criteria, and reporting

requirements for grantees. Likewise, Philanthropy Northwest enlisted the support of philanthropic leaders throughout Region 10 to advise on the overall design of the grant making process.

41.     As part of the Thriving Communities program, Plaintiffs also built relationships with technical assistance partners in their regions to lend their expertise to subgrantees.

42.     GHHI, for example, developed a partnership with Children's National Hospital, which had agreed to serve as technical assistance advisor to subgrantees addressing asthma-related health hazards for children.

43.     The Minneapolis Foundation developed a Collaborative for the Great Lakes Thriving Communities Grantmaking Program to streamline application and reporting procedures to more efficiently manage the grantmaking process. Similarly, Philanthropy Northwest formed a Taskforce of community leaders to provide counsel on the grant application to minimize applicant burden.

44.     Plaintiffs also spent substantial time educating local communities and organizations in their regions about the Thriving Communities program. To do so, staff members from the Plaintiff Organizations traveled throughout their respective regions, including to meet with local community leaders and conduct outreach sessions detailing the Thriving Communities program.

45.     For instance, Philanthropy Northwest conducted 15 presentations at conferences or meetings to general audiences across its region; nine presentations to tribal audiences; nearly 250 one-on-one meetings with prospective or current applicants; and sent 700 postcards across Alaska and Idaho for increased visibility in those states.

46.     Each Plaintiff has spent significant time soliciting and reviewing applications by prospective subgrantees. Plaintiffs received hundreds of applications from non-profit organizations and local and tribal governments seeking to monitor or address environmental hazards in their local communities. Plaintiffs have continued to receive applications following EPA's termination of their initial grants, though their capacity to review and evaluate those applications has been impaired by Defendants' actions.

47.     Prior to the termination of the initial grant and suspension of subsequent grant funding, GHHI had started awarding subgrants under the Thriving Communities program.

48.     As of February 20, 2025, GHHI had awarded subgrants to 63 organizations, consisting of 12 subgrantees in Maryland, 17 in Pennsylvania, 6 in the District of Columbia, 13 in Virginia, 13 in West Virginia, and 2 in Delaware. On or about February 21, 2025, GHHI sent award letters to the 63 subgrantees. These letters notified the subgrantees that they had been selected to receive a grant, the amount of the grant, and the next steps in the process.

49.     As of April 1, 2025, the Minneapolis Foundation had received more than 515 applications from prospective subgrantees and had identified over 40 subgrantees ready to receive federal funding as soon as access is made available to the subsequent grant.

50.     Similarly, Philanthropy Northwest has reviewed applications and identified 42 subgrantees whose subawards are pending.

**C.  Based on Vague and Unsubstantiated of Reasons, EPA Terminates the Plaintiff Organizations' Thriving Communities Initial Grants and Suspends Access to Subsequent Grant Funding, While Declaring it an "Agency Priority" Not to Fund "Organizations that Promote 'DEI' Initiatives or 'Environmental Justice' Initiatives."**

51.     On February 21 and 22, 2025, EPA terminated the $8 million Thriving Communities initial grants that it had previously awarded to each of the Plaintiff Organizations. EPA effectuated these actions by issuing a termination memorandum to each organization.

Although the memoranda sent to GHHI, the Minneapolis Foundation, and Philanthropy Northwest were purportedly authored by different "EPA Award Officials" assigned to different EPA regional offices, the text of each memorandum is identical or nearly identical to the others. Each memorandum was accompanied by an Assistance Amendment to the prior Cooperative Agreement governing the organization's Thriving Communities initial grant award.

52.     The termination memorandum sent to each organization cites the grant regulations at 2 C.F.R. § 200.340 and states that the organization's Thriving Communities initial grant "is terminated in its entirety effective immediately on the grounds that the award no longer effectuates the program goals or Agency priorities." Each memorandum then explains as follows:

> It is a priority of the EPA to eliminate discrimination in all programs . . . . The EPA Administrator has determined that, per the Agency's obligations to the constitutional and statutory law of the United States, this priority includes ensuring that the Agency's grants do not support programs or organizations that promote or take part in diversity, equity, and inclusion ("DEI") initiatives, "environmental justice" initiatives, and conflict with the Agency's policy of prioritizing merit, fairness, and excellence in performing our statutory functions. . . .
>
> The grant specified above provides funding for programs that promote or take part in DEI initiatives or environmental justice initiatives or other initiatives that conflict with the Agency's policy of prioritizing merit, fairness, and excellence in performing our statutory functions; that are not free from fraud, abuse, waste, or duplication; or that otherwise fail to serve the best interests of the United States. The grant is therefore inconsistent with, and no longer effectuates, Agency priorities.

