# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
(Northern Division)

GREEN & HEALTHY HOMES INITIATIVE, INC., ET AL.

                Plaintiffs,

     v.

ENVIRONMENTAL PROTECTION AGENCY, ET AL.

              Defendants.

Civil Action No. 1:25-cv-01096-ABA

## PLAINTIFFS' MEMORANDUM IN SUPPORT OF
## <u>MOTION FOR PRELIMINARY INJUNCTION</u>

## TABLE OF CONTENTS

TABLE OF AUTHORITIES...................................................................................iii

INTRODUCTION .............................................................................................. 1

FACTUAL BACKGROUND ................................................................................ 3

    I.     Pursuant to Congressional Direction in the Clean Air Act, EPA Establishes the Thriving Communities Grantmaking Program and Designates the Plaintiff Organizations as Regional Grantmakers.................................................... 3

    II.    The Plaintiff Organizations, with Oversight from EPA, Begin to Implement the Thriving Communities Program in Their Respective Regions. ....................................................................................................... 7

    III.   Without a Coherent Statement of Reasons, EPA Terminates the Plaintiff Organizations' Initial Grants and Suspends Access to All Thriving Communities Funds. ...................................................................................11

LEGAL STANDARD ...................................................................................... 14

ARGUMENT .................................................................................................. 14

    I.     The Court Should Enter a Preliminary Injunction Requiring EPA to Restore the Plaintiff Organizations' Thriving Communities Initial Grants and Access to Funding During the Pendency of this Case.................................... 14

        A.    The Plaintiff Organizations Are Likely to Succeed on the Merits of Their Claims................................................................................... 14

            1.    EPA supplied no meaningful explanation or coherent reasoning for terminating and suspending the grants, and, as such, its actions were arbitrary and capricious and constitute an abuse of discretion. .................................................... 16

            2.    Having been directed in the Clean Air Act to fund "environmental and climate justice block grants," EPA lacks statutory authority to terminate such grants or to suspend or freeze grant funds based on a newly-declared "Agency priority" not to fund "environmental justice.".............. 22

            3.    The First Amendment prohibits EPA from terminating the Plaintiff Organizations' initial grants or suspending access to funding on the ground that the organizations "promote or take part in" programs or initiatives that the EPA disfavors. ........ 24

4.    In terminating the Plaintiff Organization's Thriving
       Communities initial grants, EPA did not adhere to OMB
       regulations governing the termination of grants by
       executive branch agencies............................................................. 28

B.    Without a Grant of Preliminary Injunctive Relief, Plaintiffs Will
       Suffer Severe and Irreparable Harm. ......................................... 31

C.    The Balance of Equities and the Public Interest Favor Entry of a
       Preliminary Injunction. ............................................................... 37

D.    Plaintiffs Are Entitled to Preliminary Relief in the Form
       Requested. ................................................................................. 39

E.    No Bond Is Necessary Here. ....................................................... 39

CONCLUSION ................................................................................................. 41

# TABLE OF AUTHORITIES

**Cases**

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.,*
570 U.S. 205 (2013) ................................................................................. 25, 27−28, 28

*Am. Ass'n of Colls. for Tchr. Educ. v. McMahon,*
Case No. 1:25-cv-00702, 2025 WL 833917 (D. Md. March 17, 2025) ........................... *passim*

*Armstrong v. Exceptional Child Ctr., Inc.,*
575 U.S. 320 (2015) ................................................................................................. 39

*Barnes v. E-Sys., Inc. Grp. Hosp. Med. & Surgical Ins. Plan,*
501 U.S. 1301 (1991) ............................................................................................... 37

*Bd. of Cnty. Comm'rs, Wabaunsee Cnty., Kan. v. Umbehr,*
518 U.S. 668 (1996) ................................................................................................. 26

*California v. U.S. Dep't of Educ.,*
Case No. 25-10548-MJJ, 2025 WL 760825 (D. Mass. March 10, 2025) ........................ *passim*

*Centro Tepeyac v. Montgomery Cnty.,*
722 F.3d 184 (4th Cir. 2013) ..................................................................................... 14

*Cnty. of Santa Clara v. Trump,*
250 F. Supp. 3d 497 (N.D. Cal. 2017) .................................................................... 34−35

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.,*
591 U.S. 1 (2020) ................................................................................................ 16, 18

*Direx Israel Ltd. v. Breakthrough Med. Corp.,*
952 F.2d 802 (4th Cir. 1991) ..................................................................................... 31

*FCC v. Prometheus Radio Proj.,*
592 U.S. 414 (2021) ................................................................................................. 16

*HIAS, Inc. v. Trump,*
985 F.3d 309 (4th Cir. 2021) ..................................................................................... 35

*Hoechst Diafoil Co. v. Nan Ya Plastics Corp.,*
174 F.3d 411 (4th Cir. 1999) ..................................................................................... 40

*Iancu v. Brunetti,*
588 U.S. 388 (2019) ..................................................................................... 24, 25, 26

*In re Aiken County,*
725 F.3d 255 (D.C. Cir. 2013) ................................................................................... 24

*In re Murphy-Brown LLC,*
   907 F.3d 788 (4th Cir. 2018) ................................................................................ 32

*Int'l Union, United Mine Workers of Am. v. U.S. Dep't of Labor,*
   358 F.3d 40 (D.C. Cir. 2004) .................................................................................. 18

*Johnson v. Bergland,*
   586 F.2d 993 (4th Cir. 1976) ............................................................................. 31−32

*Larson v. Domestic & Foreign Com. Corp.,*
   337 U.S. 682 (1949) ............................................................................................... 39

*League of Women Voters of U.S. v. Newby,*
   838 F.3d 1 (D.C. Cir. 2016) ...................................................................... 32, 36, 38

*Legal Servs. Corp. v. Velazquez,*
   531 U.S. 533 (2001) .......................................................................................... 25−26

*Lonza Walkersville, Inc. v. Adva Biotechnology,*
   581 F. Supp. 3d 736 (D. Md. 2022) ....................................................................... 35

*Loper Bright Enters. v. Raimondo,*
   603 U.S. 369 (2024) ............................................................................................... 22

*Mach Mining, LLC v. EEOC,*
   575 U.S. 480 (2015) ............................................................................................... 23

*Maryland v. Exxon Mobil Corp.,*
   569 F. Supp. 3d 273 (D. Md. 2021) ....................................................................... 28

*Maryland v. U.S. Dep't of Agric.,*
   Civil No. JKB-25-0748, 2025 WL 800216 (D. Md. Mar. 13, 2025) ................. 38, 40

*Massachusetts v. Nat'l Inst. of Health,*
   Case No. 25-CV-103338, 2025 WL 702163 (D. Mass. Mar. 5, 2025) ........ 33, 35, 36

*Md. Dept. of Hum. Res. v. U.S. Dept. of Agric.,*
   976 F.2d 1462 (4th Cir. 1992) ........................................................................... 39−40

*Michigan v. EPA,*
   576 U.S. 743 (2015) ............................................................................................... 16

*Motor Vehicle Mfrs. Assn. v. State Farm Mut. Auto. Ins. Co.,*
   463 U.S. 29 (1983) ................................................................................................. 16

*Mountain Valley Pipeline, LLC v. 6.56 Acres of Land, Owned by Sandra Townes Powell,*
   915 F.3d 198 (4th Cir. 2019) ................................................................................. 31

*N. Mariana Islands v. United States,*
    686 F. Supp 2d 7 (D.D.C. 2009) ................................................................ 38

*Nat'l R.R. Passenger Corp. v. Morgan,*
    536 U.S. 101 (2002) .................................................................................. 23

*New Jersey v. EPA,*
    626 F.2d 1038 (D.C. Cir. 1980) ............................................................... 38

*New York v. Trump,*
    No. 25-cv-39, 2025 WL 715621 (D.R.I. Mar. 6, 2025) ..................... 32, 37

*New York v. Trump,*
    No. 25-cv-39-JJM-PAS, 2025 WL 357368 (D.R.I. Jan. 31, 2025) ........... 36

*Nken v. Holder,*
    556 U.S. 418 (2009) .................................................................................. 37

*Ohio v. EPA,*
    603 U.S. 279 (2024) .................................................................................. 16

*Open Cmtys. All. v. Carson,*
    286 F. Supp. 3d 148 (D.D.C. 2017) ......................................................... 36

*Pacito v. Trump,*
    Case No. 2:25-cv-255, 2025 WL 655075 (W.D. Wash. Feb. 28, 2025)................... 32

*R.I.L-R v. Johnson,*
    80 F. Supp. 3d 164 (D.D.C. 2015) ........................................................... 38

*Reed v. Town of Gilbert, Ariz.,*
    576 U.S. 155 (2015) .................................................................................. 26

*Rochester Pure Waters Dist. v. EPA,*
    960 F.2d 180 (D.C. Cir. 1992) ................................................................. 24

*Rodriguez v. Robbins,*
    715 F.3d 1127 (9th Cir. 2013) ................................................................. 38

*Roe v. Dep't of Defense,*
    947 F.3d 207 (4th Cir. 2020) .............................................................. 37, 38

*Rokster v. Goldberg,*
    448 U.S. 1306 (1980) ............................................................................... 37

*Rosenberger v. Rectors & Visitors of Univ. of Va.,*
    515 U.S. 819 (1995) ..............................................................24−25, 25, 26

*Sanderson Farms, Inc. v. Tyson Foods, Inc.*,
  547 F. Supp. 2d 491 (D. Md. 2008) ....................................................... 14

*SEC v. Chenery Corp.*,
  318 U.S. 80 (1943) ............................................................................ 16

*Shawnee Tribe v. Mnuchin*,
  984 F.3d 94 (2021) ............................................................................ 23

*Stuller, Inc. v. Steak N Shake Enters.*,
  695 F.3d 676 (7th Cir. 2012) ............................................................. 31

*Taliaferro v. N.C. State Bd. of Elections*,
  489 F. Supp. 3d 433 (E.D.N.C. 2020) ................................................. 37

*U.S. Dep't of Navy v. Fed. Labor Rels. Auth.*,
  665 F.3d 1339 (D.C. Cir. 2012) .......................................................... 24

*U.S. ex rel. Accardi v. Shaughnessy*,
  347 U.S. 260 (1954) .......................................................................... 28

*United States v. N. Carolina*,
  192 F. Supp. 3d 620 (M.D.N.C. 2016) ................................................ 36

*United States v. South Carolina*,
  720 F.3d 518 (4th Cir. 2013) ............................................................. 14

*Winter v. Natural Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) ......................................................................... 14, 16

## **Constitutional Provisions**

U.S. Const. amend. I ............................................................................ *passim*

## **Statutes**

28 U.S.C. § 2201 ................................................................................. 39

42 U.S.C. § 7438 ........................................................................... *passim*

5 U.S.C. § 706 ............................................................................... *passim*

## **Rules**

Fed. R. Civ. Proc. 65 ........................................................................... 39

## **Regulations**

2 C.F.R. § 200.340 ........................................................................ *passim*

2 C.F.R. § 200.341 ................................................................................................................. 6, 29

## INTRODUCTION

Through this action, the plaintiffs, Green and Healthy Homes Initiative, Inc. ("GHHI"), the Minneapolis Foundation, and Philanthropy Northwest (collectively, "the Plaintiff Organizations"), seek relief from the unlawful and arbitrary and capricious decision of the Defendant, the U.S. Environmental Protection Agency, to terminate grants and suspend grant funding it had previously awarded to the Plaintiff Organizations. The grants at issue—for each organization, a $8 million "initial grant" that EPA has now terminated, as well as a $52 million "subsequent grant," access to which EPA has now suspended—are intended to support the Plaintiff Organizations' work as EPA-designated Regional Grantmakers under the agency's Thriving Communities program, as well as the environmental protection work of hundreds of non-profit organizations and local and tribal government agencies in communities across the Mid-Atlantic, Great Lakes and Northwest regions identified through the program's grantmaking processes.

