UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Northern Division)

| | | |
|---|---|---|
| **GREEN & HEALTHY HOMES INITIATIVE, INC.,** *et al.*, | * | |
| | * | |
| Plaintiffs, | * | |
| | * | |
| v. | * | Case No.: 25-cv-1096 (ABA) |
| | * | |
| **ENVIRONMENTAL PROTECTION AGENCY,** *et al.*, | * | |
| | * | |
| Defendants. | * | |

\*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*

**REPLY TO DEFENDANTS' RESPONSE IN OPPOSITION
TO MOTION FOR PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

INTRODUCTION .................................................................................................................1

REPLY ARGUMENT ..........................................................................................................3

    I.    This Court has subject matter jurisdiction to resolve Plaintiffs' claims. ................3

        A.    Plaintiffs' claims for equitable relief are not subject to the Tucker Act. ......................................................................................................4

            i.    Plaintiffs' grants are not contracts, and Plaintiffs seek to vindicate substantive rights located in statutory and constitutional law, not in any contract or agreement........................4

            ii.    Plaintiffs seek equitable injunctive relief of a prospective nature, not money damages..............................................................9

        B.    COFC lacks jurisdiction over Plaintiffs' First Amendment claims. ..........11

    II.    Plaintiffs have satisfied the requirements for a preliminary injunction. ................12

        A.    Plaintiffs are likely to succeed on the merits of their claims......................12

            i.    EPA's actions were arbitrary and capricious. .................................13

            ii.    EPA's actions were in excess of statutory authority. .....................15

            iii.    EPA's actions violate the First Amendment....................................16

            iv.    EPA failed to adhere to regulations governing the termination of grants.....................................................................19

            v.    The EPA's actions are reviewable.....................................................19

            vi.    Remand without vacatur, even if theoretically permissible, would be wholly unwarranted here. .................................20

        B.    Plaintiffs have met the other requirements for a preliminary injunction. ...................................................................................................21

        C.    This Court should not impose a bond. ........................................................23

CONCLUSION..................................................................................................................24

## <u>TABLE OF AUTHORITIES</u>

**Cases** **Page(s)**

*Agency for International Development v. Alliance for Open Society International, Inc.*,
  570 U.S. 205 (2013) .................................................................................... 11, 12, 17, 18

*Am. Near E. Refugee Aid v. U.S. Agency for Int'l Dev.*,
  703 F. Supp. 3d 126 (D.D.C. 2023) ..................................................................... 4, 5

*Am. Sci. & Eng'g, Inc. v. Califano*,
  571 F.2d 58 (1st Cir. 1978) ...................................................................................... 4

*Amer. Assoc. of Coll. For Teacher Educ. v. McMahon*,
  No. 25-1281, Doc. 30 (4th Cir., Apr. 10, 2025) ................................................... 10

*American Ass'n of Colleges for Teacher Educ. v. McMahon*,
  No. 1:25-cv-00702 (D. Md. Mar. 3, 2025) .......................................................... 10

*Armstrong v. Exceptional Child Center, Inc.*,
  575 U.S. 320 (2015) .................................................................................................. 3

*Bowen v. Massachusetts*,
  487 U.S. 879 (1988) ....................................................................................... 9, 10, 11

*Chicago Women in Trades v. Trump*,
  1:25-cv-02005, 2025 WL 1114466 (N.D. Ill. April 14, 2025) ................................ 2

*Climate United Fund v. Citibank*,
  Civil Action No. 25-CV-698 (TSC), 2025 WL 1131412 (D.D.C. Apr. 16, 2025) ...................................................................................................................... 19

*Cmty. Bankers v. F.D.I.C.*,
  200 F.3d 822 (D.C. Cir. 2000) ............................................................................... 10

*Coleman v. v. Kendall*,
  74 F.4th 610 (4th Cir. 2023) .................................................................................. 10

*Corner Post, Inc. v. Board of Governors of Federal Reserve System*,
  603 U.S. 799 (Kavanaugh, J., concurring) ............................................................ 21

*Dep't of Educ. v. California*,
  604 U.S. ——, 145 S. Ct. 966 (Apr. 4, 2025) ............................................... *passim*

*Honeyfund.com, Inc. v. DeSantis*,
  622 F. Supp. 3d 1159 (N.D. Fla. 2022) ................................................................ 24

*Hymas v. U.S.*,
    810 F.3d 1312 (Fed. Cir. 2016) ............................................................ 5

*Ingersoll-Rand Co. v. United States*,
    780 F.2d 74 (D.D.C. 1985) .................................................................... 8

*Int'l Union, United Mine Workers of Am. v. U.S. Dep't of Labor*,
    358 F.3d 40 (D.C. Cir. 2004) .............................................................. 14

*Johnson v. Bergland*,
    586 F.2d 993 (4th Cir. 1976) .............................................................. 21

*Legal Servs. Corp. v. Velazquez*,
    531 U.S. 533 (2001) ............................................................................ 18

*Lincoln v. Vigil*,
    508 U.S. 182 (1993) ...................................................................... 19, 20

*Maine Cmty. Health Options v. U.S.*,
    590 U.S. 296 (2020) .............................................................................. 9

*Maine v. U.S. Dept of Agric.*,
    No. 1:25-CV-00131-JAW, 2025 WL 1088946 (D. Me. Apr. 11, 2025) ............................ 2, 10

*Maryland Dept. of Human Resources v. Dept. of Health and Human Services*,
    763 F.2d 1441 (1985) ............................................................................ 9

*Megapulse, Inc. v. Lewis*,
    672 F.2d 959 (D.C. Cir. 1982) ...................................................... *passim*

*Nat. Res. Def. Council, Inc. v. Morton*,
    337 F. Supp. 167 (D.D.C. 1971) ........................................................ 24

*National Association of Diversity Officers in Higher Education et al. v. Donald J. Trump et al.*,
    No. 25-1189, Doc. 29 (4th Cir., Mar. 14, 2025) ................................ 18

*New York v. Trump*,
    No. 25-cv-39-JJM-PAS, ECF No. 182 (D.R.I. Apr. 14, 2025) ............ 2, 10

*Normandy Apartments, Ltd. v. U.S. Dept. of Hous. and Urb. Dev.*,
    554 F.3d 1290 (10th Cir. 2009) ........................................................ 7, 8

*Ohio v. EPA*,
    603 U.S. 279 (2024) ............................................................................ 14

*Pacito v. Trump*,
    2:25-cv-255-JNW, 2025 WL 1077401 (W.D. Wash. April 9, 2025) ........................ 2

*Palomino v. Federal Bureau of Prisons,*
    408 F. Supp. 2d 282 (S.D. Tex. 2005) ............................................................15, 16

*Pol'y & Rsch., LLC v. Dep't of Health & Hum. Servs.,*
    313 F. Supp. 3d 62 (D.D.C. 2018) (Jackson, J.)........................................... 20

*Robbins v. U.S. Bureau of Land Mgt.,*
    438 F.3d 1074 (10th Cir. 2006) ...................................................................... 7