53.     The termination memorandum provides no further explanation for the Agency's action. EPA does not give, and has not subsequently given, any content whatsoever to its newly declared "Agency priority" not to fund "environmental justice" and to withhold financial support from "organizations that promote or take part in . . . 'DEI' or 'environmental justice' initiatives." EPA has not explained how it reconciles its "Agency priority" to defund "environmental justice" with the congressional directive in the Clean Air Act that it "shall use" the appropriated funds at issue to award "environmental and climate justice block grants." 42 U.S.C. § 7438. EPA has not

identified any offending "DEI" or "environmental justice" "initiatives" that it believes the Plaintiff Organizations have "promote[d]," or in which it believes the organizations have "take[n] part." EPA has not pointed to any evidence on which a finding of "promoting or taking part in" disfavored "initiatives" could be based. Moreover, EPA has not identified the "constitutional and statutory law of the United States" that it claims forms the basis for its newly declared "Agency priority." The Agency has not even defined the terms "DEI" or "environmental justice."

54.    Meanwhile, EPA's references in its termination memoranda to "fraud, waste, abuse or duplication" and "the best interests of the United States" are wholly conclusory and without basis. The Agency says nothing at all to substantiate or explain either of these grounds for terminating the Plaintiff Organizations' initial grant awards.

55.    Around the same time that EPA terminated the Plaintiff Organizations' Thriving Communities $8 million initial grants, the Agency also suspended the organizations' access to the $52 million in subsequent grant funds, from which the organizations are to award subgrants to local and tribal government agencies and non-profit organizations to support environmental protection projects in communities throughout their respective regions.

**D. EPA's actions will cause irreparable harm to the Plaintiff Organizations and will jeopardize environmental programs in disadvantaged communities across the country.**

56.    GHHI, the Minneapolis Foundation, and Philanthropy Northwest have been, and will continue to be, irreparably harmed by the termination of their grant awards and suspension of access to grant funding.

57.    Most imminently, the Plaintiff Organizations will be forced to lay off staff they can no longer pay due to the termination of their initial grants. Plaintiffs have already curtailed their work under the Thriving Communities program and likely will be forced to abandon the

program altogether. Given their inability to fulfill their obligations to partner organizations and subgrantees, Plaintiffs will also suffer serious and irreversible reputational harm.

58.     For GHHI, the terminated $8 million grant covered the salaries for staff members working on the Thriving Communities program. If funding is not restored, GHHI will be forced to lay off between 8 and 10 staff members.

59.     For the Minneapolis Foundation, the termination of the initial $8 million grant combined with the lack of access to the subsequent grant will result in the loss of 26 full- or part-time positions allocated to the Thriving Communities program across the Minneapolis Foundation and its Collaborative implementing partners. These staff and independent contractors are located across EPA Region 5 and perform a variety of roles supporting the grant program, including on its advisory and review committees, communications teams, compliance functions, evaluations, finance and grants administration, information technology, outreach services, program management and oversight, and technical assistance for subrecipients.

60.     For Philanthropy Northwest, the termination of the initial grant and lack of access to the subsequent grant funds will result in the loss of jobs for the seven staff fully funded by the initial grant and likely for additional staff members in the organization.

61.     Losing so many staff members will also adversely impact Plaintiffs' ability to carry out their organizational missions and will cause irreparable reputational damage, making it more difficult for them to hire staff in the future. These employees work in essential positions fully funded by the initial grant and have spent months gaining familiarity with the program and EPA requirements, while also building trust with subrecipient applicants and program partners. Losing numerous staff members at once due to the grant termination and suspension of funding

would make it more difficult for the Plaintiff Organizations to recruit and retain employees in the future.

62.    In reliance on the promised funding, the Plaintiff Organizations had already engaged in and planned significant work for the remainder of their grant terms. Plaintiffs lack alternate sources of funding to replace the terminated and suspended grant funding. The $8 million initial grants comprise a significant portion of the Plaintiff Organizations' annual budgets, and Plaintiffs are unable to fundraise the same amounts to pay staff and continue their critical work. Plaintiffs do not have alternative grant sources that can be quickly reallocated or deployed to cover the gap, making it impossible to fully absorb the financial impact within the current fiscal period.