EPA's actions are arbitrary and capricious and constitute an abuse of discretion. *See* 5 U.S.C. § 706(2)(A). EPA offered no meaningful explanation for terminating and suspending access to the grant funds at issue, instead providing only a boilerplate list of vague and conclusory grounds on which its actions allegedly were based, referencing, variously, "DEI," "environmental justice," "fraud, waste, abuse, and duplication," and "the best interests of the United States." EPA's statement of purported grounds here is strikingly similar to one that this Court and its counterpart in Massachusetts recently found to provide no meaningful explanation when given by the Department of Education in the context of that agency's mass termination of grants for teacher training programs. *See Am. Ass'n of Colls. for Tchr. Educ. v. McMahon*, Case No. 1:25-cv-00702, 2025 WL 833917 (D. Md. March 17, 2025) ("*AACTE*"); *California v. U.S.*

*Dep't of Educ.*, Case No. 25-10548-MJJ, 2025 WL 760825 (D. Mass. March 10, 2025). As in the *AACTE* and *California* cases, EPA's purported explanations for its actions here "fail to provide [the Plaintiff Organizations] any workable, sensible or meaningful reason or basis for the termination of their awards." *AACTE*, 2025 WL 833917, at *21.

EPA's actions are also facially unlawful. The Agency's boilerplate statement includes an assertion that the Plaintiff Organizations' grants are "inconsistent with" a newly-declared "Agency priority" not to provide funding for "organizations that promote or take part in . . . 'environmental justice' initiatives." The Clean Air Act, under which EPA awarded the funds at issue, affords no discretion to EPA to adopt such a "priority," because the Act mandates that EPA's Administrator "shall use" the funds for "environmental and climate justice" initiatives. 42 U.S.C. § 7438. EPA's actions are also patently unconstitutional. The agency cannot, consistent with the First Amendment to the Constitution, adopt an "Agency priority" to withhold grant funding or terminate previously-awarded grants based on its perception that an organization "promote[s] or take[s] part in . . . initiatives" that the agency disfavors.

Absent preliminary relief from this Court, EPA's unlawful and unconstitutional actions will cause severe and irreparable harm. GHHI, the Minneapolis Foundation, and Philanthropy Northwest have been engaged for more than a year in organizationally transformative work as EPA-designated Regional Grantmakers—hiring staff, building capacity, developing partnerships, and, in recent months, reaching out to hundreds of groups across their respective regions to offer support for community-based environmental protection work. Without a preliminary injunction, most or all of this work would effectively be undermined or destroyed during the pendency of this case. Within days or weeks, the three organizations would be forced to terminate the employment of dozens of staff members hired to implement the Thriving Communities program.

The harm to those individuals would, of course, be particularly severe. Meanwhile, the programs themselves would be largely or entirely shuttered, and environmental protection work undertaken by hundreds of non-profit organizations and local and tribal government agencies as Thriving Communities subgrantees would come to an end. None of that organizational work could simply reconstitute itself upon entry of a final judgment in this case.

Therefore, and as further discussed below, the Plaintiff Organizations' motion for a preliminary injunction should be granted.

## FACTUAL BACKGROUND

I.   **Pursuant to Congressional Direction in the Clean Air Act, EPA Establishes the Thriving Communities Grantmaking Program and Designates the Plaintiff Organizations as Regional Grantmakers.**

In the Inflation Reduction Act of 2022 ("IRA"), Congress amended Part A of the Clean Air Act and appropriated $3 billion to EPA for "climate and environmental justice block grants." 42 U.S.C. § 7438. Congress further mandated that EPA's Administrator "shall use" the appropriated amounts "to award grants for periods of up to 3 years" to carry out certain environmental protection activities "that benefit disadvantaged communities. *Id*. § 7438(a) & (b)(1). The activities eligible for support include "community-led air and other pollution monitoring, prevention, and remediation," "investments in low- and zero-emission and resilient technologies and related infrastructure," and "mitigating climate and health risks from urban heat islands, extreme heat, wood heater emissions, and wildfire events." *Id*. § 7438(b)(2).

In 2023, EPA established the Thriving Communities Grantmaking Program to facilitate the flow of IRA climate and environmental justice funds to small non-profit organizations and local and tribal governments, in part by designating a Regional Grantmaker in each of EPA's ten regions. Ex. 1, Declaration of Ruth Ann Norton ("Norton Decl."), Attach. A at 16–17. Regional Grantmakers are responsible for awarding grants to subgrantees to support community-based

environmental protection projects to be undertaken over periods of one to two years. *Id.* at 2, 6. As EPA explained in launching the Thriving Communities program, projects eligible for support include community cleanup projects and environmental job training, as well as projects that monitor or address, for example, linkages between air quality and asthma, effluent discharges from industrial facilities, community food access, stormwater issues and green infrastructure, lead and asbestos contamination, pesticides and other toxic substances, illegal dumping activities, or emergency preparedness and disaster resiliency. *Id.* at 9–10.

GHHI, the Minneapolis Foundation, and Philanthropy Northwest are non-profit organizations based in Baltimore, Minneapolis, and Seattle, respectively. Ex. 1, Norton Decl. ¶ 1; Ex. 2, Declaration of R.T. Rybak ("Rybak Decl."), ¶ 1; Ex. 3, Declaration of Jill T. Nishi ("Nishi Decl."), ¶ 6. In December 2023, EPA designated the three organizations to serve as Regional Grantmakers—GHHI for EPA Region 3, which encompasses Delaware, Maryland, Pennsylvania, Virginia, West Virginia, and Washington, D.C., as well as seven federally recognized tribes; Minneapolis Foundation for EPA Region 5, which encompasses Indiana, Illinois, Michigan, Minnesota, Ohio, and Wisconsin, as well as 37 federally recognized tribes; and Philanthropy Northwest for EPA Region 10, which encompasses Alaska, Idaho, Oregon, and Washington, along with 271 tribal nations. Ex. 1, Norton Decl. ¶¶ 6–7; Ex. 2, Rybak Decl. ¶ 8; Ex. 3, Nishi Decl. ¶¶ 9–10.

In May or June of 2024, EPA awarded each organization an $8 million Thriving Communities "initial grant." Ex. 1, Norton Decl. ¶ 8 & Attach. C; Ex. 2, Rybak Decl. ¶ 9 & Attach. A; Ex. 3, Nishi Decl. ¶ 13 & Attach. A. EPA designated these initial grants to support expanded staffing, regionwide outreach to community-based organizations, and the development and administration of a grant application process in each region, as well as to provide technical

assistance and initial oversight to subgrant applicants and subgrantees. Ex. 1, Norton Decl. ¶ 8; Ex. 2, Rybak Decl. ¶ 9; Ex. 3, Nishi Decl. ¶ 16. These three grants, now terminated, were to fund work performed by plaintiffs for a three-year period. Ex. 1, Norton Decl. ¶ 9; Ex. 2, Rybak Decl. ¶ 9; Ex. 3, Ex. 3, Nishi Decl. ¶ 29.

EPA then awarded each organization a Thriving Communities "subsequent grant" in the amount of $52 million. Ex. 1, Norton Decl. ¶ 19, Attach. E; Ex. 2, Rybak Decl. ¶ 3, Attachs. B & C; Ex. 3, Nishi Decl. ¶ 2, Attachs. B & C. In their roles as Regional Grantmakers, the Plaintiff Organizations, after administering regional application processes, are to use $48 million out of the $52 million subsequent grant to award subgrants to support projects undertaken by selected sub-grantee non-profit organizations and local and tribal governments. Ex. 1, Norton Decl. ¶¶ 2, 19; Ex. 2, Rybak Decl. ¶ 10; Ex. 3, Nishi Decl. ¶ 17.

Each of the Thriving Communities grants awarded to GHHI, the Minneapolis Foundation and Philanthropy Northwest is governed by a Cooperative Agreement, *see, e.g.*, Ex. 1, Norton Decl. Attach. C; Ex. 2, Rybak Decl. Attach. A; Ex. 3, Nishi Decl. Attach. A, and each Cooperative Agreement references General Terms and Conditions issued by EPA to govern its grants, *see, e.g.*, Ex. 1, Norton Decl. Attach. C at 5 (referencing terms and conditions). With respect to the Plaintiff Organizations' $8 million initial grant awards, the applicable General Terms and Conditions allow for unilateral termination of the award by EPA only under two sets of circumstances: first, "[i]f a recipient fails to comply with the terms and conditions of the award including statutory or regulatory requirements"; and second—the provision that EPA has invoked in terminating the initial grants—"[i]f the award no longer effectuates the program goals or agency priorities." Ex. 1, Norton Decl. Attach. K at 2–3.

Importantly, EPA's General Terms and Conditions identify three circumstances when the

agency may terminate an award because it "no longer effectuates the program goals or agency

priorities." These are circumstances when:

> i. EPA *obtains evidence* that was not considered in making the award that reveals that specific award objective(s) are *ineffective at achieving program goals* and EPA *determines* that it is in the government's interest to terminate the award;
>
> ii. EPA *obtains evidence* that was not considered in making the award that causes EPA to significantly question the *feasibility of the intended objective(s) of the award* and EPA *determines* that it is in the government's interest to terminate the award;
>
> iii. EPA *determines* that the objectives of the award are no longer consistent with *funding priorities for achieving program goals*.

*Id.* at 3 (emphasis added).