*San Antonio Hous. Auth. v. United States,*
    143 Fed. Cl. 425 (2019) ................................................................................... 5

*Shawnee Tribe v. Mnuchin,*
    984 F.3d 94 (D.C. Cir. 2021)......................................................................... 19

*Solutions in Hometown Connections, et al. v. Noem,*
    No. 25-CV-00885-LKG, 2025 WL 1103253 (D. Md. Apr. 14, 2025).............2, 7, 8

*St. Bernard Parish Gov't v. United States,*
    134 Fed. Cl. 730 (2017), *aff'd on other grounds,* 916 F.3d 987 (Fed. Cir.
    2019)................................................................................................................ 5

*Suburban Mortg. Assocs., Inc. v. U.S. Dep't of Hous. & Urb. Dev.,*
    480 F.3d 1116 (Fed. Cir. 2007) ...................................................................... 4

*Texas v. United States,*
    126 F. 4th 392 (5th Cir. 2025) ...................................................................... 21

*Trauma Serv. Grp. v. United States,*
    104 F.3d 1321 (Fed. Cir. 1997) ...................................................................... 5

*United States v. Connolly,*
    716 F. 2d 882 (Fed. Cir. 1983) ..................................................................... 12

*United Steel v. Mine Safety & Health Admin.,*
    925 F. 3d 1279 (D.C. Cir. 2019)................................................................... 21

*Volk v. United States,*
    111 Fed. Cl. 313 (2013) ................................................................................ 12

*Woonasquatucket River Watershed Council v. U.S. Dep't of Agric.,*
    No. 1:25-CV-00097-MSM-PAS, 2025 WL 1116157 (D.R.I. Apr. 15, 2025)................. *passim*

**Statutes, Rules & Regulations**

2 C.F.R. § 200.340............................................................................................14, 19

5 U.S.C. § 702 ..................................................................................................3, 6, 9

5 U.S.C. § 704 ............................................................................................................ 3, 6

5 U.S.C. § 706(2)(A) ...................................................................................................... 14

5 U.S.C. § 706(2)(C) ...................................................................................................... 19

5 U.S.C. § 706(2)(D) ...................................................................................................... 19

18 U.S.C. § 4046(a) ....................................................................................................... 15

28 U.S.C. § 1491(a) ......................................................................................................... 3

28 U.S.C. § 1491(a)(1) .................................................................................................. 4, 8

41 U.S.C. § 7102 .............................................................................................................. 8

42 U.S.C. § 7438 ........................................................................................................ 15, 16

42 U.S.C. § 7438(a) ...................................................................................................... 3, 6

42 U.S.C. § 7438(b)(1) .................................................................................................. 3, 6

42 U.S.C. § 7438(b)(2) ...................................................................................................... 6

**Other Authorities**

U.S. Constitution, First Amendment ...................................................................... *passim*

U.S. Constitution, Fifth Amendment .............................................................................. 18

## INTRODUCTION

This Court, not the United States Court of Federal Claims ("COFC"), is the proper forum for adjudication of the claims brought by the Plaintiff Organizations in this case. In asserting its Tucker Act jurisdictional defense, EPA recognizes that the decision of the D.C. Circuit in *Megapulse, Inc. v. Lewis* supplies an appropriate framework to determine whether Plaintiffs' action is properly brought in District Court or whether it is instead a "disguised contract action" that must be brought in the COFC. 672 F.2d 959, 968 (D.C. Cir. 1982). EPA fails to recognize, however, that, under the *Megapulse* analysis as it has been applied for more than forty years, including in *Megapulse* itself, Plaintiffs' claims fall squarely within the District Court's jurisdiction.

On both prongs of the pertinent analysis, Plaintiffs' claims allege improper agency action under the Administrative Procedure Act ("APA") and violation of constitutional rights, and are not "disguised contract" claims. First, in challenging EPA's decision to eliminate a program that was statutorily mandated by Congress, Plaintiffs have invoked, as the source of the substantive rights that they seek to vindicate, the Clean Air Act, the U.S. Constitution, certain federal grant award regulations, and the APA. Second, Plaintiffs have sought from this Court only prospective equitable and declaratory relief, not money damages, or even the payment of any particular sum of money.

In recent weeks, in the wake of the Supreme Court's brief, *per curiam* ruling in *Dep't of Educ. v. California*, 604 U.S. ——, 145 S. Ct. 966 (Apr. 4, 2025), the same jurisdictional defense asserted by EPA here has been asserted by the federal government in courts across the country in cases involving the government's termination and suspension of grant funding. In a substantial majority of these post-*California* cases (five of the six decisions of which Plaintiffs are aware), federal courts have retained jurisdiction and recognized that, under *Megapulse* and other long-

established precedents, grantees have properly established jurisdiction under the APA, not under the Tucker Act, to challenge an improper decision by a government agency to ignore a statutory mandate by Congress and adopt a new "priority" resulting in across-the-board terminations or suspensions of grants.[1]  Those cases supply the appropriate analysis here.

On the merits, EPA does not meaningfully engage with Plaintiffs' claims. EPA's purported "Agency priority" is arbitrary and capricious, because, among other reasons, its content is almost wholly amorphous. EPA's responsive memorandum does not bring any additional clarity to the basis for its decision to terminate and suspend Plaintiffs' grants. EPA's actions exceed its authority under the Clean Air Act, because, as EPA does not dispute, its newly declared "priority" requires the withholding of congressionally mandated "climate and environmental justice" grant funding from programs or organizations that "promote or take part in . . . 'environmental justice.'" Finally, EPA's attempt to justify its viewpoint discrimination as a "policy priority" is unavailing. Because the new "priority" conditions an organization's eligibility for grant funding on the organization refraining from "promot[ing] or tak[ing] part in" certain viewpoints, including "DEI" and "environmental justice," that EPA now disfavors, it cannot be squared with the rights guaranteed by the First Amendment. The Plaintiff Organizations are therefore likely to succeed on the merits of their claims.

---

[1] See *Woonasquatucket River Watershed Council v. U.S. Dep't of Agric.*, No. 1:25-CV-00097-MSM-PAS, 2025 WL 1116157, at *15 (D.R.I. Apr. 15, 2025); *Chicago Women in Trades v. Trump*, 1:25-cv-02005, 2025 WL 1114466, at *8-10 (N.D. Ill. April 14, 2025);  *New York v. Trump*, No. 25-cv-39-JJM-PAS, ECF No. 182 at 5–9 (D.R.I. Apr. 14, 2025); *Maine v. U.S. Dept of Agric.*, No. 1:25-CV-00131-JAW, 2025 WL 1088946, at *18-19 (D. Me. Apr. 11, 2025); *Pacito v. Trump*, 2:25-cv-255-JNW, 2025 WL 1077401, at *3 (W.D. Wash. April 9, 2025) (denying government's motion for reconsideration). *But see Solutions in Hometown Connections, et al. v. Noem*, No. 25-CV-00885-LKG, 2025 WL 1103253 (D. Md. Apr. 14, 2025).