63.    Plaintiffs have already limited their work under the Thriving Communities program and will have to cease all operations under the program, including their issuance and administration of subgrants, as a result of EPA's termination and suspension of grant funding. The Thriving Communities program is a key initiative for all three Plaintiff Organizations. The sudden and arbitrary nature in which grant funding has been withheld—in the middle of the grant cycles—has upended more than a year of work and disrupted future work.

64.    For instance, the termination of essential positions fully funded by the initial grant at the Minneapolis Foundation would make it impossible for the Program to continue as originally designed. As a result of the termination, the Minneapolis Foundation has been forced to halt any new contracts and travel associated with the technical assistance support it provides to applicants, impeding many eligible grant subrecipients in their efforts to successfully apply for or manage any federal funding received under the Thriving Communities program. The loss of this

support would significantly hamper the Minneapolis Foundation's ability to review and process applications from prospective subrecipients.

65.    GHHI also directed its technical assistance partners to stop all work in connection with the Thriving Communities program. The loss of this work will have far-reaching consequences. For example, one of GHHI's technical assistance partners, the Children's National Hospital, will be unable to assist subgrantees that are seeking to reduce asthma-related health hazards for children.

66.    Likewise, without access to the terminated funding, Philanthropy Northwest will be unable to complete the rigorous award preparation phase. This phase includes kickoff meetings to establish the subgrantee and grantmaker relationship, subgrantee capacity assessment and review of grant and compliance guidelines, financial management and subaward orientation trainings, review and refinement of project workplans and budgets, and establishment of payment and reporting schedules. This process requires hours of work from both the subgrantees and Philanthropy Northwest, all before the subgrant agreements are signed.

67.    In addition to the work they have already stopped, the Plaintiff Organizations will be unable to complete the work they had planned for the remainder of the three-year grant period. Because of EPA's termination and suspension of Thriving Communities grant funding, Plaintiffs will be unable to properly vet, award, administer, and monitor the additional $144 million in grantmaking ($48 million from each of the three $52 million grants) to their subgrantees. In short, Plaintiffs will be unable to effectively implement the Thriving Communities program.

68.    For example, although the subsequent $52 million grant includes resources available for unhired positions, the termination of the initial grant and continued suspension of

access to the subsequent grant has restricted the Minneapolis Foundation from recruiting and hiring new staff members. Without the ability to hire additional staff members, the Minneapolis Foundation will not have the capacity to review, process, and manage the large number of subgrants that the Thriving Communities Program is intended to support. Taken together, the termination of the initial grant and the lack of access to the subsequent grant account will make it impossible for the Minneapolis Foundation to expend all of the subsequent grant dollars within the allotted grant period over the next two years.

69.     Without adequate staffing or funding, the Plaintiff Organizations will not be able to meet their commitments to partner organizations and subgrantees, eroding trust in Plaintiffs and damaging their reputations. Not only will these organizations and subgrantees lose confidence in Plaintiffs' ability to administer the program, but performance by the partner organizations and subgrantees will suffer as a result of the grant terminations and suspension of funding.

70.     The reputations that the Plaintiff Organizations have painstakingly built have been and will continue to be damaged by Defendants' actions. If Plaintiffs are wrongly perceived to have engaged in any of the conduct described in the termination memorandum, federal, state, local, philanthropic and private organizations will be hesitant to associate with or support Plaintiffs.

71.     For example, the Minneapolis Foundation's fundholder assets account for approximately 75% of its current assets. Any grant termination would make it more difficult to secure future contributions from donors, given the specter of uncertainty raised by such a substantial loss in funding and questions that may arise from the perception that the Minneapolis Foundation could not successfully perform against its grants.

72.     The harms caused by Defendants' actions will reverberate throughout the regions the Plaintiff Organizations serve. Due to EPA's termination of the grants and suspension of access to grant funding, Plaintiffs' subgrantees will lose critical funding and support for their planned projects, which will create budget and staffing chaos in those organizations. Many subgrantees have paused hiring program staff or implementation of their planned projects because they lack confidence in Plaintiffs' ability to deliver promised funding.

73.     Dozens of subgrantees, who have planned projects including the remediation of lead and asbestos poisoning and the reduction of childhood asthma, will be compromised in their efforts to remedy hazards that negatively impact the health and safety of their communities. Examples from each of Plaintiffs' subgrantees underscore the immediate and irreparable harm caused by the grant terminations.