Thus, under the General Terms and Conditions applicable to the Plaintiff Organizations'

initial grants, in each circumstance when EPA invokes "program goals or agency priorities" as

the basis for unilateral termination of a grant award, it must "obtain evidence that was not

considered in making the award" and/or make a "determin[ation]" supporting its action.

Moreover, the General Terms and Conditions nowhere permit EPA simply to declare its adoption

of *new* "program goals" or "agency priorities" and unilaterally terminate a grant on that basis.

As further discussed below, the Office of Management and Budget ("OMB") has

promulgated regulations governing federal grant awards, including relating to grant termination,

by executive branch agencies, and EPA acknowledges that it is bound by these regulations. *See*

Ex. 1, Norton Decl. Attach. G at 1 (referencing OMB regulations); Ex. 2, Rybak Decl. Attach. D

at 1 (same); Ex. 3, Nishi Decl. Attach. D at 1 (same). Under the OMB regulations, a federal

agency terminating a grant award "must provide written notice of termination to the recipient,"

and this notice must include "the reasons for termination. 2 C.F.R. § 200.341(a). Like EPA's

General Terms and Conditions, the regulations anticipate that an agency may terminate an award,

"to the extent authorized by law, if an award no longer effectuates the program goals or agency

priorities." *Id*. § 200.340(a)(4). However, the regulations further provide that all grounds for termination must be "*clearly and unambiguously specif[ied]* . . . in the terms and conditions of the Federal award." *Id*. § 200.340(b) (emphasis added).

## II.    The Plaintiff Organizations, with Oversight from EPA, Begin to Implement the Thriving Communities Program in Their Respective Regions.

Since their selection as Regional Grantmakers in December 2023, GHHI, the Minneapolis Foundation, and Philanthropy Northwest have all undertaken immense, organizationally transformative efforts to implement EPA's Thriving Communities program. These efforts have included, in the case of each organization, the hiring of significant numbers of new staff; the building of substantial new in-house capacity; the procurement of grant management systems, financial management systems, and professional services; the development of new external partnerships; regionwide outreach to non-profit organizations and local and tribal government agencies concerning the availability of Thriving Communities funding to support community-based environmental protection work; and the development and administration of an application process through which such organizations and agencies have sought and are continuing to seek financial support. Ex. 1, Norton Decl. ¶¶ 11–16; Ex. 2, Rybak Decl. ¶ 9; Ex. 3, Nishi Decl. ¶ 16.

Several aspects of this effort bear particular emphasis here. First, each of the Plaintiff Organizations significantly expanded its staff in order to serve as a Regional Grantmaker and implement the Thriving Communities program. GHHI created and filled nine new professional staff positions to work full-time on the Thriving Communities program, including a senior vice president to serve as GHHI's Thriving Communities project manager and a vice president and compliance officer. Ex. 1, Norton Decl. ¶ 11. The Minneapolis Foundation employed 26 full- or part-time staff allocated to the program. Ex. 2, Rybak Decl. ¶ 9(a). Philanthropy Northwest

created and filled seven new positions, including a new director of grantmaking. Ex. 3, Nishi Decl. ¶ 16(a)(i). Meanwhile, the senior leadership and numerous other staff members at all three organizations have dedicated a substantial part of their time to the Thriving Communities program since late 2023, and the organizations have planned for their senior leadership and other staff to continue to do so in the coming years. Ex. 1, Norton Decl. ¶ 11; Ex. 2, Rybak Decl. ¶ 9(a); Ex. 3, Nishi Decl. ¶ 16(a)(ii). The grants that EPA awarded to the three organizations are necessary for the organizations to continue to employ the staff that they have hired specifically to implement the Thriving Communities, as well as to support the Thriving Communities-related work of the organizations' senior leadership and other staff. Ex. 1, Norton Decl. ¶¶ 11, 16; Ex. 2, Rybak Decl. ¶ 9(a); Ex. 3, Nishi Decl. ¶¶ 16(a)(i)–(ii).

Second, the three organizations have developed numerous external partnerships to implement the Thriving Communities program. For example, GHHI established an advisory board, the members of which bring significant experience, scientific and technical expertise, and community perspective to GHHI's implementation of the Thriving Communities program in the Mid-Atlantic region. Ex. 1, Norton Decl. ¶ 14. GHHI also engaged several institutions, including the Children's National Hospital and Howard University, to provide technical assistance to organizations applying for and receiving Thriving Communities subgrants. *Id.* at ¶ 15. The Minneapolis Foundation and Philanthropy Northwest have developed numerous similar partnerships to assist in all phases of their work as Regional Grantmakers, including to streamline the application process and to provide technical assistance to applicants and subgrant recipients. Ex. 2, Rybak Decl. ¶ 9(b); Ex. 3, Nishi Decl. ¶¶ 16(c)–(d). For example, the Minneapolis Foundation developed a Collaborative for the Great Lakes Thriving Communities Grantmaking Program to streamline application and reporting procedures to more efficiently

manage the grantmaking process. Ex. 2, Rybak Decl. ¶ 9(b). Philanthropy Northwest enlisted the support of philanthropic leaders throughout Region 10 to advise on the overall design of the grantmaking process, and formed a Task Force of community leaders to provide counsel on the grant application to minimize applicant burden. Ex. 3, Nishi Decl. ¶¶ 9, 16(c).

Third, each of the three organizations has made significant progress in its grantmaking work, including by engaging in extensive, regionwide outreach to the "disadvantaged communities" that the Clean Air Act and the Thriving Communities program intend to serve, *see* 42 U.S.C. § 7438(b)(1), and by developing and administering its application process for subgrant awards. Each organization has already received hundreds of applications for support, and, as of the filing of this case, has selected a first round of subgrant awards. Ex. 1, Norton Decl. ¶ 20; Ex. 2, Rybak Decl. ¶ 30; Ex. 3, Nishi Decl. ¶¶ 39–40.

On February 20, 2025, GHHI awarded 63 Thriving Communities subgrant awards to non-profit organizations and local and tribal government agencies across the mid-Atlantic region: two in Delaware, six in the District of Columbia, twelve in Maryland, seventeen in Pennsylvania, thirteen in Virginia, and thirteen in West Virginia with cumulative funding of $19.2 million. Ex. 1, Norton Decl. ¶ 20. The recipients of these awards include a non-profit community development organization in West Virginia that designed a project to address sewage overflow into the public drinking water system and a local government in Pennsylvania that planned to address lead exposure and poor indoor air quality in homes with pregnant women and children. *Id.* ¶¶ 42, 44.

At the time that EPA terminated its Thriving Communities initial grant, the Minneapolis Foundation had selected more than 40 subgrantees and was prepared to announce that first round of subawards. Ex. 2, Rybak Decl. ¶ 30. The anticipated award recipients included two small rural

Appalachian communities in Ohio proposing to modernize their wastewater treatment processes, as well as a federally-recognized rural tribe in Michigan proposing to clean up an unregulated dump site that has been the source of significant concerns about drinking water quality and exposure to contaminated materials. *Id.* ¶¶ 31–33.

As of the filing of this case, Philanthropy Northwest has selected 42 applications for Thriving Communities subgrant awards with cumulative funding of $14.5 million. Ex. 3, Nishi Decl. ¶ 40. These selected subgrantees include 12 from Alaska, two from Idaho, 12 from Oregon, and 16 from Washington, including eight federally recognized tribes or Alaska Native villages. These entities are spread across remote, rural, and urban areas of each state—from the Seward Peninsula in Alaska, to Southwest Idaho, to the Oregon Coast, to Eastern Washington, and major cities in between. *Id.* Projects will support efforts such as: addressing food security challenges in a remote community by promoting revitalization of Indigenous food systems of harvesting and preservation; reducing the risk of severe wildfires through programs that promote community involvement and preparedness; implementing clean energy retrofits to lower household energy costs and protect indoor air quality for low-income households; and supporting a tribe's regional emergency management in a remote, highly visited area vulnerable to flooding, severe weather, and earthquakes. *Id.*

Moreover, as anticipated in the Cooperative Agreements for their Thriving Communities initial grant awards, the Plaintiff Organizations have undertaken all of this work in close collaboration with, and with substantial oversight from, EPA. *See* Ex. 1, Norton Decl. Attach. C at 10 ("EPA will be substantially involved in this agreement."). Plaintiffs had regular and extensive communications with EPA officials during the development and early implementation phases of the Thriving Communities program. Ex. 1, Norton Decl. ¶ 17; Ex. 2, Rybak Decl.

¶ 9(d); Ex. 3, Nishi Decl. ¶ 12. EPA approved the work of the Plaintiff Organizations under the grants, including their recruitment of new staff members to administer the program, application materials for subgrantees, public communications, and contracts with partner organizations. Ex. 1, Norton Decl. ¶¶ 13, 18, Attach. D; Ex. 2, Rybak Decl. ¶ 9(d); Ex. 3, Nishi Decl. ¶ 16.

### III.    Without a Coherent Statement of Reasons, EPA Terminates the Plaintiff Organizations' Initial Grants and Suspends Access to All Thriving Communities Funds.

On February 21 and 22, 2025, EPA terminated the $8 million Thriving Communities initial grant that it had previously awarded to the three Plaintiff Organizations. Ex. 1, Norton Decl. ¶ 22 & Attach. F; Ex. 2, Rybak Decl. ¶ 4; Ex. 3, Nishi Decl. ¶ 22. EPA effectuated the terminations by sending each organization an Assistance Amendment to the Cooperative Agreement governing the organization's initial grant, *see* Ex. 1, Norton Decl. Attach. H; Ex. 2, Rybak Decl. Attach. D at 3; Ex. 3, Nishi Decl. Attach. D at 3–8, along with a Memorandum from each organization's "EPA Award Official" stating the basis for the Agency's action, Ex. 1, Norton Decl. Attach. G; Ex. 2, Rybak Decl. Attach. D at 1–2; Ex. 3, Nishi Decl. Attach. D at 1–2. Although the memoranda were purportedly authored by different EPA officials assigned to different EPA regional offices, the text of each is identical or nearly identical. *Compare* Ex. 1, Norton Decl. Attach. G at 1–2 *with* Ex. 2, Rybak Decl. Attach. D at 1–2 & Ex. 3, Nishi Decl. Attach. D at 1–2.

The termination memorandum sent to each organization cites the regulation at 2 C.F.R. § 200.340 and states that the organization's Thriving Communities initial grant "is terminated in its entirety effective immediately on the grounds that the award no longer effectuates the program goals or agency priorities." *See, e.g.*, Ex. 1, Norton Decl. Attach. G at 1. Each memorandum then explains as follows:

It is a priority of the EPA to eliminate discrimination in all programs . . . . The EPA Administrator has determined that, per the Agency's obligations to the constitutional and statutory law of the United States, this priority includes ensuring that the Agency's grants do not support programs or organizations that promote or take part in diversity, equity, and inclusion ("DEI") initiatives, "environmental justice" initiatives, and conflict with the Agency's policy of prioritizing merit, fairness, and excellence in performing our statutory functions. . . .