With respect to irreparable harm, EPA's opposition mischaracterizes the harm to the Plaintiff Organizations' missions as "loss of profits and business opportunities." But, as explained in Plaintiffs' opening brief and declarations as well as in the supplemental declarations filed herewith, the loss of these grants, or even their continued suspension, will cause significant and irreparable harm to the organizations and their missions.

Finally, as held in numerous similar cases, no bond is appropriate. A bond of the size requested by EPA would be impossible for these organizations to obtain and defeat the purpose of preliminary relief.

## REPLY ARGUMENT

## I.    This Court has subject matter jurisdiction to resolve Plaintiffs' claims.

Notwithstanding EPA's attempt to reframe this case as a contractual dispute for monetary damages, the Plaintiff Organizations have challenged here an improper agency action: EPA's adoption of an arbitrary, unlawful and unconstitutional "Agency priority" that runs directly counter to the Agency's statutory mandate as defined in the Clean Air Act. *See* 42 U.S.C. § 7438(a) & (b)(1) (mandating that the EPA Administrator "shall use" appropriated funds to establish a program of "environmental and climate justice block grants"). EPA argues that Plaintiff's claims should be dismissed because the COFC has exclusive jurisdiction over this action pursuant to the Tucker Act, 28 U.S.C. § 1491(a).  Jurisdiction under the APA is appropriate for suits, like this one, seeking relief "other than money damages" for "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. §§ 702, 704. With respect to this Court's equitable jurisdiction to hear constitutional claims, "[t]he ability to sue to enjoin unconstitutional actions by . . . federal officers is the creation of courts of equity, and reflects a long history of judicial review of illegal executive action."  *Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320, 327 (2015). Plaintiffs seek to enforce substantive rights located

in statutory and constitutional law, not in any contract or agreement, and Plaintiffs seek an injunctive remedy, not monetary damages. Accordingly, this lawsuit is properly before this Court under the APA.

**A.    Plaintiffs' claims for equitable relief are not subject to the Tucker Act.**

The Tucker Act vests the COFC with jurisdiction over "express or implied contract[s] with the United States." 28 U.S.C. § 1491(a)(1). In determining whether the Tucker Act applies, courts "must look beyond the form of the pleadings to the substance of the claim," *Suburban Mortg. Assocs., Inc. v. U.S. Dep't of Hous. & Urb. Dev.*, 480 F.3d 1116, 1117 (Fed. Cir. 2007), to determine whether "the essence of the action is in contract." *Am. Sci. & Eng'g, Inc. v. Califano*, 571 F.2d 58, 63 (1st Cir. 1978).

As discussed above, the two-prong analysis set forth in the D.C. Circuit's *Megapulse* decision focusing on (1) the "source of the rights upon which the plaintiff bases its claim" and (2) "the type of relief sought," 672 F.2d at 968, is an appropriate framework for this Court to determine whether Plaintiffs' claims belong in this Court or the COFC.  Under the correct application of this analysis, Plaintiffs' claims clearly belong in federal district court.

**i.    Plaintiffs' grants are not contracts, and Plaintiffs seek to vindicate substantive rights located in statutory and constitutional law, not in any contract or agreement.**

As an initial matter, EPA's jurisdictional argument misses the mark, because Plaintiffs' Thriving Community grants are not contracts and thus are not subject to review by the COFC. In certain circumstances, federal financial assistance awards such as grants may be considered "contracts" enforceable under the Tucker Act. However, for grants to be so construed, they must contain "the four required elements of offer, acceptance, consideration, and proper government authority." *Am. Near E. Refugee Aid v. U.S. Agency for Int'l Dev.*, 703 F. Supp. 3d 126, 132

(D.D.C. 2023); *San Antonio Hous. Auth. v. United States*, 143 Fed. Cl. 425, 463 (2019); *Trauma Serv. Grp. v. United States*, 104 F.3d 1321, 1326 (Fed. Cir. 1997).

Plaintiffs' grants are not contracts, because they do not entail the crucial element of consideration. EPA glosses over this point, merely stating that "EPA awarded money in exchange for performance of the grant program from Plaintiffs." ECF 22-1 at 13. This conclusion ignores extensive caselaw specifying that consideration must render a "tangible" and "direct" benefit to the government, not merely a "generalized" benefit to advance "policy interests" or an "agency's overall mission." *Am. Near E. Refugee Aid*, 703 F. Supp. 3d at 133 (finding no consideration or "direct, tangible benefits" to the government resulting from nonprofit plaintiff's cooperative agreement with USAID to increase "access to water, sanitation and other small and medium scale community infrastructure"); *see, e.g., St. Bernard Parish Gov't v. United States*, 134 Fed. Cl. 730, 735–36 (2017), *aff'd on other grounds*, 916 F.3d 987 (Fed. Cir. 2019) (finding no consideration and only indirect benefits to the federal government in the context of a grant agreement with a local parish to clear sediment from area watersheds after Hurricane Katrina, even where the government received "the restoration of a natural resource and a reduction in the amount of emergency funds" required for future flooding emergencies); *Hymas v. U.S.*, 810 F.3d 1312, 1328 (Fed. Cir. 2016) (finding no consideration and only indirect benefit to the U.S. Fish and Wildlife Service in the context of cooperative farming agreements between private farmers and the Service, even where the farmers directly sought to "advance the agency's overall mission" by promoting wildlife conservation). Here, Plaintiffs' grants provide no direct, tangible benefits to EPA, and thus lack the required consideration to be considered contracts for purposes of Tucker Act jurisdiction.   Plaintiffs' Thriving Communities grants are born of the Inflation Reduction Act of 2022 ("IRA"), where Congress amended the Clean Air Act and appropriated

funding specifically to "award grants . . . that benefit disadvantaged communities." 42 U.S.C. §
7438(a) & (b)(1). The grant activities eligible for support under the Act include "community-led
air and other pollution monitoring, prevention, and remediation," "investments in low- and zero-
emission and resilient technologies and related infrastructure," and "mitigating climate and
health risks from urban heat islands, extreme heat, wood heater emissions, and wildfire events."
42 U.S.C. § 7438(b)(2). Any generalized benefit that may inure to the advancement of broader
statutory goals are neither direct nor tangible to EPA and do not satisfy the consideration prong
for purposes of COFC review. Plaintiffs' grants, thus, cannot be considered contracts covered by
the Tucker Act and its claims cannot be brought at COFC.  As a result, this Court must take
jurisdiction over Plaintiffs' claims, otherwise there would be "no other adequate remedy in a
court." *See* 5 U.S.C. §§ 702, 704.

Moreover, and crucially, even if the grants at issue were contracts, the "essence" of
Plaintiffs' claims are not contractual in nature. The Court in *Megapulse* specifically rejected the
notion that "any case requiring some reference to or incorporation of a contract is necessarily on
the contract and therefore directly within the Tucker Act." *Megapulse*, 672 F.2d at 968. Instead,
determining whether a claim "is or is not 'at its essence' a contract action" requires a "more
deliberate . . . examination" of the specific claims at issue, ultimately turning on the "source of
the rights upon which the plaintiff bases its claims, and upon the type of relief sought," which
Defendants have not bothered to do here. *Id*. at 968.