74.     GHHI awarded $280,000 to a nonprofit community development organization in West Virginia. In recent years, storm events in Fort Gay, West Virginia, have caused sewage to overflow into the public drinking water system and local bodies of water. The non-profit had planned to use the subgrant awarded by GHHI to prevent future overflows and contamination of local water sources.

75.     GHHI had planned to award approximately $350,000 to a city development authority for a project to remediate lead contamination in a local park on the bank of the Ohio river. Recent testing has confirmed dangerously high levels of lead contamination in the soil of the park campgrounds.  Such contamination has been documented to harm the brain and cognitive ability, damage bones and kidneys, and increase cancer risk.

76.     The Minneapolis Foundation had planned to award approximately $350,000 to support wastewater treatment processes in two small rural Appalachian communities in Ohio,

each with populations of less than 500. Specifically, the grants are designed to support the use of fixed-film wastewater treatment processes that eliminate the use of blowers common in many treatment processes, aiding the communities in leveraging the same land footprint for wastewater treatment as will be used for energy production itself. The modest energy demand for the pumps can be efficiently served by grid-tied solar panels, meaning the project also involves an environmental job training component by way of a solar installer course.

77.     The Minneapolis Foundation had also planned to award approximately $350,000 to a rural, federally recognized tribe to clean up an unregulated dump site in Michigan posing public health concerns due to downgradient drinking-water wells and exposure to contaminated materials. Site assessments show a perched, contaminated aquifer within the dump that could be breached as the dump site erodes further. The subgrant funding is intended to provide access to heavy equipment to begin the removal of exposed hazardous materials constituting an immediate public health threat, allowing the tribe to clean up the dump site and ultimately gain approval for future housing developments in the area.

78.     Philanthropy Northwest already selected 42 applications for funding at a cumulative $14.5 million. These selectees include 12 from Alaska, two from Idaho, 12 from Oregon, and 16 from Washington, including eight federally recognized tribes or Alaska Native villages. These entities are spread across remote, rural, and urban areas of each state—from the Seward Peninsula in Alaska to Southwest Idaho to the Oregon Coast to Eastern Washington, and major cities in between. Forty percent of the projects serve rural or remote areas, and projects are well distributed within the four states. These projects were designed to support efforts such as: addressing food security challenges in a remote community by promoting revitalization of Indigenous food systems of harvesting and preservation (Alaska); reducing the risk of severe

wildfires through programs that promote community involvement and preparedness (Idaho); implementing clean energy retrofits to lower household energy costs and protect indoor air quality for low-income households (Oregon); and supporting a tribe's regional emergency management in a remote, highly visited area vulnerable to flooding, severe weather, and earthquakes (Washington).

## CLAIMS FOR RELIEF

### Count I – Administrative Procedure Act
### Arbitrary and Capricious Agency Action –
### Failure to Supply Reasons and Engage in Reasoned Decisionmaking

79.    Each foregoing paragraph is incorporated as if restated fully herein.

80.    Under the APA, any person adversely affected or aggrieved by final agency action is entitled to judicial review of that action. 5 U.S.C. §§ 702, 704. The APA provides that a reviewing court shall "hold unlawful and set aside Agency action . . . found to be . . . arbitrary and capricious." *Id*. § 706(2)(A).

81.    EPA's termination of its Thriving Communities initial grant awards to the Plaintiff Organizations is final "Agency action" for purposes of the APA. *See id*. § 551(6), (13). EPA's suspension of the organizations' access to Thriving Communities grant funds is also final agency action. *See, e.g.*, *Chamblee v. Espy*, 100 F. 3d 15 (4th Cir. 1996).

82.    Through its requirement that "arbitrary and capricious" agency action be set aside on judicial review, the APA establishes a fundamental requirement that agencies engage in "reasoned decisionmaking." *See, e.g.*, *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 16 (2020); *see also* 5 U.S.C. § 555(e) (requiring that agencies provide "statement of the grounds" even for informal agency action).

83.    In terminating the Plaintiff Organizations' Thriving Communities initial grants and suspending the organizations' access to all Thriving Communities' grant funds, EPA did not

supply a valid statement of reasons for taking these actions. Nor did it engage in reasoned decisionmaking.

84.    EPA identified three vague and baseless grounds for its actions: (1) because the grant awards are purportedly inconsistent with EPA's newly-adopted "Agency priority" to withdraw financial support from "organizations that promote or take part in … 'DEI' [or] 'environmental justice' initiatives"; (2) because the organizations' grant-funded programs are purportedly not be "free from fraud, abuse, waste, or duplication"; or (3) because the organizations' programs allegedly "otherwise fail to serve the best interests of the United States." EPA's stated reasons for termination of the grants are so varied and ambiguous that the statement is meaningless. The Agency gave no legitimate reason for its actions.