The grant specified above provides funding for programs that promote or take part in DEI initiatives or environmental justice initiatives or other initiatives that conflict with the Agency's policy of prioritizing merit, fairness, and excellence in performing our statutory functions; that are not free from fraud, abuse, waste, or duplication; or that otherwise fail to serve the best interests of the United States. The grant is therefore inconsistent with, and no longer effectuates, Agency priorities.

*Id.*

The termination memorandum provides no further explanation for the agency's action. EPA does not give, and has not subsequently given, any content whatsoever to its newly declared "Agency priority" not to fund "environmental justice" and to withhold financial support from "organizations that promote or take part in . . . 'DEI' or 'environmental justice' initiatives." EPA has not explained how it reconciles its "Agency priority" to defund "environmental justice" with the congressional directive in the Clean Air Act that it "shall use" the appropriated funds at issue to award "environmental and climate justice block grants." 42 U.S.C. § 7438. EPA has not identified any offending "DEI" or "environmental justice" "initiatives" that it believes GHHI, the Minneapolis Foundation, or Philanthropy Northwest have "promote[d]," or in which it believes the organizations have "take[n] part." EPA has not pointed to any evidence on which a finding of "promoting or taking part in" disfavored "initiatives" could be based. Moreover, EPA has not identified the "constitutional and statutory law of the United States" that it claims forms the basis for its newly declared "Agency priority." The agency has not even defined the terms "DEI" or "environmental justice."

Meanwhile, EPA's references in its termination memoranda to "fraud, waste, abuse or

duplication" and "the best interests of the United States" are wholly conclusory and without basis. The agency says nothing at all to substantiate or explain either of these possible grounds for terminating the Plaintiff Organizations' initial grant awards.

Around the same time that EPA terminated the Plaintiff Organizations' Thriving Communities $8 million initial grant awards, the agency also suspended the organizations' access to the subsequent grant funds, thus undermining their ability to award subgrants and preventing them from making payments to subgrantees. Ex. 1, Norton Decl. ¶ 25 & Attach. I; Ex. 2, Rybak Decl. ¶ 18 & Attachs. H–I; Ex. 3, Nishi Decl. ¶ 3 & Attach. E.

As further discussed below, EPA's actions have caused and will continue to cause the Plaintiff Organizations to suffer irreparable harm. The agency's abrupt termination of initial grant funding, combined with its suspension of access to the subsequent grant awards, has created turmoil within the Plaintiff Organizations. In a matter of weeks, Plaintiffs will need to lay off dozens of employees that they hired to implement, and whose salaries are paid from, the terminated Thriving Communities grants. Ex. 1, Norton Decl. ¶ 28; Ex. 2, Rybak Decl. ¶ 21; Ex. 3, Nishi Decl. ¶ 27. Without the requisite staff or awarded funding, Plaintiffs will have no choice but to shutter the Thriving Communities program. Ex. 1, Norton Decl. ¶ 30; Ex. 2, Rybak Decl. ¶ 20; Ex. 3, Nishi Decl. ¶ 47. As a result of their inability to implement the program as promised, the Plaintiff Organizations will suffer irreversible harm to their reputations. Ex. 1, Norton Decl. ¶¶ 35–36; Ex. 2, Rybak Decl. ¶¶ 22, 26; Ex. 3, Nishi Decl. ¶¶ 44, 46. Moreover, hundreds of subgrantees will be unable to complete their environmental protection projects. Ex. 1, Norton Decl. ¶¶ 40–41; Ex. 2, Rybak Decl. ¶ 30; Ex. 3, Nishi Decl. ¶ 38. The community work that will be discontinued includes projects to prevent stormwater and dump site contamination from permeating drinking water sources, to remove lead from soils in parks and playgrounds, to

remediate mold, asbestos, and radon in homes with children, and to reduce the risk of wildfires. Ex. 1, Norton Decl. ¶¶ 41–45; Ex. 2, Rybak Decl. ¶¶ 30–34; Ex. 3, Nishi Decl. ¶ 40. Therefore, as a result of EPA's actions, communities across the Mid-Atlantic, Great Lakes, and Northwest regions will suffer.

## LEGAL STANDARD

The purpose of a preliminary injunction is to "prevent irreparable harm during the pendency of a lawsuit ultimately to preserve the court's ability to render a meaningful judgment on the merits." *United States v. S. Carolina*, 720 F.3d 518, 524 (4th Cir. 2013) (citation omitted). A court may enter a preliminary injunction if a plaintiff shows "(1) that he is likely to succeed on the merits, (2) that he is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in his favor, and (4) that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *Centro Tepeyac v. Montgomery Cnty.*, 722 F.3d 184, 188 (4th Cir. 2013) (en banc). In each case, courts must "balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Id*. at 24 (citation omitted). Ultimately, the decision to issue a preliminary injunction is within the "sound discretion of the trial court." *Sanderson Farms, Inc. v. Tyson Foods, Inc.*, 547 F. Supp. 2d 491, 502 (D. Md. 2008) (citations omitted).

## ARGUMENT

I.    **The Court Should Enter a Preliminary Injunction Requiring EPA to Restore the Plaintiff Organizations' Thriving Communities Initial Grants and Access to Funding During the Pendency of this Case.**

A.    **The Plaintiff Organizations Are Likely to Succeed on the Merits of Their Claims.**

In their complaint, GHHI, the Minneapolis Foundation, and Philanthropy Northwest assert five claims for relief. Those claims are based on four sets of deficiencies in EPA's

termination of the organizations' Thriving Communities initial grants and suspension of funding

for the subsequent grants. As asserted in Count One, EPA's actions are arbitrary and capricious

and constitute an abuse of discretion, *see* 5 U.S.C. § 706(2)(A), because the agency gave no

meaningful explanation for its actions and did not engage in "reasoned decisionmaking." As

asserted in Count Two, EPA's actions are in excess of its statutory authority, *see* 5 U.S.C.

§ 706(2)(C), because the provisions of the Clean Air Act directing EPA to award "environmental

and climate justice block grants" afforded no discretion to the agency to terminate or suspend

such grants on the basis of a new "Agency priority" not to fund "environmental justice." As

asserted in Counts Three and Four, which invoke the Court's equitable jurisdiction and its

authority under the APA respectively, EPA has engaged in viewpoint discrimination proscribed

by the First Amendment, in that the agency has asserted, as a basis for terminating and

suspending the grants, an "Agency priority" to withhold funding from "organizations that

promote or take part in" initiatives that the agency now disfavors. As asserted in Count Five,

EPA's actions are not in accordance with law and are without observance of procedure required

by law, *see* 5 U.S.C. § 706(2)(C)–(D), because the agency, in terminating the organizations'

initial grants, failed to adhere to regulations establishing procedures and limiting the grounds for

termination of federal grant awards.

 To a significant extent, the unlawfulness of EPA's actions appears on the face of the

memoranda terminating the Plaintiff Organizations' initial grants. *See, e.g.*, Ex. 1, Norton Decl.

Attach. G. In those memoranda, EPA failed to supply any meaningful explanation for its actions,

and it announced an "Agency priority" irreconcilably at odds with the Clean Air Act and the First

Amendment's prohibition on viewpoint discrimination. Meanwhile, with respect to each of the

Plaintiff Organizations' claims, the applicable law is clear. GHHI, the Minneapolis Foundation

and Philanthropy Northwest demonstrate below that they are likely to succeed on the merits on all of their claims. By demonstrating likelihood of success on any one of their claims, the organizations satisfy the first prong of the *Winter* standard for issuance of a preliminary injunction.

### 1. EPA supplied no meaningful explanation or coherent reasoning for terminating and suspending the grants, and, as such, its actions were arbitrary and capricious and constitute an abuse of discretion.

The APA fundamentally requires that agencies engage in "reasoned decisionmaking." *See, e.g.*, *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 16 (2020); *Michigan v. EPA*, 576 U.S. 743, 750 (2015). For purposes of judicial review under the APA, an agency's action is "arbitrary and capricious" if it is not both "reasonable and reasonably explained." *Ohio v. EPA*, 603 U.S. 279, 292 (2024); *FCC v. Prometheus Radio Proj.*, 592 U.S. 414, 423 (2021). This means that, as the Supreme Court has often explained, the agency must provide "a satisfactory explanation for its action," including by drawing a "rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Assn. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

Moreover, "[t]he grounds upon which [the agency's action] must be judged are those upon which the record discloses that its action was based." *SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943). The agency's action must be "measured by what [the agency] did, not by what it might have done." *Id*. at 93–94. Thus, the law required EPA to provide a "satisfactory explanation" for its decision to terminate the Plaintiff Organizations' Thriving Communities grants, and, on judicial review, the explanation to be evaluated is the one that EPA actually gave in its termination memoranda not some other hypothetical explanation it might have given or might now give.

EPA's explanation for terminating and suspending the grants was far from "satisfactory,"

and its actions fall well below the APA minimum of "reasoned decisionmaking." As discussed above, EPA identified three purported reasons—all exceptionally vague, and all without support—for why it allegedly terminated the initial grants: (1) because the awards are purportedly "inconsistent with" EPA's newly-adopted "Agency priority" to withdraw financial support from "organizations that promote or take part in … diversity, equity, and inclusion ('DEI') initiatives [or] 'environmental justice' initiatives"; (2) because the organizations' grant-funded programs are purportedly not "free from fraud, abuse, waste, or duplication"; *or* (3) because the organizations' programs allegedly "otherwise fail to serve the best interests of the United States." Ex. 1, Norton Decl. Attach. G at 1. EPA's stated reasons for terminating the initial grants are so varied and devoid of support, and each stated ground is itself so vague, that the assertions are meaningless. The Agency effectively gave no explanation for its actions.

Beyond these baseless statements, EPA has offered no rationale to support its actions. The agency did not identify any evidence, find any facts, supply any reasoning or make any individualized determination that would support any of its three asserted grounds for terminating the grants.

With respect to EPA's newly-adopted "Agency priority" to withhold financial support from "organizations that promote or take part in … 'DEI' [or] 'environmental justice' initiatives," EPA, again, has not identified any offending "initiatives" that it believes GHHI, the Minneapolis Foundation or Philanthropy Northwest have "promote[d]," or in which it believes the organizations have "take[n] part." EPA has not pointed to any evidence on which a finding of "promoting or taking part in" disfavored "initiatives" could be based. EPA has not identified the "constitutional and statutory law of the United States" that it claims forms the basis for its newly-

17

declared "Agency priority." The agency has not even defined the terms "DEI" or "environmental justice."