Plaintiffs' claims here, like those brought by the contractor in *Megapulse*, do not turn on
the terms and conditions of any contract or agreement. The claims in this case challenge the
Agency's failure to act in accordance with the statutory mandate of the Clean Air Act, the
Agency's failure to provide a rationale for termination of a statutorily-imposed program, and the

Agency's violation of the First Amendment. As these claims are not founded upon the terms and conditions of the grants, they do not—and cannot—fall under the Tucker Act's exclusive jurisdiction. *See Woonasquatucket River Watershed Council v. U.S. Dep't of Agric*., No. 1:25-CV-00097-MSM-PAS, 2025 WL 1116157, at *15 (D.R.I. Apr. 15, 2025) (finding the "essence" of an action was not contractual where "the gravamen" of plaintiff nonprofits' allegations "does not turn on terms of a contract between the parties; it turns on federal statute and regulations put in place by Congress and the agencies").

Further, the fact that Plaintiffs hold grant agreements with EPA is not dispositive of the "source" of Plaintiffs' rights or the "essence" of Plaintiffs' claims. In fact, when a party asserts that the government's breach is contrary to federal law and that party seeks relief other than monetary damages, the APA's waiver of sovereign immunity applies and the Tucker Act does not preclude a federal district court from taking jurisdiction. *Normandy Apartments, Ltd. v. U.S. Dept. of Hous. and Urb. Dev*., 554 F.3d 1290, 1300 (10th Cir. 2009). Relying on *Megapulse*, the Tenth Circuit in *Normandy* explained that "[w]hen the source of rights asserted is constitutional, statutory, or regulatory in nature, the fact that resolution of the claim requires some reference to contract does not magically 'transform [the] action ... into one on the contract and deprive the court of jurisdiction it might otherwise have.'" *Id*. (quoting *Megapulse*, 672 F.2d at 968). Instead, "litigants may bring statutory and constitutional claims in federal district court *even when the claims depend on the existence and terms of a contract with the government*." *Id*. at 1300 (quoting *Robbins v. U.S. Bureau of Land Mgt.*, 438 F.3d 1074, 1083 (10th Cir. 2006)).

EPA fails to address *Megapulse* and instead focuses on the recent ruling in *Solutions in Hometown Connections, et al., v. Noem*, No. 25-CV-00885-LKG, 2025 WL 1103253 (D. Md.

Apr. 14, 2025), which ignores the compelling distinction outlined in *Normandy*.[2] And even if EPA did address *Megapulse* and assuming the grants were actually contracts for purposes of Tucker Act jurisdiction, "the mere fact that a court may have to rule on a contract issue does not, by triggering some mystical metamorphosis, automatically transform an action . . . into one on the contract and deprive the court of jurisdiction it might otherwise have." *Megapulse*, 672 F.2d at 968.[3] Analyzing the "basis for jurisdiction independent of the Tucker Act" instead requires a "more deliberate . . . examination" specific to Plaintiffs' claims in the present case. *Id.*

Similarly, the Supreme Court's recent ruling in *Department of Education v. California* does not negate the applicability of *Megapulse* and its progeny, nor does it govern or address the "essence" of Plaintiffs' claims in this instance. If anything, the Supreme Court's ruling emphasizes the importance of distinguishing between "suits *based on* 'any express or implied contract with the United States'" and suits—including the present case—where the source of rights asserted is constitutional, statutory, or regulatory in nature; a distinction that *Megapulse* addresses directly. *California*, 145 S. Ct. at 968 (quoting 28 U.S.C. § 1491(a)(1)). The Supreme Court's brief references to jurisdictional issues in *California* certainly do not settle all jurisdictional questions here. This Court must instead examine Plaintiffs' source of rights and the essence of Plaintiffs' claims based on the specific facts in this case. Those facts make clear that neither are contractual.

---

[2] And, unlike the plaintiffs in *Solutions in Hometown Connections,* Plaintiffs here are not asking this Court for reimbursement for costs incurred and do not seek contractual relief of any sort. *See infra* Section I.A.ii for additional discussion of the type of relief sought.

[3] EPA's reference to *Ingersoll-Rand Co. v. United States*, 780 F.2d 74, 75, 76–77 (D.D.C. 1985) is also inapposite here, as that case addressed the ability of government contractors to recover termination costs under the Contract Disputes Act, 41 U.S.C. § 7102. Disputes pursuant to the CDA are exclusively appealed to the COFC.

ii.    **Plaintiffs seek equitable injunctive relief of a prospective nature, not money damages.**

The second step in determining whether a claim is "at its essence" a contract action requires an analysis of "the type of relief sought." *Megapulse*, 672 F.2d at 968. Where that relief sought is money damages stemming from a contract claim, a claim falls under the exclusive jurisdiction of the COFC. But where the relief sought is equitable in nature, as here, jurisdiction is proper under the APA.  For example, as recently recognized by the Supreme Court, "a district court's jurisdiction 'is not barred by the possibility' that an order setting aside an agency's action may result in the disbursement of funds." *California*, 145 S. Ct. at 968 (quoting *Bowen v. Massachusetts*, 487 U.S. 879, 910 (1988)). More plainly, just because "a judicial remedy may require one party to pay money to another" does not necessarily "characterize the relief as money damages." *Bowen*, 487 U.S. at 893.

As in *Bowen*, Plaintiffs here seek an order for "specific relief . . . rather than for money damages ([providing] relief that substitutes for that which ought to have been done)," thus squarely placing Plaintiffs' claims "within the District Court's jurisdiction under [APA] § 702's waiver of sovereign immunity." *Bowen*, 487 U.S. at 910. Although EPA acknowledges that the requested relief cannot be granted by COFC (ECF 22-1 at 18), it, nonetheless, asserts that this is a contract termination that must be brought as a breach action at the COFC. In so doing, it collapses the distinction between *monetary damages*—"given to the plaintiff to substitute for a suffered loss," *Bowen*, 487 U.S. at 895 (quoting *Maryland Dept. of Human Resources v. Dept. of Health and Human Services*, 763 F.2d 1441 (1985)), and covering "specific sums already calculated, past due, and designed to compensate for completed labors," *Maine Cmty. Health Options v. U.S.*, 590 U.S. 296, 327 (2020)—with *equitable relief* that clarifies ongoing agency obligations on a prospective basis. In other words, "money damages represent compensatory

relief, an award given to a plaintiff as a substitute for that which has been lost," whereas equitable relief "in contrast represents an attempt to restore to the plaintiff that to which it was entitled from the beginning." *Am.'s Cmty. Bankers v. F.D.I.C.*, 200 F.3d 822, 829 (D.C. Cir. 2000). Plaintiffs seek equitable relief in this case to prevent the "increasingly severe and irreparable harm" that will occur because of EPA's unlawful agency actions. ECF 2-1 at 31.