85.    EPA provided no rationale for its actions beyond this vague and unsubstantiated statement. The Agency did not identify any evidence, find any facts, or supply any reasoning that would support any of its three stated reasons for terminating the grants. With respect to EPA's newly adopted "Agency priority" to withhold financial support from "organizations that promote or take part in … 'DEI' [or] 'environmental justice' initiatives," EPA has not identified any offending "initiatives" that it believes the Plaintiff Organizations have "promote[d]," or in which it believes the organizations have "take[n] part." EPA has not pointed to any evidence on which a finding of "promoting or taking part in" disfavored "initiatives" could be based. EPA has not identified the "constitutional and statutory law of the United States" that it claims forms the basis for its newly declared "Agency priority." The Agency has not even defined the terms "DEI" or "environmental justice."

86.     Meanwhile, EPA's invocations of "fraud, waste, abuse or duplication" and "the best interests of the United States" are pure boilerplate. The Agency does not supply even a hint of anything that it might be referencing.

87.     Simply put, EPA's actions here, in addition to being unlawful and unconstitutional, are a paradigm of arbitrary and capricious Agency action constituting an improper abuse of discretion as those terms are used in the APA.

88.     As a result of EPA's arbitrary and capricious actions and the abuse of its discretion, Plaintiff Organizations have suffered and will continue to suffer irreparable injury.

89.     The Plaintiff Organizations are entitled to preliminary and permanent relief under the APA, *see* 5 U.S.C. §§ 705, 706, including an order holding unlawful and setting aside EPA's termination of the organizations' Thriving Communities initial grant awards and suspension of the organizations' access to Thriving Communities grant funds.

### Count II – Administrative Procedure Act
### Agency Action in Excess of Statutory Authority – Clean Air Act

90.     Each foregoing paragraph is incorporated as if restated fully herein.

91.     Under the APA, any person adversely affected or aggrieved by final agency action is entitled to judicial review of that action. 5 U.S.C. §§ 702, 704. The APA provides that a reviewing court shall "hold unlawful and set aside agency action . . . found to be . . . in excess of statutory . . . authority." *Id*. § 706(2)(C).

92.     EPA's termination of the Thriving Communities initial grants awarded to the Plaintiff Organizations is final "agency action" for purposes of the APA. *See id*. § 551(6), (13). EPA's suspension of the organizations' access to Thriving Communities grant funds is also final agency action. *See, e.g.*, *Chamblee v. Espy*, 100 F. 3d 15 (4th Cir. 1996).

93.     In the Inflation Reduction Act amendments to the Clean Air Act, Congress appropriated $3 billion to EPA for "climate and environmental justice block grants." 42 U.S.C. § 7438. The Clean Air Act further directs that the Agency's Administrator "shall use" those amounts "to award grants . . . to carry out activities . . . that benefit disadvantaged communities" by, among other things, monitoring, preventing and remediating pollution and mitigating climate risk. *Id.* § 7438(a) & (b)(1).

94.     In terminating the Thriving Communities initial grants that it had previously awarded to the Plaintiff Organizations, EPA stated in each case that its "Agency priorities" no longer include "funding . . . 'environmental justice' initiatives."

95.     EPA and Administrator Zeldin had no statutory authority to terminate the grants or suspend access to grant funding on this basis. In the Clean Air Act, Congress did not confer any discretion on the Agency to determine that its own "priorities" no longer match those of Congress and on that basis to decline to fund environmental protection activities that benefit disadvantaged communities. To the contrary, the Clean Air Act unambiguously provides that the EPA and Administrator Zeldin "shall use" appropriated amounts to fund "environmental justice" initiatives. The Agency and its Administrator, in declaring it an "Agency priority" not to fund such initiatives, have acted in defiance of that congressional direction.

96.     As a result of the unlawful actions of the EPA and Administrator Zeldin, the Plaintiff Organizations have suffered and will continue to suffer irreparable injury.