As a result, it is impossible to know what types of "initiatives" the EPA does not permit its grantees to "promote" or in which "initiatives" it does not permit grantees to "take part." And, it adds nothing to EPA's statement for the agency to declare that the offending "initiatives" are "inconsistent with" an "Agency priority." EPA's newly-declared "Agency priority" is "not informative in the least." *See Int'l Union, United Mine Workers of Am. v. U.S. Dep't of Labor*, 358 F.3d 40, 44 (D.C. Cir. 2004) ("The [agency's] statement that there was a 'change in agency priorities,' without explanation, is not informative in the least; it is merely a reiteration of the decision to withdraw the proposed rule.").

Meanwhile, EPA's invocations of "fraud, waste, abuse or duplication" and "the best interests of the United States" are pure, conclusory boilerplate. The Agency does not supply even a hint of what it might be referencing.

EPA's failure to provide a reasoned explanation renders its decision arbitrary and capricious and constitutes an abuse of discretion. But that is "not the only defect" here, as the agency also failed to account for Plaintiffs' reliance interests. *Regents of the Univ. of Cal.*, 591 U.S. at 30 (internal quotation marks and citations omitted). When "an agency changes course, . . . it must be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account." *Id.* (citations omitted). Here, GHHI, the Minneapolis Foundation and Philanthropy Northwest all relied and acted upon their expectations that EPA would fulfill its commitment to provide Thriving Communities grant funding. EPA has not recognized, in its termination memoranda or elsewhere, the extent to which Plaintiffs, in reliance on EPA's commitments, have transformed their organizations to serve as Regional Grantmakers

and accomplish the objectives of the Thriving Communities program.

Notably, the termination memoranda at issue here are, except in two subtle respects discussed below, strikingly similar to grant termination decisions that were issued several weeks earlier by the Department of Education; and that were the subject of opinions issued earlier this month by this Court, in *AACTE*, and by the U.S. District Court for the District of Massachusetts, in *California*. In the context of motions for preliminary injunction, both this Court and the Massachusetts court determined that the Department of Education's grant termination decisions would likely be found to be arbitrary and capricious. All three of the "reasons" that EPA has given here for terminating the Plaintiff Organizations' Thriving Communities initial grants—*i.e.*, asserted inconsistency with a new agency "priority" to withdraw funding from organizations that "promote or take part in DEI initiatives"; "fraud, waste, abuse, and duplication"; and "best interests of the United States"—are also cited either in full or nearly in full in the "Termination Letters" at issue in the *AACTE* and *California* cases.

It is worth comparing the language in the Department of Education "Termination Letters," quoted at length in *AACTE*, 2025 WL 833917, at \*17, and *California*, 2025 WL 760825, at \*2–3, with the language of the EPA termination memoranda at issue here. It is remarkable that the two agencies—each purportedly operating in its own sphere, each seeking to execute its own quite distinct set of congressional policy mandates, and each terminating grants serving altogether different purposes—issued grant termination decisions adopting very nearly the same text as a purported "explanation" for the decisions.

This Court and the Massachusetts court had little trouble concluding that the boilerplate text of the "Termination Letters" does "not provide[] the 'reasonable explanation' of [] final agency action that the APA requires," *AACTE*, 2025 WL 833917, at \*21, and, indeed, "amounts

to no explanation at all," *California*, 2025 WL 760825, at *3. That same boilerplate text is no more explanatory here. Everything that this Court said about the "Termination Letters" in *AACTE* applies with equal force in this case.

> The Termination Letter's list of ways in which a Grant Recipient's program is "inconsistent" with [agency] priorities is so broad and vague as to be limitless; devoid of import even. Couple with the disjunctive nature of the list ("…or that otherwise fail to serve the best interests of the United States"), the Termination Letter effectively and practically renders meaningless the right to appeal . . . . Inasmuch as the Termination Letter at once accuses a Grant Recipient of nothing and everything, it is utterly unclear to the court how a terminated Grant Recipient might mount such an appeal. How does one draft a "brief statement" of a "disputed" fact when one has no earthly idea what has been asserted, if anything?

> A reasonable explanation considers relevant data and articulates a satisfactory explanation of the agency's decision, "including a rational connection between the facts found and the choice made." . . . The [agency] has not provided a satisfactory explanation of the facts found or the choice made, much less a rational connection between the two. The Termination Letter fails to mention or refer to data or information the [agency] considered, if any, in deciding that the Grant Programs no longer effectuate [agency] priorities. Further, the [agency's] use of a template or boilerplate letter issued to all Grant Recipients further strengthens Plaintiffs' argument that the [agency] did not consider individual, or any, data or information.

*AACTE*, 2025 WL 833917, at *21. So, too, here.

Meanwhile, there are two subtle but noteworthy differences between the text of EPA's termination memoranda here and that of the "Termination Letters" in *AACTE* and *California*. These subtle differences render EPA's termination memoranda even more vague than the Department of Education's "Termination Letters," and thus, EPA's decisions at issue even more arbitrary and capricious.

First, although the "Termination Letters" in *AACTE* and *California* cited a purported agency "priority" to withdraw funding from "organizations that promote or take part in DEI initiatives," EPA's termination memorandum cites an "Agency priority" to withdraw funding from "DEI initiatives *or* environmental justice initiatives" (emphasis added). As a result, EPA was even more unclear than the Department of Education about the nature of the "initiatives" to

which it objects. EPA could be faulting the Plaintiff Organizations for promoting unspecified "DEI initiatives." *Or*, EPA could be focused on unspecified "environmental justice" initiatives, potentially including even the "climate and environmental justice" block grants that Congress directed EPA to fund in the Clean Air Act at 42 U.S.C. § 7438. (Of course, as in the *AACTE* and *California* cases, the agency's actions *also* might be unrelated to "promot[ing]" or "tak[ing] part in" any "DEI initiatives or environmental justice initiatives," and might instead be for unspecified "fraud, waste, abuse, and duplication," or, alternatively, for failing for unspecified reasons "to serve the best interests of the United States.")

Second, unlike the Department of Education in *AACTE* and *California*, EPA has not limited its newly-declared "Agency priority" to the withdrawal of funding from assertedly *unlawful* "initiatives." In *AACTE* and *California*, the Department of Education asserted in its "Termination Letters" that it had adopted a "priority" against funding "programs that promote or take part in DEI initiatives . . . *that unlawfully discriminate on the basis of race, color, religion, sex, national origin or another protected characteristic*; [or] *that violate either the letter or purpose of Federal civil rights law*." *AACTE*, 2025 WL 833917, at *17 (emphasis added). Thus, although the Department of Education left the term "DEI" undefined and vague, the Department at least seemed to allude to civil rights law as perhaps giving some kind of content to its newly-adopted "priority."

The italicized language above does not appear in the EPA termination memoranda. *See* Ex. 1, Norton Decl. Attach. G. EPA has adopted a purported new "Agency priority" to defund "DEI" and "environmental justice," and EPA has omitted even the Department of Education's gesture toward civil rights law as a potential limit on what that might mean. EPA's "priority," it seems, is to defund "organizations that promote or take part in" *any* initiative that the agency

chooses to characterize as a "DEI initiative" or an "environmental justice initiative." The vagueness of this "Agency priority" is boundless.

      **2.   Having been directed in the Clean Air Act to fund "environmental and climate justice block grants," EPA lacks statutory authority to terminate such grants or to suspend or freeze grant funds based on a newly-declared "Agency priority" not to fund "environmental justice."**

As discussed above, Congress amended the Clean Air Act, as part of the Inflation Reduction Act of 2022, to establish a program of "environmental and climate justice block grants" to support activities "that benefit disadvantaged communities." 42 U.S.C. § 7438. Congress appropriated $3 billion for such grants and mandated that EPA's Administrator "shall use" the appropriated amounts to fund the grants. *Id*. § 7438(a) & (b)(1). Last year, EPA awarded the Plaintiff Organizations' Thriving Communities grants pursuant to that statutory delegation of authority. In explaining its decision to terminate the organizations' initial grants, EPA states that it has now adopted an "Agency priority" not to provide "funding for . . . environmental justice initiatives." Ex. 1, Norton Decl. Attach. G at 1. EPA lacks statutory authority to terminate or suspend access to the Plaintiff Organizations' grants for this reason.

In a challenge to an agency action undertaken pursuant to statutorily-delegated authority, like the authority delegated to EPA in the Clean Air Act's "environmental and climate justice block grants" provisions, it is the role of the reviewing court "to independently identify and respect such delegations of authority, police the outer statutory boundaries of those delegations, and ensure that agencies exercise their discretion consistent with the APA." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 404 (2024). This case calls for exceptionally straightforward judicial "polic[ing]" of "the outer statutory boundaries" of the Clean Air Act's delegation of authority to EPA. Whatever discretion the Act's "environmental and climate justice block grants" provisions afford to EPA in stating that the agency "shall use" appropriated funds to award such grants, the

agency's discretion plainly does not, and cannot, include the termination of such grants on the basis of a declared "Agency priority" not to "provide[] funding for . . . environmental justice initiatives." EPA's actions here are not merely, in APA terms, "in excess of statutory . . . authority," 5 U.S.C. § 706(2)(C). EPA's actions are in defiance of such authority.

Moreover, in reviewing agency decisions under the APA, the courts have not hesitated, even in less straightforward cases, to set aside agency decisions that conflict with statutory language establishing principles for how appropriated funds should be distributed. Thus, for example, the D.C. Circuit has directed the entry of a preliminary injunction against a decision of the Department of Treasury to award only $100,000 to a tribal government under a statute providing for reimbursement of tribes' public health expenditures, where the Department, in determining the amount of the award at issue, did not adhere to statutory direction stating that the Secretary "shall determine" the amount of each award "based on increased expenditures of each such Tribal government." *See Shawnee Tribe v. Mnuchin*, 984 F.3d 94, 96, 101–03 (2021) ("the Shawnee Tribe is likely to succeed in its claim that the IHBG data [utilized by the Department] is not a suitable proxy for 'increased expenditures'"). There is no impediment to this Court enjoining EPA, in awarding funds that Congress directed for use as "environmental justice" block grants, from adopting an "Agency priority" under which it will not fund "organizations that promote . . . environmental justice."

A few observations from the case law only underscore the severity and groundlessness of EPA's present defiance of the Clean Air Act. First, there is the wholly unambiguous nature of the statutory direction at issue here. Congress has directed that EPA "shall use" the funds at issue for "environmental justice" grants. As many courts have observed, "the word 'shall' admits of no discretion." *Mach Mining, LLC v. EEOC*, 575 U.S. 480, 486 (2015) (citing *Nat'l R.R. Passenger*

*Corp. v. Morgan*, 536 U.S. 101, 209 (2002)).