Finally, EPA argues that because "Plaintiffs' claims here mirror those in *AACTE* and *California*," recent cases where the Fourth Circuit and the Supreme Court, respectively, granted stays of preliminary injunctions related to grant terminations, the same result should follow here. ECF 22-1 at 17; *see* Order, *Amer. Assoc. of Coll. For Teacher Educ. v. McMahon*, No. 25-1281, Doc. 30 (4th Cir., Apr. 10, 2025) ("*AACTE*"); *Dep't of Educ. v. California*, 604 U.S. ——, 145 S. Ct. 966 (Apr. 4, 2025) (per curiam). Unlike the plaintiffs in *AACTE*, however, Plaintiffs here seek *prospective* equitable relief rather than an order to provide "reimbursement for all otherwise allowable expenditures incurred between the date of termination and the Court's order," *American Ass'n of Colleges for Teacher Educ. v. McMahon*, No. 1:25-cv-00702 (D. Md. Mar. 3, 2025), ECF No. 1.[4]

In short, Plaintiffs' claims are not claims for money damages, retrospective or otherwise. Their suit "is not a suit seeking money in *compensation* for the damage sustained by the failure

---

[4] Plaintiffs also note that neither *AACTE* nor *California* overruled *Bowen* or *Coleman*, both of which remain binding and govern the issue of prospective, equitable injunctive relief involving payments made under the APA. *See Bowen*, 487 U.S. at 893; *Coleman v. v. Kendall*, 74 F.4th 610, 615 (4th Cir. 2023); *see also Woonasquatucket*, 2025 WL 1116157, at *15 (holding *California* did not divest the court of jurisdiction where *Bowen* "directly controls"); *Maine v. U.S. Dept of Agric.*, No. 1:25-CV-00131-JAW, 2025 WL 1088946, at *19 n.8 (D. Me. Apr. 11, 2025) (relying on "well-established precedent in concluding" district court had jurisdiction to hear APA claims even where the TRO would likely result in monetary payments); *New York v. Trump*, No. 25-cv-39-JJM-PAS, ECF No. 182 at 5–9 (D.R.I. Apr. 14, 2025) (denying motion for reconsideration where "*Bowen* makes clear that the Court has jurisdiction" to hear APA claims).

of the Federal Government to pay as mandated; rather, it is a suit seeking to enforce the statutory mandate itself, which happens to be one for the payment of money." *Bowen v. Massachusetts*, 487 U.S. 879, 900 (1988). *Bowen* directly controls any question of "money damages" here and makes clear that Plaintiffs' claims do not fall under the exclusive jurisdiction of the Tucker Act.

**B.    COFC lacks jurisdiction over Plaintiffs' First Amendment claims.**

EPA attempts to preempt counterarguments regarding its APA and First Amendment violations by asserting that "where [constitutional] claims are peripheral to the core determination of whether a breach of contract had occurred," the COFC still retains exclusive jurisdiction. Unfortunately for EPA and as described in more detail below, such assertions do not alter the reality that, for all of the reasons described above, Plaintiffs' allegations are not contractual claims for money, the EPA's unconstitutional actions are not "peripheral," and this case is properly heard by this Court under its APA jurisdiction.

All of Plaintiffs' claims belong in this Court, not the Court of Federal Claims, but the deficiencies in EPA's jurisdictional argument are perhaps best illustrated by considering Plaintiff's constitutional claims. Plaintiffs assert that EPA has engaged in impermissible viewpoint discrimination, in violation of the First Amendment, by declaring the organizations ineligible for grants because of their asserted "promotion" of "DEI" and "environmental justice." These claims are quite similar to those asserted by the prevailing plaintiffs in *Agency for International Development v. Alliance for Open Society International, Inc.*, 570 U.S. 205 (2013), which were nonprofit organizations challenging on First Amendment grounds a government requirement that recipients of certain USAID grant funding adopt a policy opposing prostitution and sex trafficking. In *Agency for International Development*, the ruling in plaintiffs' favor resulted in those organizations being eligible to receive grant money from the government, just as the relief that Plaintiffs seek here would result in the organizations again being able to seek

11

reimbursement for grant-funded activities.  Yet the relief that the prospective grantees sought in *Agency for International Development* certainly was not "money damages."  And, it would have come as a surprise to all the courts that heard that case, including the Supreme Court, that the plaintiffs had actually brought a Tucker Act claim, and that the lower courts had lacked jurisdiction to hear the claim.

EPA has not pointed to a single case in which a court has suggested that Congress established the COFC to hear constitutional claims of this sort.  If a federal agency adopted a "priority" that excluded Jews or evangelical Christians from eligibility for agency grant funding, no one would seriously suggest that a First Amendment claim seeking an injunction against that "priority" would be a Tucker Act claim, or that Congress, through the Tucker Act, had vested exclusive jurisdiction in the COFC to hear the claim.  To the contrary, the Federal Circuit and the COFC have long held that, because the First Amendment does not mandate the payment of money damages, such a claim would fall definitively *outside* the Tucker Act and could *not* be heard by the COFC.  *See, e.g.*, *United States v. Connolly*, 716 F. 2d 882, 886-87 (Fed. Cir. 1983); *Volk v. United States*, 111 Fed. Cl. 313, 326 (2013).

## II.    Plaintiffs have satisfied the requirements for a preliminary injunction.

### A.    Plaintiffs are likely to succeed on the merits of their claims.

In the termination memoranda, the Agency offered three sets of possible reasons for its termination and suspension of the organizations' Thriving Communities grants. As discussed in Plaintiffs' opening memorandum, EPA's actions should be vacated and set aside because its disjunctive list of "reasons" for terminating the grants is arbitrary and capricious, defies the governing provisions of the Clean Air Act, violates the First Amendment, and did not comply with the statutory requirements of the grant program.

In its Response, EPA does not respond to any of the claims that Plaintiffs make and on which they are likely to succeed. Instead, EPA addresses a series of strawmen arguments and hypothetical scenarios divorced from anything that actually occurred in this case. Thus, for example, and as further discussed below, this case has nothing to do—factually or legally—with the current Administrator's as-yet-unexercised authority to redefine the term "disadvantaged community," or the Administrator's general authority to terminate grants for lawful reasons. *See, e.g.*, Resp. at 7, 20, 21-22, 26.  It powerfully underscores the arbitrariness of EPA's actions that the Agency cannot articulate, any coherent explanation for its actions, and that it has instead chosen to defend other actions that it might take some day but has not in fact taken.

Meanwhile, the day before EPA filed its Response here, the U.S. District Court for the District of Rhode Island issued a comprehensive opinion explaining why EPA's across-the-board suspension of grants awarded and funded through the Inflation Reduction Act ("IRA"), including the $52 million subsequent grants awarded to Plaintiffs, is final agency action subject to review under the APA and why the suspensions and terminations will likely be found to be arbitrary and capricious and to exceed EPA's statutory authority.  *Woonasquatucket*, 2025 WL 1116157, at *19–21.  Although the Rhode Island court issued an injunction requiring EPA to "resume the processing, disbursing and payment" of funds under IRA-funded grants, EPA did not mention that injunction in its filing here, claimed to be "still obtaining information" about its suspension of access to Plaintiffs' Thriving Communities grants, Resp. at 8 n.1, and has not, in the case of any of the three organizations, complied with the Rhode Island court's injunction.  The court should "set aside" and vacate in this case EPA's termination of the initial grants and the suspension of the subsequent grants.