97.     The Plaintiff Organizations are entitled to preliminary and permanent relief under the APA, *see* 5 U.S.C. §§ 705, 706, including an order holding unlawful and setting aside EPA's termination of the organizations' Thriving Communities initial grant awards and suspension of the organizations' access to grant funds. Under the Declaratory Judgment Act, the organizations

are entitled to a declaration that the Clean Air Act's direction to the EPA to fund "environmental justice" grants precludes the EPA from terminating grants or suspending grant funding because the Agency has adopted a "priority" not to fund such grants. The Plaintiff Organizations are further entitled to an injunction directing EPA and Administrator Zeldin to reinstate the grant awards and prohibiting Defendants from terminating or suspending any of the Plaintiffs' Thriving Communities grants or freezing funding under any of the grants. 28 U.S.C. §§ 2201, 2202.

### Count III – United States Constitution
### Violation of First and Fifth Amendments

98.    Each foregoing paragraph is incorporated as if restated fully herein.

99.    The First Amendment to the United States Constitution prohibits the government from "abridging the freedom of speech . . . or the right of the people . . . to petition the Government for a redress of grievance." It is a "core postulate" of the First Amendment that "[t]he government may not discriminate against speech based on the ideas or opinions it conveys." *Iancu v. Brunetti*, 588 U.S. 388, 393 (2019). Indeed, "[v]iewpoint discrimination is poison to a free society." *Id*. at 399 (Alito, J., concurring).

100.    In terminating the Thriving Communities initial grants that it had previously awarded to the Plaintiff Organizations, EPA declared it an "Agency priority" to ensure "that the Agency's grants do not support . . . organizations that promote or take part in diversity, equity, and inclusion ('DEI') initiatives [or] 'environmental justice' initiatives." In so stating, EPA has acknowledged engaging in viewpoint discrimination.

101.    The First Amendment prohibits EPA and Administrator Zeldin from terminating grants or suspending grant funding based on their perception that the Plaintiff Organizations "promote" or "take part in" viewpoints with regard to "environmental justice" that the

government now disfavors. Moreover, the First Amendment protects the Plaintiff Organizations' advocacy for and on behalf of disadvantaged communities.

102.    The Fifth Amendment prohibits "depriv[ations] of life, liberty, or property without due process of law."

103.    In terminating the Plaintiff Organizations' initial grant award and suspending their access to subsequent grant funds without any legitimate reason, EPA and Administrator Zeldin have violated Plaintiffs' due process rights.

104.    As a result of the unconstitutional actions of the EPA and Administrator Zeldin, the Plaintiff Organizations have suffered and will continue to suffer irreparable injury.

105.    Under the Declaratory Judgment Act, the Plaintiff Organizations are entitled to a declaration that EPA's actions infringe the organizations' constitutional rights and are therefore unlawful. The Plaintiff Organizations are further entitled to an injunction directing EPA and Administrator Zeldin to reinstate the grant awards and prohibiting Defendants from terminating or suspending any of the organizations' Thriving Communities grants or freezing funding under any of the grants. 28 U.S.C. §§ 2201, 2202.

**Count IV – Administrative Procedure Act**
**Agency Action Contrary to Constitutional Right**

106.    Each foregoing paragraph is incorporated as if restated fully herein.

107.    Under the APA, any person adversely affected or aggrieved by final agency action is entitled to judicial review of that action. 5 U.S.C. §§ 702, 704. The APA provides that a reviewing court shall "hold unlawful and set aside agency action . . . found to be . . . contrary to constitutional right." *Id*. § 706(2)(B).

108.    EPA's termination of the Thriving Communities initial grants awarded to the Plaintiff Organizations is final "agency action" for purposes of the APA. *See id*. § 551(6), (13).

EPA's suspension of the organizations' access to Thriving Communities grant funds is also final agency action. *See, e.g.*, *Chamblee v. Espy*, 100 F. 3d 15 (4th Cir. 1996).

109.    In terminating the Plaintiffs' Thriving Communities initial grants, EPA stated that it was doing so to ensure "that the Agency's grants do not support . . . organizations that promote or take part in diversity, equity, and inclusion ('DEI') initiatives [or] 'environmental justice' initiatives." In so stating, EPA has acknowledged engaging in viewpoint discrimination.

110.    The agencies' actions are unconstitutional. The First Amendment prohibits EPA and Administrator Zeldin from terminating grants or suspending access to grant funds based on their perception that the Plaintiff Organizations "promote" or "take part in" viewpoints with regard to "environmental justice" that the government disfavors. Moreover, the First Amendment protects the Plaintiff Organizations' advocacy for and on behalf of disadvantaged communities.

111.    As a result of the unconstitutional actions of the EPA and Administrator Zeldin, the Plaintiff Organizations have suffered and will continue to suffer irreparable injury.