Second, as then-Judge Kavanaugh underscored in a decision for the D.C. Circuit, an administrative agency "may not decline to follow a statutory mandate or prohibition simply because of policy objections." *In re Aiken County*, 725 F.3d 255, 259 (D.C. Cir. 2013) (granting petition for mandamus and directing Nuclear Regulatory Commission to resume licensing process for construction of nuclear waste facility). Agencies do not possess discretion simply to "disregard . . . statutory requirements," including requirements "to pay benefits, or to implement or administer statutory projects or programs." *Id*. at 266.

Third, EPA's declaration of an "Agency priority" here not to "provide[] funding for . . . environmental justice initiatives" defies congressional authority in an area where that authority is particularly strong relative to that of the executive branch. Under Article I of the Constitution, Congress possesses "exclusive power over the federal purse." *U.S. Dep't of Navy v. Fed. Labor Rels. Auth.*, 665 F.3d 1339, 1346–47 (D.C. Cir. 2012) (quoting *Rochester Pure Waters Dist. v. EPA*, 960 F.2d 180, 185 (D.C. Cir. 1992)). Whatever discretion an executive agency may have to determine its own "funding priorities," such discretion plainly cannot include the declaration of a "priority" of terminating or not continuing to fund a category of activities or "initiatives" for which Congress has appropriated money and that Congress has directed the agency to fund.

> **3. The First Amendment prohibits EPA from terminating the Plaintiff Organizations' initial grants or suspending access to funding on the ground that the organizations "promote or take part in" programs or initiatives that EPA disfavors.**

The First Amendment to the United States Constitution prohibits the government from "abridging the freedom of speech . . . or the right of the people . . . to petition the Government for a redress of grievance." It is a "core postulate" of the First Amendment that "[t]he government may not discriminate against speech based on the ideas or opinions it conveys."

*Iancu v. Brunetti*, 588 U.S. 388, 393 (2019). "Discrimination against speech because of its message is presumed to be unconstitutional. . . . When the government targets not subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant." *Rosenberger v. Rectors & Visitors of Univ. of Va.*, 515 U.S. 819, 828–29 (1995). Such "viewpoint discrimination" is "an egregious form of content discrimination." *Id*. at 829. As Justice Alito has put it, "[v]iewpoint discrimination is poison to a free society." *Iancu*, 588 U.S.at 399 (Alito, J., concurring) ("At a time when free speech is under attack, it is especially important for this Court to remain firm on the principle that the First Amendment does not tolerate viewpoint discrimination.").

It has long been clear that these principles apply, not only when the government directly regulates speech and expressive conduct, but also when the government conditions the awarding of contracts, grants and subsidies on the speech or expressive conduct of the contractor, grantee, or beneficiary. The Supreme Court has repeatedly "reaffirmed the requirement of viewpoint neutrality in the Government's provision of financial benefits." *Rosenberger*, 515 U.S. at 834. In numerous cases, the Court has recognized that "the Government may not deny a benefit to a person on a basis that infringes his constitutionally protected freedom of speech even if he has no entitlement to that benefit." *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214 (2013).

Thus, the Supreme Court has held unconstitutional, on First Amendment grounds, a statute that conditioned an award of grant funding for HIV/AIDS prevention work on grantee organizations' adoption of a policy expressing opposition to prostitution. *See Agency for Int'l Dev.*, 570 U.S. at 213–21. Likewise, the Court has found unconstitutional a statute that conditioned legal services funding on grantee organizations' refraining from representing clients

in cases involving an effort to amend or challenge federal or state welfare law. *See Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 540–49 (2001). The Court has held that the First Amendment would prohibit a local government from terminating a trash hauling contract in retaliation for the contractor's political activities. *See Bd. of Cnty. Comm'rs, Wabaunsee Cnty., Kan. v. Umbehr*, 518 U.S. 668, 673–86 (1996). The Court has also held that the University of Virginia engaged in constitutionally impermissible "viewpoint discrimination" when, in awarding grants to student organizations, it withheld grant funding for any "religious activity." *Rosenberger*, 515 U.S. at 828–32.

In terminating the Plaintiff Organizations' Thriving Communities initial grants, EPA has cited—as the first of its "reasons" for taking the action—its adoption of a newfound "Agency priority" of "ensuring that the Agency's grants do not support . . . organizations that promote or take part in diversity, equity, and inclusion ('DEI') initiatives [or] 'environmental justice' initiatives." Ex. 1, Norton Decl. Attach. G at 1. This is viewpoint discrimination in an unvarnished form. EPA has straightforwardly acknowledged that it is withdrawing funding from organizations that "promote or take part in" disfavored viewpoints on matters of social and environmental concern.

Any form of "content discrimination" is "presumptively unconstitutional and may be justified only if the government proves that [such discrimination] is narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 164 (2015). As discussed above, viewpoint discrimination is a "particularly egregious form of content discrimination." *Rosenberger*, 515 U.S. at 829. It is "poison in a free society." *Iancu*, 588 U.S. at 399 (Alito, J., concurring). Thus, EPA must surmount an exceptionally high bar to justify its decision to terminate grants or to suspend access to funding to "organizations that promote or

take part in" "DEI" or "environmental justice."

To say the least, EPA has not proffered a "compelling state interest" that would be served by this viewpoint discrimination. All the agency says is that it wants to "prioritiz[e] merit, fairness, and excellence." Ex. 1, Norton Decl. Attach. G at 1. But that is not a "compelling state interest" at all; it is, at best, a slogan. What could "merit, fairness, and excellence" possibly mean in this context? That the government has a "compelling interest" in shifting the focus of environmental protection work from lower-income or minority communities to some different set of communities selected on the basis of "merit" and "excellence"?

Even if a "compelling state interest" could somehow be discerned here, EPA's newly-declared "Agency priority" would not be "narrowly tailored" to serve that interest. There is no sense in which a grantee organization, by "promot[ing] or tak[ing] part in DEI initiatives or environmental justice initiatives" (whatever EPA might mean when it uses those terms), can impede EPA in the achievement of its own interest in "merit, fairness, and excellence" (whatever EPA might mean when it uses those terms). In particular, a grantee organization's promotion of the view that lower-income, minority, and tribal communities should be a focus of environmental protection work has no impact at all on the ability of EPA to use "merit, fairness and excellence" as its principal criteria in deciding where to focus its own work. The viewpoint discrimination at issue here does not advance EPA's asserted interest at all. Rather, it is viewpoint discrimination for the sake of viewpoint discrimination and not "narrowly tailored" to achieve any legitimate objective.

In *Agency for International Development*, as discussed above, the Supreme Court struck down, on First Amendment grounds, a statute that conditioned eligibility for grant funding to support HIV prevention work on the adoption by grantee organizations of a policy expressly

opposing prostitution and sex trafficking. The Supreme Court explained that, in the government grantmaking context, the First Amendment particularly disfavors "conditions that seek to leverage funding to regulate speech outside the contours of the program itself." 570 U.S. at 214–15. This seems to be what EPA is attempting to do here. Under *Agency for International Development*, EPA cannot condition eligibility for Thriving Communities grants on grantees forgoing the right to engage in "initiatives" of their own choosing, including "DEI" and "environmental justice" initiatives, "outside the contours" of their work as Thriving Communities grantees. *See id*.

But even if EPA were terminating the Plaintiff Organizations' Thriving Communities grants or freezing grant funding because of their asserted promotion of "environmental justice," not in their other work, but in the course of their work as Thriving Communities Regional Grantmakers, EPA's actions here could not pass constitutional muster. Under that mind-bending scenario, EPA would be restricting the organizations from promoting "environmental justice" in their work administering the "environmental and climate justice block grants" that EPA previously awarded to them pursuant to the Clean Air Act. 42 U.S.C. § 7438. It would advance no "compelling state interest" for EPA to do so.

**4.    In terminating the Plaintiff Organization's Thriving Communities initial grants, EPA did not adhere to OMB regulations governing the termination of grants by executive branch agencies.**

Beyond the deficiencies discussed above, the EPA actions at issue here also run afoul of the *Accardi* doctrine. When the government adopts regulations with the force and effect of law, it must abide by those regulations. *See U.S. ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954). The *Accardi* doctrine "refers to the long-settled principle that government agencies are bound to follow their own rules and regulations." *Maryland v. Exxon Mobil Corp.*, 569 F. Supp. 3d 273, 283 (D. Md. 2021). When an agency takes action without complying with applicable regulations,

its action is, for APA purposes, "not in accordance with law" and/or "without observance of procedure required by law." 5 U.S.C. § 706(2)(C)–(D).

Here, the Office of Management and Budget has adopted regulations establishing procedures and limiting the grounds for a federal agency's termination of a grant award. *See* 2 C.F.R. §§ 200.340, .341. EPA cites these regulations in the termination memoranda and thus acknowledges that it is bound by them. Ex. 1, Norton Decl. Attach. G at 1. Nonetheless, there are at least two ways in which EPA failed to adhere to the regulations when it terminated the Plaintiff Organizations' Thriving Communities initial grants.

First, the regulations provide that an agency terminating a grant "must provide written notice of termination to the recipient," and that such notice must "include the reasons for termination." 2 C.F.R. § 200.341(a). As discussed above, the termination memoranda that EPA sent to the three organizations did not provide any meaningful notice of its reasons for termination. As this Court said in the *AACTE* case, the EPA's list of reasons here "is so broad and vague as to be limitless; devoid of import even." 2025 WL 833917, at *21. EPA's purported explanation for its actions "amounts to no explanation at all." *California*, 2025 WL 760825, at *3.

Second, although the OMB regulations permit termination of a grant when the award "no longer effectuates the program goals or agency priorities," 2 C.F.R. § 200.340(a)(4), the agency must "clearly and unambiguously specify all termination provisions in the terms and conditions of the Federal award," *id*. § 200.340(b). Here, there is nothing in the applicable terms and conditions that anticipates, let alone that "clearly and unambiguously specif[ies]," the possibility of termination in the manner undertaken by EPA here, or on the grounds that the agency cited.

In its General Terms and Conditions for the grants at issue, EPA identifies three

29

circumstances when it may terminate a grant because the award "no longer effectuates the program goals or agency priorities." These are circumstances when:

    i.    EPA *obtains evidence* that was not considered in making the award that reveals that specific award objective(s) are *ineffective at achieving program goals* and EPA *determines* that it is in the government's interest to terminate the award;

    ii.    EPA *obtains evidence* that was not considered in making the award that causes EPA to significantly question the *feasibility of the intended objective(s) of the award* and EPA *determines* that it is in the government's interest to terminate the award; [or]

    iii.    EPA *determines* that the objectives of the award are no longer consistent with *funding priorities for achieving program goals*.