### i.     EPA's actions were arbitrary and capricious.

The EPA actions at issue here were neither "reasonable" nor "reasonably explained,"

*Ohio v. EPA*, 603 U.S. 279, 292 (2024), and thus must be set aside as arbitrary and capricious. *See* Pls.' Mem. 16–22. EPA's termination memoranda, and the new "Agency priority" that EPA referenced, contain nothing more than incoherent boilerplate.  Moreover, because EPA listed the reasons for its actions in the disjunctive ("promot[ing]" "DEI" or "environmental justice," "fraud, waste, abuse or duplication," or "best interests of the United States"), it is not possible even to know which of those amorphous reasons is the one on which the agency actually based its decision. On their face, EPA's termination memoranda demonstrate that its actions were arbitrary and capricious. Notably, EPA failed to submit with its Response any declaration explaining its position.

EPA has only one "response," but it is non-responsive. Citing 2 C.F.R. § 200.340, EPA states that federal regulations permit it to "terminate grants for no other reason besides 'an award no longer effectuates . . . agency priorities.'"  Resp. 24. That may be true in the abstract, but it is insufficient as a response to Plaintiffs' challenge to the actions at issue, for at least two reasons. First, EPA's newly declared "Agency priority" is itself a subject of the claims in this case. The "priority" is, itself, arbitrary and capricious, unlawful, and unconstitutional. Second, the cited regulation does not—and cannot, in light of the APA—authorize EPA to terminate or suspend a statutorily-mandated grant.  *See* 5 U.S.C. § 706(2)(A).  Moreover, as the D.C. Circuit has recognized, an agency cannot render its actions non-arbitrary merely by invoking the term "agency priorities." *See Int'l Union, United Mine Workers of Am. v. U.S. Dep't of Labor*, 358 F.3d 40, 44 (D.C. Cir. 2004) ("The [agency's] statement that there was a 'change in agency priorities,' without explanation, is not informative in the least[.]"). Yet, that is the entirety of EPA's argument here.  EPA has not articulated any coherent "agency priority," and it has not identified any legitimate issue that justifies overturning a congressionally-imposed statutory

14

mandate. As such, EPA's actions were arbitrary, capricious, and contrary to law.

  **ii.  EPA's actions were in excess of statutory authority.**

  Congress spoke clearly in amending the Clean Air Act. It stated that the EPA Administrator "shall use" appropriated funds to establish a program of "environmental and climate justice block grants." 42 U.S.C. § 7438. EPA therefore defied a binding congressional directive in purporting to terminate and suspend the grants at issue on the basis of a declared "Agency priority" not to "provide[] funding for . . . environmental justice initiatives."  Under the Clean Air Act, EPA has no discretion to terminate "environmental justice" grants on the ground that the grantees or the grant-funded activities "promote . . . environmental justice."

  In its Response, EPA does not defend its newly declared "priority" to discontinue funding of "environmental justice" and instead defends its authority to take other sorts of actions that it did not actually take.  EPA repeatedly states that the Clean Air Act "contains no guarantees of funding to any particular grant recipient" and that "no language in the relevant provisions of the Clean Air Act can be read to require EPA to disburse funds to the instant Plaintiffs as the only way to effectuate the statute." Resp. at 7, 21. Those statements, too, are true in the abstract but irrelevant to this case. Plaintiffs have challenged the particular actions at issue here, where the "Agency priority" that EPA cited for those actions—rendering the organizations ineligible for "environmental justice" grants because they promote "environmental justice"—is unlawful and irrational.

  The case EPA cites in support of its position, *Palomino v. Federal Bureau of Prisons*, 408 F. Supp. 2d 282 (S.D. Tex. 2005), actually supports Plaintiffs' position.  In *Palomino*, Congress directed that the Bureau of Prisons ("BOP") "*may* place" certain persons in a boot camp program. *Id.* at 290 (emphasis in original) (quoting 18 U.S.C. § 4046(a)). The prisoner-petitioner brought an APA challenge to the BOP's subsequent decision to terminate that program. The court

rejected the challenge, holding that BOP's discretionary decision to terminate the program was not reviewable under the APA. By "using the word 'may' instead of 'shall,'" the *Palomino* court held, the statute "gives the BOP discretion to operate its boot camp program—including the discretion whether to operate one at all." *Id.* (citations omitted). Here, by contrast, in the pertinent amendments to the Clean Air Act, *Congress used the word "shall" instead of "may"* in directing EPA to use appropriated funds to award "climate and environmental justice" block grants. 42 U.S.C. § 7438. Therefore, even under the reasoning in *Palomino*, EPA's decision to defy that statutory mandate is subject to judicial review.

EPA also repeatedly adverts to its Administrator's authority under the Clean Air Act to define the term "disadvantaged communities." Resp. at 7, 21, 26 (citing 42 U.S.C. § 7438). Yet, EPA does not claim that the current Administrator has actually exercised that authority, nor has it explained why the communities supported through the grants at issue here should not be regarded as "disadvantaged communities" under either the agency's current definition or some hypothetical future definition. Moreover, the "reasons" that EPA identified in its termination memoranda for taking the actions at issue here, amorphous as they are, do not reference the definition of "disadvantaged communities." In other words, here, too, EPA has failed to defend the actions that it has actually taken, and it has instead defended some other action—a redefinition of the term "disadvantaged communities"—that the agency has not taken, that it has never claimed to have taken, and the substance of which it has not yet even anticipated or explained.

### iii.    EPA's actions violate the First Amendment.

With respect to the Plaintiff Organizations' constitutional claims, EPA's arguments are equally non-responsive. Importantly, EPA is incorrect when it asserts that "Plaintiffs make no allegation that the grant terminations were based on anything other than the nature of the grant

programs themselves." Resp. 23. In fact, Plaintiffs have repeatedly and clearly made that very

allegation. *See* ECF No. 1 Compl. ¶¶ 7, 98–105; *see also* Pls. Mem. 28 ("Under *Agency for*

*International Development*, EPA cannot condition eligibility for Thriving Communities grants on

recipients forgoing the right to engage in 'initiatives' of their own choosing, including 'DEI' and

'environmental justice' initiatives, '*outside the contours*' of their work as Thriving Communities

grantees.") (emphasis added).

   And, Plaintiffs are on solid ground in making this allegation. In its termination

memoranda, EPA declared it an "Agency priority" to discontinue funding to "*organizations* that

promote or take part in diversity, equity, and inclusion ("DEI") initiatives [or] 'environmental

justice' initiatives." ECF No. 2-9 (Attach. G to Declaration of Ruth Ann Norton) at 1 (emphasis

added).  In other words, EPA, under its new "Agency priority," deemed Plaintiffs to be ineligible

as "*organizations*" for Thriving Communities grant funding because of their purported

"promot[ion]" of "DEI" and "environmental justice," not because of anything that the

organizations have done in their implementation of the Thriving Communities program.