112.    The Plaintiff Organizations are entitled to preliminary and permanent relief under the APA, *see* 5 U.S.C. §§ 705, 706, including an order holding unlawful and setting aside EPA's termination of the organizations' Thriving Communities initial grants and suspension of their access to Thriving Communities grant funds.

### Count V – Administrative Procedure Act
### Agency Action Not in Accordance with Law or Regulation and Without Observance of Procedure Required by Law — Violations of Federal Award Regulations, *Accardi* Doctrine

113.    Each foregoing paragraph is incorporated as if restated fully herein.

114.    Under the APA, any person adversely affected or aggrieved by final agency action is entitled to judicial review of that action. 5 U.S.C. §§ 702, 704. The APA provides that a reviewing court shall "hold unlawful and set aside agency action . . . found to be . . . not in

accordance with law" or "without observance of procedure required by law." *Id*.

§ 706(2)(A)&(D).

115.    EPA's termination of Plaintiffs' Thriving Communities initial grants is final

"agency action" for purposes of the APA. *See id*. § 551(6), (13).

116.    When the government adopts regulations with the force and effect of law, it must

abide by those regulations. *See United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260

(1954). With respect to federal grants, OMB has adopted regulations limiting the circumstances

under which a federal agency may terminate a grant award. *See* 2 C.F.R. §§ 200.340, .341. EPA

acknowledges that it is bound by these regulations.

117.    The federal award regulations provide that an agency terminating a grant "must

provide written notice of termination to the recipient," and that such notice must "include the

reasons for termination." *Id*. § 200.341(a). In terminating the Plaintiff Organizations' Thriving

Communities initial grants, EPA failed to adhere to this regulatory requirement. The Agency

failed to provide a meaningful statement of its "reasons for termination." EPA's reasons for

terminating the Plaintiffs' initial grants are unconstitutionally vague and unsubstantiated.

118.    The applicable regulations permit an agency to terminate a grant award "*pursuant

to terms and conditions of the Federal award*, including, to the extent authorized by law, if an

award no longer effectuates program goals or Agency priorities." *Id*. § 200.340(a)(4) (emphasis

added). However, the agency must "*clearly and unambiguously specify all termination

provisions* in the terms and conditions of the Federal award." *Id*. § 200.340(b) (emphasis added).

119.    In the case of Plaintiffs' Thriving Communities initial grants, the General Terms

and Conditions, which incorporate 2 C.F.R. Part 200, identify three specific circumstances when

EPA may terminate an award because it "no longer effectuates program goals or Agency

priorities." In each identified circumstance, the Agency must "obtain[] evidence" and/or make a "determin[ation]" supporting a particular conclusion concerning the award's effectuation of "program goals or Agency priorities." Nowhere do the General Terms and Conditions contemplate, let alone "clearly and unambiguously specify," that the EPA may terminate an award based on its identification of new "Agency priorities or program goals."

120.    Here, in terminating the Plaintiffs' Thriving Communities initial grants, EPA in each case purported to invoke its authority under 2 C.F.R. § 200.340(a)(4) to terminate an award that "no longer effectuates . . . Agency priorities." However, EPA did not adhere to that regulation, both because it failed to abide by procedures described in the grant award's "terms and conditions," *id*., and because it relied on grounds for termination that were not "clearly and unambiguously specif[ied] . . . in the terms and conditions," *id*. § 200.340(b).

121.    With regard to procedure, the applicable General Terms and Conditions require EPA to "obtain evidence" or make a "determination" prior to terminating the grants on the basis of "program goals" or "Agency priorities," but here EPA has not identified any evidence or made any determination that supports grant termination. In particular, and even setting aside the unconstitutionality of EPA's adoption of an "Agency priority" to withhold financial support from organizations that "promote or take part in diversity, equity, and inclusion ('DEI') initiatives [or] 'environmental justice' initiatives," EPA has not obtained any evidence, nor has it made any determination, that the Plaintiff Organizations promote or take part in such initiatives. Because EPA failed here to adhere to "the terms and conditions of the federal award," 2 C.F.R. § 200.340(a)(4), its actions were without observance of procedure required by law.