Ex. 1, Norton Decl. Attach. K at 3 (emphasis added).

    Thus, under the applicable General Terms and Conditions, in each circumstance when EPA asserts that an award "no longer effectuates program goals or agency priorities" as the basis for termination, it must "obtain evidence that was not considered in making the award" and/or make a "determin[ation]" supporting termination. Here, EPA has not obtained any new evidence, and the agency has not articulated or substantiated any "determination" with regard to the Plaintiff Organizations' Thriving Communities initial grants and their continued effectuation of "program goals" or "agency priorities."

    Equally fundamentally, EPA reserved discretion in the General Terms and Conditions only to determine that an award "no longer effectuates" the "program goals" for the grant program at issue, or the "agency priorities" under which the agency established the program in the first place. EPA did not reserve any discretion to declare *new* "program goals" or "Agency priorities" and terminate an award on that basis. For purposes of 2 C.F.R. § 200.340(b), there is no sense in which EPA's General Terms and Conditions "clearly and unambiguously specify" the possibility that EPA may unilaterally terminate an award based on its declaration of an "Agency

priority" that did not exist and could not be anticipated as of the time of the award.

Moreover, EPA's action here—awarding an "environmental justice" grant and then, nearly a year later, and after the investment of significant effort by the grantee, terminating the grant on the basis of a newly-declared "Agency priority" not to fund such grants—is even further afield from the termination provisions set forth above and, if permitted, would render those provisions meaningless. If EPA may terminate a grant award at any time merely by declaring the adoption of a new or additional "priority" not contemplated at the time of award, then any language purporting to limit unilateral termination is illusory: there is no real restriction on unilateral termination. As such, EPA's actions here are wholly at odds with the executive branch's codified regulatory commitment to terminate grants only on grounds "clearly and unambiguously" set forth in the termination provisions governing the grant. 2 C.F.R. § 200.340(b).

### B.    Without a Grant of Preliminary Injunctive Relief, Plaintiffs Will Suffer Severe and Irreparable Harm.

Without injunctive relief from this Court, EPA's abrupt and unlawful termination of the Plaintiff Organizations' Thriving Communities initial grants and suspension of access to subsequent grant funding will cause the organizations to experience increasingly severe and irreparable harm. To demonstrate irreparable harm in the context of a request for preliminary injunctive relief, the movant "must make a 'clear showing' that it will suffer harm that is 'neither remote nor speculative, but actual and imminent.'" *Mountain Valley Pipeline, LLC v. 6.56 Acres of Land*, *Owned by Sandra Townes Powell*, 915 F.3d 198, 216 (4th Cir. 2019) (quoting *Direx Israel Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 812 (4th Cir. 1991)). The injury "must be irreparable, meaning that it 'cannot be fully rectified by the final judgment after trial.'" *Id.* (quoting *Stuller, Inc. v. Steak N Shake Enters.*, 695 F.3d 676, 680 (7th Cir. 2012)).

31

As an initial matter, it is well-established in this Circuit that "[v]iolations of first amendment rights constitute per se irreparable injury." *Johnson v. Bergland*, 586 F.2d 993, 995 (4th Cir. 1976); *see also In re Murphy-Brown LLC*, 907 F.3d 788, 796 (4th Cir. 2018). As discussed above, EPA's actions plainly infringe on the Plaintiff Organizations' First Amendment rights. The Agency has withdrawn critical funding from the organizations because they assertedly "promote or take part in" "DEI initiatives or environmental justice initiatives." Moreover, without preliminary injunctive relief, the ability of the Plaintiff Organizations to continue to work with EPA likely depends on their adherence to the agency's strictures against the promotion of "DEI" and "environmental justice."

Beyond these per se irreparable constitutional injuries, EPA's unlawful actions are already causing the Plaintiff Organizations to suffer serious programmatic and operational harms. In similar contexts, courts across the country have deemed similar harms—including the inability of an organization to retain staff and fulfill its mission—irreparable. *See, e.g.*, *AACTE*, 2025 WL 833917, at *22–23 (finding plaintiffs made "clear showing" of irreparable harm where they introduced evidence demonstrating they "will be forced to terminate staff"); *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016) (finding that impairment of organizational mission qualifies as irreparable harm); *see also New York v. Trump*, No. 25-cv-39, 2025 WL 715621, at *15 (D.R.I. Mar. 6, 2025) (detailing harms "resulting from the chaos and uncertainty that the Defendants' arbitrary decision to categorically freeze" federal funding); *Pacito v. Trump*, Case No. 2:25-cv-255, 2025 WL 655075, at *22–23 (W.D. Wash. Feb. 28, 2025) (similar).

The evidence submitted with this Motion substantiates Plaintiffs' irreparable harms. *First*, without resumption of the grant funding at issue and with the continued suspension of

access to the subsequent grant award accounts, GHHI, the Minneapolis Foundation, and Philanthropy Northwest will soon be forced to lay off staff members whose work is funded in whole or in part by the terminated initial grants. Ex. 1, Norton Decl. ¶ 28; Ex. 2, Rybak Decl. ¶ 21; Ex. 3, Nishi Decl. ¶ 27. The Plaintiff Organizations are currently covering those salaries using their reserves, which is unsustainable. Ex. 1, Norton Decl. ¶ 28; Ex. 2, Rybak Decl. ¶ 21; Ex 3, Nishi Decl. ¶ 28 & Attach. F. If the grants are not imminently reinstated, GHHI will have to lay off between at least ten employees in the coming weeks. Ex. 1, Norton Decl. ¶ 28. The Minneapolis Foundation will lose 26 full- or part-time positions allocated to the Thriving Communities program if the initial grant is terminated and it continues to lack access to the subsequent grant. Ex. 2, Rybak Decl. ¶ 21. Philanthropy Northwest will be forced, at a minimum, to lay off the seven staff members who it hired to work full time on the Thriving Communities program, with the possibility of additional job losses associated with the loss of grant funds covering the organization's indirect costs. Ex. 3, Nishi Decl. ¶ 27. The need to lay off employees will significantly disrupt those individuals' lives and the work of the Plaintiff Organizations, resulting in irreparable harm. *Massachusetts v. Nat'l Inst. of Health*, Case No. 25-CV-103338, 2025 WL 702163, at *28 (D. Mass. Mar. 5, 2025) (finding "potential loss of human capital and talent" to be "incapable of run-of-the-mill legal relief"); *see also AACTE*, 2025 WL 833917, at *22.

*Second*, if the Plaintiff Organizations' Thriving Communities initial grants are not reinstated and access is not restored to the subsequent grant accounts, Plaintiffs will be forced to abandon their participation in the Thriving Communities program. Already, lack of access to grant funding has forced Plaintiffs to limit critical work under the program and to halt certain work altogether. Ex. 1, Norton Decl. ¶ 29; Ex. 2, Rybak Decl. ¶ 25; Ex. 3, Nishi Decl. ¶ 43.

Plaintiffs have cancelled events to inform prospective subgrantees, stopped travel related to the program, and directed partners not to perform any additional work. Ex. 1, Norton Decl. ¶¶ 29, 33 & Attach. J; Ex. 2, Rybak Decl. ¶ 25. Without the promised funding, Plaintiffs cannot complete the subgrant process, much less monitor those subgrants for compliance with program requirements. Ex. 1, Norton Decl. ¶ 29; Ex. 2, Rybak Decl. ¶ 28; Ex. 3, Nishi Decl. ¶ 43. Plaintiffs have been attempting to keep the program alive with their own funds, but the reality is that, without grant funding, the Plaintiff Organizations' Thriving Communities programs will soon cease to exist in their envisioned form and likely altogether. Ex. 1, Norton Decl. ¶ 30; Ex. 2, Rybak Decl. ¶¶ 6, 20; Ex. 3, Nishi Decl. ¶¶ 28, 46–47. It would not be possible for GHHI, the Minneapolis Foundation, or Philanthropy Northwest simply to resume their work after obtaining a favorable final judgment at the end of this litigation. Ex. 1, Norton Decl. ¶ 30; Ex. 2, Rybak Decl. ¶¶ 22–23; Ex. 3, Nishi Decl. ¶ 32 46. All of the essential organizational infrastructure will by then have disappeared.

    *Third*, the termination of the initial grants and suspended access to the subsequent grant accounts has created severe budgetary challenges. Each of the Plaintiff Organizations had anticipated drawing funds from their grants over a three-year period and had accordingly planned their work under the Thriving Communities program and otherwise. Ex. 1, Norton Decl. ¶ 34; Ex. 2, Rybak Decl. ¶ 9; Ex. 3, Nishi Decl. ¶ 29. Plaintiffs' use of reserves to cover expenses related to the Thriving Communities program will leave them unable to complete work in other program areas, to the detriment of their missions. Ex. 1, Norton Decl. ¶¶ 29, 31; Ex. 2, Rybak Decl. ¶ 21; Ex. 3, Nishi Decl. ¶ 33. Plaintiffs will also be unable to fulfill obligations to third-parties, including partner organizations and outside vendors, which they had budgeted from the $8 million initial grants. Ex. 1, Norton Decl. ¶ 16; Ex. 2, Rybak Decl. ¶ 24; Ex. 3, Nishi Decl.

¶¶ 36–37. The EPA's abrupt termination of grant funding "interferes with the [Plaintiffs'] ability to budget, plan for the future, and properly serve" their respective communities. *Cnty. of Santa Clara v. Trump*, 250 F. Supp. 3d 497, 537 (N.D. Cal. 2017).

*Fourth*, the Plaintiff Organizations will suffer serious and irreversible reputational harm due to EPA's actions. Plaintiffs spent more than a year building relationships with community leaders and partner organizations, as well as community-based non-profits and local and tribal government agencies. Ex. 1, Norton Decl. ¶¶ 14–15; Ex. 2, Rybak Decl. ¶¶ 9(b)–(c), 22; Ex. 3, Nishi Decl. ¶ 14. These individuals and entities placed their trust in the Plaintiff Organizations to serve as partners and administer the Thriving Communities program, which they will be unable to do. Ex. 1, Norton Decl. ¶ 35; Ex. 2, Rybak Decl. ¶¶ 26–27; Ex. 3, Nishi Decl. ¶ 46. EPA's actions will make it more difficult for the organizations to "secure future contributions from donors, given the specter of uncertainty raised by such a substantial loss in funding and questions that may arise from the perception that [they were] not able to successfully accomplish the originally funded program, as originally publicized in the community." Ex. 2, Rybak Decl. ¶ 26. As a result, the organizations' relationships and standing in their communities will suffer. *See HIAS, Inc. v. Trump*, 985 F.3d 309, 326 (4th Cir. 2021) (finding a "significant and irreparable" injury where "community connections that [plaintiffs] have developed are likely to erode"); *see also Lonza Walkersville, Inc. v. Adva Biotechnology*, 581 F. Supp. 3d 736, 750 (D. Md. 2022) (identifying "loss of goodwill" and "damage to reputation" as irreparable harm).