   Moreover, and notably, the Thriving Communities grants at issue have never been

defined or understood to be "DEI" programs, so when EPA, later in its responsive memorandum,

states that it terminated and suspended Plaintiffs' grants in order to advance the "[t]he public

interest in ending DEI," Resp. 30, EPA further acknowledges that its actions were intended to

suppress expressive activities outside the scope of the grants themselves. It is understandable that

EPA would elect not to defend the action that it said it was taking when it declared

"organizations that promote . . . 'DEI' [or] 'environmental justice'" wholly ineligible for grant

funding. That action was constitutionally indefensible. EPA engaged in impermissible viewpoint

discrimination and violated the First Amendment when it adopted an "Agency priority" not to award funding to "organizations" that "promote" ideas it does not favor.

With respect to the possibility that EPA may have terminated and suspended the grants at issue because of the organizations' expressive activities arguably *within* the scope of their grant-funded work, EPA's arguments resort to the familiar pattern, responding not to the legal claim that the organizations have actually made, but rather to another strawman.  It is of course true that the government does not violate the First Amendment "simply because it chooses not to pay for" certain expressive activity. Resp. 22. At the same time, it is equally true—as the Supreme Court has repeatedly made clear, including in the lead case cited by EPA here—that EPA "cannot recast a condition on funding as a mere definition of its program in every case, lest the First Amendment be reduced to a simple semantic exercise." *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. at 215 (quoting *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 547 (2001)). EPA never acknowledges the latter proposition.  Ultimately, EPA cannot, consistent either with the First Amendment or with sound logic, re-define the "climate and environmental justice" block grant program that Congress directed it to establish as a program that excludes "promot[ing] or tak[ing] part in . . . 'environmental justice' initiatives."

Despite what EPA says, Resp. 22-23, the Fourth Circuit's stay of this Court's injunction in the *NADOHE* case is not to the contrary. In *NADOHE*, Chief Judge Diaz stated that the elimination of a program or termination of a grant on the ground that it "promotes DEI" "may well implicate cognizable First and Fifth Amendment concerns," and Judge Harris stated that this Court had "cogently explained" why the termination of a grant on "DEI" grounds "may well raise serious First Amendment and Due Process concerns." Order, *National Association of Diversity Officers in Higher Education et al. v. Donald J. Trump et al.*, No. 25-1189, Doc. 29 at

4.n1 & 7 (4th Cir., Mar. 14, 2025). There is nothing in the Fourth Circuit's stay decision in

*NADOHE* that supports EPA's position here.

> ### iv.    EPA failed to adhere to regulations governing the termination of grants.

In addition, EPA's actions were "not in accordance with law" and "without observance of

procedure required by law," 5 U.S.C. § 706(2)(C)–(D), because the agency did not comply with

the applicable OMB regulations establishing procedures and limiting the grounds for a federal

agency's termination of a grant award. *See* 2 C.F.R. §§ 200.340, .341. In its Response, EPA offers

no response at all to these claims.  Plaintiffs are likely to succeed on the merits of the claims.

> ### v.    The EPA's actions are reviewable.

This Court should reject EPA's sweeping assertion that its actions here are unreviewable.

For support, EPA relies on *Lincoln v. Vigil*, 508 U.S. 182 (1993). Resp. 25. But *Lincoln*

forecloses judicial review only in situations where courts "have no meaningful standard against

which to judge the agency's exercise of discretion." *Id.* at 191.

That is not the case here. Rather, this is a case in which "Congress has circumscribed

agency discretion to allocate resources by putting restrictions in the operative statute."  *Shawnee*

*Tribe v. Mnuchin*, 984 F.3d 94, 100 (D.C. Cir. 2021). Thus, there is "no presumption of non-

reviewability." *Id*. (distinguishing *Lincoln v. Vigil* on this basis and holding that agency funding

decision was subject to judicial review under APA).

At least two other courts have reached the same conclusion in the context of challenges to

EPA's recent actions suspending access to grant funding.  The suspensions are reviewable, the

courts have found, because Congress "appropriated money for specific grant programs by a

specific deadline and set specific, substantive priorities." *Climate United Fund v. Citibank*, Civil

Action No. 25-CV-698 (TSC), 2025 WL 1131412, at *13 (D.D.C. Apr. 16, 2025); *see also*

*Woonasquatucket*, 2025 WL 1116157, at *16 (recognizing that grant terminations are reviewable when Congress circumscribes agency discretion).  Such "limitation[s] afford[] a 'statutory reference point' by which the court is able to review" the termination or suspension. *Id.* (internal quotation marks and citations omitted).

What is more, as the U.S. District Court for the District of Rhode Island also recently recognized, and as Justice Jackson recognized during her district court service, "agencies themselves frequently cabin their own discretionary funding determinations by generating formal regulations or other binding policies that provide meaningful standards for a court to employ when reviewing agency decisions under the APA." *Woonasquatucket*, 2025 WL 1116157, at *16 (quoting *Pol'y & Rsch., LLC v. Dep't of Health & Hum. Servs.*, 313 F. Supp. 3d 62, 76 (D.D.C. 2018) (Jackson, J.)). Unlike *Lincoln v. Vigil*, which concerned "appropriated but not-yet-awarded funds," the "funds at issue here were already awarded to" the Plaintiff Organizations. *Woonasquatucket*, 2025 WL 1116157, at *16. The regulations governing termination of already-awarded grants, discussed above, further cabined EPA's discretion and thus supply this Court with additional meaningful standards by which to evaluate the agency's actions. *Id.*

> ### vi.    Remand without vacatur, even if theoretically permissible, would be wholly unwarranted here.

Although the APA directs reviewing courts to "set aside" agency actions that, like EPA actions at issue, are arbitrary and capricious, not in accordance with law, contrary to constitutional right, in excess of statutory jurisdiction, or without observance of procedure required by law, EPA argues that the court should *not* "set aside" its actions here but instead merely "remand the matter back to EPA." Resp. 27. As an initial matter, EPA fails to acknowledge that the basic permissibility of "remand without vacatur" under the APA is itself a

subject of current judicial debate. *See, e.g.*, *Corner Post, Inc. v. Board of Governors of Federal Reserve System*, 603 U.S. 799, 836-37 n. 6 (Kavanaugh, J., concurring).

At best, remand without vacatur is available as a remedy only in "rare cases" where the deficiencies in the agency's actions are not very serious and the consequences of vacatur would be particularly disruptive. *See, e.g.*, *United Steel v. Mine Safety & Health Admin.*, 925 F. 3d 1279, 1287 (D.C. Cir. 2019); *Texas v. United States*, 126 F. 4th 392, 418 (5th Cir. 2025). EPA has not attempted to satisfy this demanding standard, and it cannot do so. The agency actions at issue are self-evidently arbitrary, as well as patently unlawful and unconstitutional, and it would not be disruptive in any sense to restore the status quo that existed prior to EPA's taking of those actions.