122.    With regard to the specification of grounds for termination, the General Terms and Conditions refer exclusively to EPA's unilateral termination of an award based on evidence or a

determination that the award no longer effectuates the "program goals or Agency priorities" under which the grant was awarded in the first place. No reader of the General Terms and Conditions would understand that these "environmental justice" grant awards could be terminated because of the Agency's adoption of a sweeping new "priority" to deny financial support to organizations that advocate for "environmental justice" or for disadvantaged communities or for other disfavored viewpoints on social issues. Indeed, if EPA were correct that it could unilaterally terminate an "environmental justice" grant award merely by declaring it an "Agency priority" *not* to fund "environmental justice" grant awards, then it would have been meaningless to include termination provisions in the terms and conditions for the grant: there would be no limits on EPA's rights to terminate the award. In any event, the applicable terms and conditions do not "clearly and unambiguously specify" the possibility of such unilateral termination, 2 C.F.R. § 200.340(b), and EPA's actions are therefore contrary to law.

123.    As a result of the failure of the EPA and Administrator Zeldin to follow the executive branch's own regulations governing the termination of grant awards, Plaintiff Organizations have suffered and will continue to suffer irreparable injury.

124.    The Plaintiff Organizations are entitled to preliminary and permanent relief under the APA, *see* 5 U.S.C. §§ 705, 706, including that EPA's termination of the organizations' Thriving Communities initial grant awards be held unlawful and set aside. Under the Declaratory Judgment Act, the organizations are further entitled to a declaration that EPA failed to adhere to federal award regulations in terminating the grants and that its actions are therefore unlawful, as well as an injunction directing EPA and Administrator Zeldin to reinstate the grant awards and prohibiting the Agency from terminating or suspending any of the organizations' Thriving Communities grants or freezing funding under any of the grants. 28 U.S.C. §§ 2201, 2202.

## PRAYER FOR RELIEF

Plaintiffs request that the Court:

A.    Pursuant to the Administrative Procedure Act, 5 U.S.C. § 705, postpone the effective date of the EPA's termination of Plaintiffs' Thriving Communities initial grant awards, pending final judicial review;

B.    Pursuant to the Administrative Procedure Act, 5 U.S.C. § 706, hold unlawful and set aside, after judicial review, the EPA's termination of the Plaintiffs' Thriving Communities grants and suspension of access to grant funding on the grounds that the Agency's action was arbitrary and capricious, in excess of statutory authority, contrary to constitutional right, not in accordance with law, and without observance of procedure required by law;

C.    Pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, declare that the EPA's termination of Plaintiffs' Thriving Communities initial grant awards is unlawful, because the Clean Air Act's direction that the EPA "shall" use appropriated funds for "environmental justice" grants precludes the Agency from declaring it an "Agency priority" not to fund such grants, because the Agency's actions infringe Plaintiffs' rights under the First and Fifth Amendments to the U.S. Constitution, and because the Agency's actions are not in accordance with applicable regulations governing the termination of federal grant awards;

D.    Pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2202, grant preliminary and permanent injunctive relief directing EPA and Administrator Zeldin to reinstate Plaintiffs' Thriving Communities initial grant awards and prohibiting the Agency from terminating or suspending any of the organizations' Thriving Communities grants or freezing funding under any of the grants;

E.    Award to Plaintiffs their attorneys' fees and costs; and

F.    Grant such other relief as the Court deems just and proper.

Dated: April 2, 2025

Respectfully submitted,

Jessica C. Abrahams
    (*pro hac vice* forthcoming)
Lora Brzezynski (Bar No. 17837)
Faegre Drinker Biddle & Reath LLP
1500 K Street NW, Suite 1100
Washington, DC 20005
Phone: 202-230-5000
Fax: 202-842-8465
jessica.abrahams@faegredrinker.com
lora.brzezynski@faegredrinker.com

*Attorneys for Plaintiff*
*The Minneapolis Foundation*

Jonathan A. DeMella
    (*pro hac vice* forthcoming)
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
Phone: 206-757-8338
Fax: 206-757-7338
jonathandemella@dwt.com

Charles M. English, Jr. (Bar No. 03621)
Davis Wright Tremaine LLP
1301 K Street NW, Suite 500 East
Washington, DC 20005
Phone: 202-973-4200
chipenglish@dwt.com

*Attorneys for Plaintiff*
*Philanthropy Northwest*

Andrew D. Freeman (Bar No. 03867)
Joshua N. Auerbach (Bar No. 26108)
Neel K. Lalchandani (Bar No. 20291)
Brown, Goldstein & Levy, LLP
120 E. Baltimore Street, Suite 2500
Baltimore, MD 21202
Phone: 410-962-1030
Fax: 410-385-0869
adf@browngold.com
jauerbach@browngold.com
nkl@browngold.com

*Attorneys for Plaintiff Green &*
*Healthy Homes Initiative, Inc.*