"These harms, and many more, do not only impact the Plaintiff[s], but the communities and people they serve." *Massachusetts*, 2025 WL 702163, at *31. Without the funding or staff to administer the grantmaking program, the Plaintiff Organizations will be unable to properly vet, award, and monitor the additional $144 million in subgrants. Ex. 1, Norton Decl. ¶ 29; Ex. 2,

Rybak Decl. ¶ 20; Ex. 3, Nishi Decl. ¶ 43. GHHI, the Minneapolis Foundation, and Philanthropy Northwest have together planned to award more than 500 Thriving Communities subgrants. Ex. 1, Norton Decl. ¶ 8; Ex. 2, Rybak Decl. ¶ 30; Ex. 3, Nishi Decl. ¶ 8. As a result of EPA's actions, all of those community-based non-profit organizations and local and tribal government agencies will be deprived of critical funding and support. Ex. 1, Norton Decl. ¶ 41; Ex. 2, Rybak Decl. ¶ 30; Ex. 3, Nishi Decl. ¶¶ 38–39. Plaintiffs' inability to award subgrants will diminish the health and safety of the communities that they serve. For example, GHHI has awarded $280,000 to a nonprofit community development organization in West Virginia, which had planned to use the subgrant to prevent sewage overflow and contamination of local water services. Ex. 1, Norton Decl. ¶ 42. The Minneapolis Foundation planned to award approximately $350,000 to support wastewater treatment processes in two small rural Appalachian communities in Ohio. Ex. 2, Rybak Decl. ¶ 31. And Philanthropy Northwest had selected a subgrantee that designed a project to reduce the risk of severe wildfires in Idaho. Ex. 3, Nishi Decl. ¶ 40. In impairing the ability of the Plaintiff Organizations to facilitate critical services in their communities, EPA will cause them to suffer irreparable harm. *See, e.g.*, *Open Cmtys. All. v. Carson*, 286 F. Supp. 3d 148, 177–78 (D.D.C. 2017) (citing *League of Women Voters*, 838 F.3d at 8) (deeming impairment to organization's "ability to assist voucher holders gain access to greater opportunity" irreparable); *see also Massachusetts*, 2025 WL 702163, at *28–29; *New York v. Trump*, No. 25-cv-39-JJM-PAS, 2025 WL 357368, *13–14 (D.R.I. Jan. 31, 2025) (state residents deprived of services); *United States v. N. Carolina*, 192 F. Supp. 3d 620, 629 (M.D.N.C. 2016) (finding irreparable harm where "loss of funding is likely to have an immediate impact" on provision of "critical resources to the public").

In sum, the harms caused by the Defendants are irreparable and plainly warrant

preliminary injunctive relief. As one court recently explained, it is "so obvious that it almost need not be stated that when money is obligated and therefore expected . . . and is not paid as promised, harm follows—debt is incurred, debt is unpaid, essential health and safety services stop, and budgets are upended." *New York*, 2025 WL 715621, at *13. Where, as here, grant recipients are unable to access funds mandated by the "[Inflation Reduction Act,]" they "unquestionably" suffer irreparable harm. *Id.* at *15. "Congress enacted these statutes and appropriated these funds for legitimate reasons, and the Defendants' categorical freeze, untethered to any statute, regulation or grant term, frustrates those reasons, and causes significant and irreparable harms[.]" *Id.*

### C. The Balance of Equities and the Public Interest Favor Entry of a Preliminary Injunction.

The final two factors, the balance of equities and the public interest, further compel preliminary relief. Where, as here, the defendant is a governmental entity, these two factors merge. *Roe v. Dep't of Def.*, 947 F.3d 207, 230 (4th Cir. 2020) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)); *Taliaferro v. N.C. State Bd. of Elections*, 489 F. Supp. 3d 433, 438 (E.D.N.C. 2020) ("The Court considers the public interest and the balance of the equities together."). To balance the equities, the court considers "the relative harms to [the] applicant and respondent, as well as the interests of the public at large." *Barnes v. E-Sys., Inc. Grp. Hosp. Med. & Surgical Ins. Plan*, 501 U.S. 1301, 1305 (1991) (Scalia, J., in chambers) (quoting *Rokster v. Goldberg*, 448 U.S. 1306, 1308 (1980) (Brennan, J., in chambers)).

The balance of equities tips sharply in Plaintiffs' favor here. As detailed above, EPA's unlawful termination of the initial grants and refusal to disburse subsequent grant funds has caused, and will continue to cause, irreparable harm to the Plaintiff Organizations. Absent a preliminary injunction, the Plaintiff Organizations will be forced to lay off employees, stop

critical work in frustration of their missions, and withdraw funding and support from their subgrantees and the communities they serve. As a direct result, people in the hundreds of communities across the Mid-Atlantic, Great Lakes, and Northwest regions that anticipated funding to support their environmental protection projects will suffer. The subgrantees will be unable, for example, to take steps to remove lead in soils in parks and playgrounds, remediate asbestos and radon in homes, and prevent contamination in drinking water sources.

In contrast to the concrete and imminent harms faced by GHHI, the Minneapolis Foundation, Philanthropy Northwest, and the communities they serve, EPA cannot show that it would suffer any harm—let alone substantial harm—as a result of the injunction, especially because the funding has already been appropriated in a duly enacted statute. The federal government faces no "harm from an injunction that merely ends an unlawful practice or reads a statute as required." *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 191 (D.D.C. 2015) (quoting *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013)). For its part, the public "undoubtedly has an interest in seeing its governmental institutions follow the law." *Maryland v. U.S. Dep't of Agric.*, Civil No. JKB-25-0748, 2025 WL 800216, at *21 (D. Md. Mar. 13, 2025) (quoting *Roe*, 947 F.3d at 222); *see also N. Mariana Islands v. United States*, 686 F. Supp 2d 7, 21 (D.D.C. 2009) ("The public interest is served when administrative agencies comply with their obligations under the APA." (citing *New Jersey v. EPA*, 626 F.2d 1038, 1045 (D.C. Cir. 1980))). What is more, the American public has an interest in the disbursements that Congress mandated through the Inflation Reduction Act. *See League of Women Voters*, 838 F.3d at 13 (finding that compliance with congressional enactments to further public interest). Rather than cause harm to EPA, the requested injunction will simply restore the pre-termination status quo as this litigation proceeds.

**D.    Plaintiffs Are Entitled to Preliminary Relief in the Form Requested.**

This Court possesses "wide discretion to fashion appropriate injunctive relief," *Roe*, 947

F.3d at 231, to prevent further irreparable harm to the Plaintiff Organizations, and the Court

should exercise that discretion to provide the relief specified in the organizations' proposed

order. Further, the APA provides that courts must "hold unlawful and set aside agency action,

findings, and conclusions" if they are "arbitrary, capricious, an abuse of discretion, or otherwise

not in accordance with law." 5 U.S.C. § 706. Federal courts possess the power in equity to "grant

injunctive relief . . . with respect to violations of federal law by federal officials." *Armstrong v.*

*Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326–27 (2015). Indeed, the Supreme Court has

repeatedly allowed equitable relief against federal officials who act "beyond th[e] limitations"

imposed by federal statute. *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689

(1949). In addition, Plaintiffs have requested relief pursuant to the Declaratory Judgment Act, 28

U.S.C. § 2201.

Because the Plaintiff Organizations have satisfied the requirements for a preliminary

injunction as described above, the organizations respectfully request that the Court vacate and set

aside the EPA's unlawful termination of their Thriving Communities initial grants and suspension

of access to subsequent grant funds and declare that EPA's actions are unlawful. Plaintiffs further

request preliminary injunctive relief directing the EPA and Administrator Zeldin to restore the

status quo that existed prior to the termination of their grants and prohibit Defendants from

terminating or suspending access to any of the organizations' Thriving Communities grants or

freezing access to funding under any of the grants.

**E.    No Bond Is Necessary Here.**

Federal Rule of Civil Procedure 65(c) provides that a court may enter a preliminary

injunction only if the movant "gives security" in an amount the "court considers proper" to pay

the costs and damages to a party later found to have been wrongfully enjoined. District courts possess discretion to either waive the bond requirement altogether or set the required security to a nominal amount. *See Md. Dept. of Hum. Res. v. U.S. Dept. of Agric.*, 976 F.2d 1462, 1483 n.23 (4th Cir. 1992) (citing cases); *Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 411, 421 n.3 (4th Cir. 1999). In determining the amount of an injunction harm, courts consider the "gravity of the potential harm to the enjoined party." *Hoechst*, 174 F.3d at 421 n.3. Because EPA cannot identify any non-speculative harm, the Plaintiff Organizations request that no bond or security be entered. In the alternative, Plaintiffs request a nominal bond of $100. *AACTE*, 2025 WL 833917, at *25 (quoting *Dep't of Agric.*, 2025 WL 800216, at *26) (ordering bond of $100 after reaffirming that, in this District, the "nominal bond approach 'has long been followed in public-interest litigation cases.'").

## CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for Preliminary Injunction should be granted. A proposed order entering a preliminary injunction is attached.

Dated: April 2, 2025

Respectfully submitted,

Jessica C. Abrahams
   (*pro hac vice* forthcoming)
Lora Brzezynski (Bar No. 17837)
Faegre Drinker Biddle & Reath LLP
1500 K Street NW, Suite 1100
Washington, DC 20005
Phone: 202-230-5000
Fax: 202-842-8465
jessica.abrahams@faegredrinker.com
lora.brzezynski@faegredrinker.com

*Attorneys for Plaintiff*
*The Minneapolis Foundation*

Andrew D. Freeman (Bar No. 03867)
Joshua N. Auerbach (Bar No. 26108)
Neel K. Lalchandani (Bar No. 20291)
Brown, Goldstein & Levy, LLP
120 E. Baltimore Street, Suite 2500
Baltimore, MD 21202
Phone: 410-962-1030
Fax: 410-385-0869
adf@browngold.com
jauerbach@browngold.com
nkl@browngold.com

*Attorneys for Plaintiff Green &*
*Healthy Homes Initiative, Inc.*

Jonathan A. DeMella
   (*pro hac vice* forthcoming)
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
Phone: 206-757-8338
Fax: 206-757-7338
jonathandemella@dwt.com

Charles M. English, Jr. (Bar No. 03621)
Davis Wright Tremaine LLP
1301 K Street NW, Suite 500 East
Washington, DC 20005
Phone: 202-973-4200
chipenglish@dwt.com

*Attorneys for Plaintiff*
*Philanthropy Northwest*