**B.      Plaintiffs have met the other requirements for a preliminary injunction.**

Plaintiffs presented extensive evidence detailing the irreparable harm they have and will continue to suffer as a result of Defendants' abrupt termination and suspension of grant funding. Pls. Mem. 31–37. EPA's facial violation of the First Amendment is per se irreparable injury. *Johnson v. Bergland*, 586 F.2d 993, 995 (4th Cir. 1976). Further, the categories of harm presented by Plaintiffs—shuttering and curtailing the Thriving Communities program in frustration of their missions, the chaos and uncertainty that will cause devastating consequences across their organizations, laying off staff, and the incalculable damage to Plaintiffs' standing and relationships in their respective communities—are the precise types of harms that numerous courts have deemed irreparable. *See* Pl. Mem. 32 (collecting cases); *see also Woonasquatucket*, 2025 WL 1116157, at *21–22. The impact of Defendants' unlawful actions extend to partner organizations and the subgrantees who had planned projects to address a range of public health and safety issues in their respective communities.

EPA's reliance on the *California* decision is misplaced. There, the Supreme Court's analysis turned on the state challengers' "represent[ation] in this litigation that they have the financial wherewithal to keep their programs running" without the terminated federal grants. *California*, 154 S.Ct. at 969. Here, "the opposite is true." *Woonasquatucket*, 2025 WL 1116157, at *23. In contrast to state challengers who possess budgets of billions of dollars, Plaintiffs are non-profit organizations that have expressly represented that they *cannot* sustain the Thriving Communities program absent the federal funding. Conveniently, the EPA ignores the ample record evidence on this point. *See, e.g.*, ECF No. 2-2 (Decl. of Ruth Ann Norton) ¶ 30 ("Simply put, if GHHI's grants and access to grant funding are not restored in short order, GHHI will be forced to shut down the Thriving Communities program."); ECF No. 2–14 (Decl. of R.T. Rybak) ¶ 23 (explaining that "termination of essential positions fully funded by the initial grant" would "make it impossible for the Thriving Communities Program to continue"); ECF No. 2–24 (Decl. of Jill T. Nishi) ¶ 28 (explaining that Philanthropy Northwest can cover "salaries" for employees working on the program from its "operating reserve" only for a period of "eight additional weeks as of March 24, 2025").

There is nothing "self-imposed" or "speculative" about Plaintiffs' harms. EPA caused these harms by abruptly terminating and suspending $180 million in grant funding for critical environmental protection work designed to improve peoples' lives. It defies reality and all of the record evidence for EPA to assert that Plaintiffs can nevertheless continue their operations as usual. Out of desperation to preserve work that cannot be reconstituted if abandoned, Plaintiffs have tried to maintain some form of their Thriving Communities programs until the Court's resolution of this Motion by temporarily relying on limited cashflows and reserve funds. But, absent imminent relief, Plaintiffs will not be able to operate their Thriving Communities

programs, causing severe and irreparable harm to Plaintiffs' organizational missions, financial outlooks, and to communities across the country. *See* Ex. 1, Second Declaration of Jill T. Nishi ("Second Nishi Decl."), Attach. A (describing the need to release full-time staff and downsize core operations, staffing, and delivery of other enterprise programs and services); Ex. 2, Supplemental Declaration of R.T. Rybak ("Supplemental Rybak Decl."), Attach. B (describing participation in the Thriving Communities Program as the "linchpin to the success" of the financial sustainability of the organization); Ex. 3, Supplemental Declaration of Ruth Ann Norton ("Supplemental Norton Decl."), Attach. C. (describing the staff to whom GHHI has given layoff notices as well as the harm to the organization's mission through the loss of "the organizational ecosystem linking [GHHI] to partners, advisors, and subgrantees across the region that we created over the past 18 months").

Finally, the balance of equities and public interest tip sharply in Plaintiffs' favor. EPA argues only that the government and public have a "compelling interest in ending discrimination" and "ending DEI" (without defining what that means). Resp. 30. EPA fails, however, to explain how killing programs that support projects to prevent contamination in drinking water sources, remove lead from soils in parks and playgrounds, and remediate mold, asbestos, and radon in homes with children in communities across the Mid-Atlantic, Great Lakes, and Northwest regions could possibly further those goals. Moreover, EPA fails to address how granting an Executive Branch agency the authority to ignore its statutory mandate is consistent with the public interest.

### C.    This Court should not impose a bond.

The Court should reject Defendants' request for a bond. EPA will not be harmed by administering funds appropriated by Congress. Moreover, a bond is inappropriate given the nature of Plaintiffs' claims. Courts commonly waive the bond requirements where a fundamental

constitutional right is at stake. *See, e.g.*, *Honeyfund.com, Inc. v. DeSantis*, 622 F. Supp. 3d 1159, 1186 (N.D. Fla. 2022) (waiving bond requirement considering the "unlawful impact on Plaintiffs' First Amendment rights"). In the same vein, a bond "is not necessary where requiring [one] would have the effect of denying the plaintiffs their right to judicial review of administrative action." *Nat. Res. Def. Council, Inc. v. Morton*, 337 F. Supp. 167, 168 (D.D.C. 1971) (collecting cases). In this case, Defendants' request for a "bond equal to the amount of the funding remaining on the terminated initial grants" (Resp. 31) would prevent Plaintiffs from seeking judicial review. Under these circumstances, it would "defy logic" to "hold [Plaintiffs] hostage for the resulting harm." *Woonasquatucket*, 2025 WL 1116157, at *24.

## CONCLUSION

For the foregoing reasons, and those in Plaintiffs' motion, the Court should enter a preliminary injunction.

Dated: April 23, 2025                                   Respectfully submitted,


_____                    _____
Lora Brzezynski (Bar No. 17837)              Andrew D. Freeman (Bar No. 03867)
Jessica C. Abrahams                          Joshua N. Auerbach (Bar No. 26108)
(admitted *pro hac vice*)                    Neel K. Lalchandani (Bar No. 20291)
Faegre Drinker Biddle & Reath LLP            Brown, Goldstein & Levy, LLP
1500 K Street NW, Suite 1100                 120 E. Baltimore Street, Suite 2500
Washington, DC 20005                         Baltimore, MD 21202
Phone: 202-230-5000                          Phone: 410-962-1030
Fax: 202-842-8465                            Fax: 410-385-0869
jessica.abrahams@faegredrinker.com           adf@browngold.com
lora.brzezynski@faegredrinker.com            jauerbach@browngold.com
                                             nkl@browngold.com


*Attorneys for Plaintiff*                    *Attorneys for Plaintiff Green & Healthy Homes*
*The Minneapolis Foundation*                 *Initiative, Inc.*

_[signature]_

Charles M. English, Jr. (Bar No. 03621)
Jonathan A. DeMella
(admitted *pro hac vice*)
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
Phone: 206-757-8338
Fax: 206-757-7338
jonathandemella@dwt.com

*Attorneys for Plaintiff Philanthropy Northwest*