# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

GREEN & HEALTHY HOMES        *
INITIATIVE, Inc., *et al.*,        *
                                *
        PLAINTIFFS,              *
                                *
v.                              *        No. 1:25-cv-01096-ABA
                                *
ENVIRONMENTAL PROTECTION,        *
AGENCY, *et al.*,                 *
                                *
        DEFENDANTS.              *

\*\*\*\*\*\*

## *CORRECTED* MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS, FOR TRANSFER TO THE COURT OF FEDERAL CLAIMS, OR IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

I.    INTRODUCTION ...........................................................................................1

II.   BACKGROUND FACTS ..............................................................................2

    A.  The Clean Air Act does not require that EPA continue to fund
        specific grants under the Thriving Communities Grant Program. ...................2

    B.  The Plaintiffs' Grants Were Terminated Consistent with the Discretion
        Granted to the EPA Administrator, the Agreements, and Applicable Regulations. .........3

III.  LEGAL FRAMEWORK ................................................................................7

    A.  Motions to Dismiss for Failure to State a Claim Under Rule
        12(b)(6) or for Summary Judgment under Rule 56. ........................................7

    B.  Rule 12(b)(1) Motion to Dismiss for Lack of Subject Matter Jurisdiction ......................9

    C.  A preliminary injunction is an extraordinary, disfavored, remedy. ...............10

IV.   ARGUMENT ...............................................................................................10

    A.  Plaintiffs' grant termination challenges clearly fall under the
        Tucker Act, depriving this Court of subject matter jurisdiction. ...................10

        1.  Plaintiffs' challenge to their grant terminations is a contract-based
            action subject to the exclusive jurisdiction of the Court of Federal Claims. ......12

        2.  Alleging First Amendment or Fifth Amendment violations
            does not alter the fundamental contractual nature of Plaintiffs' claims .............19

        3.  Plaintiffs' allegations that the EPA termination is *ultra vires*
            do not defeat Tucker Act jurisdiction. .................................................................21

    B.  Plaintiffs are not entitled to a preliminary injunction because
        they are unlikely to succeed on the merits of their claim. ..............................22

        1.  The grant terminations did not violate the Clean Air Act; the relevant
            provision provides the EPA Administrator the discretion to determine
            or modify the definition of "disadvantaged communities"and does not
            prevent EPA from terminating the grants awarded to these Plaintiffs ...............23

        2.  The grant terminations were violated EPA or other government regulations,
            thereby rendering them Arbitrary and Capricious under the *Accardi* doctrine. .24

3. The Plaintiffs' claims that the grant terminations violate the First and Fifth Amendments are without merit; neither of these constitutional protections are implicated in the terminations of Plaintiffs' grants..............................27

4. The grant terminations were not arbitrary or capricious.....................................29

5. The grant terminations were discretionary and thus fall outside the scope of judicial review under the APA.......................................................................30

6. The remedy under the APA is remand, not reinstatement. ...............................32

C. Plaintiffs cannot establish irreparable harm..................................................................33

D. The balance of equities and public interest do not favor Plaintiffs...............................35

E. If an Injunction is entered, a meaningful bond is appropriate  to protect the Government's interests. .....................................................................................................35

F. Summary Judgment for Defendant is appropriate. ........................................................36

V. CONCLUSION...................................................................................................................37

## I.    __INTRODUCTION__

After extensive briefing and a lengthy hearing on April 29, 2025, this Court has thus far declined to grant the Plaintiffs' April 2, 2025, motion seeking extraordinary relief: a preliminary injunction precluding the U.S. Environmental Protection Agency ("EPA") from terminating certain grants and requiring that the agency reinstate others.  Since that time, Plaintiffs have filed two "Notices" of "Further Developments" with the Court, contending that recent actions by the EPA merit the Court's immediate attention.  Plaintiffs also filed an "Amended" proposed order which addresses the recent grant terminations in their "Notices" and asks that the Court order EPA to immediately reinstate the grant awards and enjoin EPA from terminating, suspending, pausing, freezing, "any of the Plaintiffs' Thriving Communities grants." ECF 33-2.

*First*, neither Plaintiffs' initial filing, nor the subsequently filed "Notices" plead facts which establish that this Court has jurisdiction over their Plaintiffs' claims that EPA's actions violate the terms of the federal grant agreements.  Interpretation of the terms of grant agreement as well as challenges to termination of the agreement clearly fall under the Tucker Act, 28 U.S.C. § 1491.  As such, this Court lacks jurisdiction to provide either preliminary or final relief and the case should be dismissed or transferred to the Court of Federal Claims – the Court that has exclusive jurisdiction over government contract claims. *Second*, Plaintiffs still have not demonstrated they are entitled to a preliminary injunction: they are unlikely to succeed on the merits given the dispositive jurisdictional issues, they have not shown that irreparable harm is likely during the weeks or few months it will take to resolve the parties' cross motions for summary judgment, and the balance of equities and public interest do not favor Plaintiffs.  *Third*, the Plaintiffs are not entitled to summary judgment on their claims under the Administrative Procedures Act ("APA"), since they lack standing, and the Agency's decision was not arbitrary and capricious.  *Finally*, if the Court does grant a preliminary injunction, it should follow the

Supreme Court's guidance and impose a meaningful bond to cover the amount at stake in this litigation: an amount sufficient to cover any funds required to be disbursed, which the government would be unlikely to recoup if the injunction is later overturned on appeal.

## II.    BACKGROUND FACTS

### A.    The Clean Air Act does not require that EPA continue to fund specific grants under the Thriving Communities Grant Program.

This case arises from EPA's decision to terminate funding awarded pursuant to grant agreements under 42 U.S.C § 7438 *et seq*.: the Environmental and Climate Justice Block Grant. In 2022, as part of the Inflation Reduction Act ("Act") Congress passed, and President Biden signed into law, this statute which authorized the Environmental and Climate Justice Program ("ECJP"). Pub.Law 117-169, 136 Stat. 1818, Section 138. For Fiscal Year 2022, Congress appropriated a total of three billion dollars to the Administrator of the EPA under the ECJP "to award grants . . . that benefit disadvantaged communities, *as defined by the Administrator*." 42 U.S.C. § 7438(a), (b)(1) (emphasis added). The ECJP statute contains *no guarantees* of funding to any *particular grant recipient*. *Id.* Nor does it provide specific limits on the Administrator's ability to terminate grants or restrict the Administrator's ability to *redefine* which communities are considered "disadvantaged." *Id.* In fact, the statute explicitly delegates to the Administrator the power and discretion to define (and redefine) disadvantaged communities and award grants accordingly. 42 U.S.C. § 7438(b)(1).

In 2023, during the Biden Administration, EPA established the Thriving Communities Grantmaking Program ("TCGMP") which was designed to select Grantees for the funds appropriated to EPA under the ECJP in order to implement the Biden administration's stated policy

priorities.[1]  The stated purpose of the TCGMP was to set up a grant program where EPA would enter into grant agreements with larger "Grantmaker" entities who would be awarded grants and enter into grant agreements with the EPA.  Those "Grantmakers" would then act as passthrough entities, who would design and implement their own competitive application and submission processes, award subgrants, implement a tracking and reporting system, provide resources and support to smaller organizations seeking grant funding and provide programming consistent with then-current Presidential, and EPA priorities.[2]

### B.    The Plaintiffs' Grants Were Terminated Consistent with the Discretion Granted to the EPA Administrator, the Agreements, and Applicable Regulations.

The three Plaintiffs are Regional Grantmakers who were awarded grants and under the ECJP.  ECF 2-1 at 15.  Each of them was awarded two types of awards in 2024:  an "initial award" and a "subsequent award." ECF 2-1 at 12-13. The awards to the Regional Grantmakers under the ECJP are contractual and are reflected in written grant agreements with the EPA.  Each of the grant agreements incorporates the EPA's "General Terms and Conditions" which govern its grants. *Id.*[3]

The initial awards are governed by the General Terms and Conditions applicable to grants awarded on or after October 1, 2023, and contain the following language regarding termination:

---

[1]    An October 2023 EPA Press Release noted that: Biden's Environmental Justice Programs were designed to provide "financial assistance to eligible organizations working to address local environmental or public health issues in their communities." They were intended to "build[] upon President Biden's Executive Orders 13985 and 14008, creating a designation of funds exclusively for small nonprofit organizations… that historically struggle to receive federal funding."  *See* https://www-.epa.gov/-news-releases/biden-harris-administration-announces-500000-innovative-solar-energy-project-pine.

[2]    *See* EPA.gov; *The Thriving Communities Grantmaking Program* at https://www.epa.gov/inflation-reduction-act/thriving-communities-grantmaking-program.

[3]    The initial and subsequent grants to the Plaintiff Grantmakers are subject to different terms and conditions based on the date of the awards. *See* EPA General Terms and Conditions effective October 1, 2023 or later and EPA General Terms and Conditions effective October 1, 2024 or later. **EPA 98-141.**

**3. Termination.** Consistent with 2 CFR 200.340, EPA may unilaterally terminate this award in whole or in part:

(a) If a recipient fails to comply with the terms and conditions of the award including statutory or regulatory requirements; or

(b) If the award no longer effectuates the program goals or agency priorities. Situations in which EPA may terminate an award under this provision **<u>include</u>** when:

    i. EPA obtains evidence that was not considered in making the award that reveals that specific award objective(s) are ineffective at achieving program goals and EPA determines that it is in the government's interest to terminate the award;

    ii. EPA obtains evidence that was not considered in making the award that causes EPA to significantly question the feasibility of the intended objective(s) of the award and EPA determines that it is in the government's interest to terminate the award;

    iii. EPA determines that the objectives of the award are no longer consistent with funding priorities for achieving program goals.

**EPA 57-58** (emphases added).[4] *See also* **EPA 307** (Cooperative Agreement for Green & Healthy Homes Initiative, Inc.'s initial grant); **EPA 597** (Cooperative Agreement for Minneapolis Foundation's initial grant); **EPA 913** (Cooperative Agreement for Philanthropy Northwest's initial grant). Based on this provision of the grant agreement, an award may be terminated under *any* of the three circumstances described in section 2(b), including when "<u>EPA determines</u> that the objectives of the award are no longer consistent with funding priorities for achieving program goals." *Id.* at 2(b)(iii) (emphasis added).

Plaintiffs' subsequent grants are governed by the General Terms and Conditions applicable to grants awarded effective October 1, 2024, or later, and includes slightly different termination provisions:

---

[4]     At the time of the initial awards, the regulation cited provided that termination was permitted: "(2) By the Federal awarding agency or pass-through entity, to the greatest extent authorized by law, if an award no longer effectuates the program goals or agency priorities;…**or** (5) By the Federal awarding agency or pass-through entity pursuant to termination provisions included in the Federal award. 2 C.F.R. § 200.340(a)(2), (5) (effective August 13, 2020, to September 30, 2024) (emphasis added).

### 3. Termination

Consistent with 2 CFR 200.340, EPA may terminate this award in part or its entirety:

(a) If a recipient or subrecipient fails to comply with the terms and conditions of the award, including statutory or regulatory requirements;

(b) With the consent of the recipient when both the recipient and the EPA agree upon the termination conditions, which include the effective date and, in the case of partial termination, the portion to be terminated;

(c) If a recipient sends the EPA a written notification of the reasons for such termination, the effective date, and in the case of partial termination, the portion to be terminated; however, if the EPA determines that the remaining portion of the Federal award will not accomplish the purposes for which the Federal award was made, the EPA may terminate the award in its entirety; or

(d) Pursuant to the programmatic terms and conditions specified in the Federal award.

**EPA 99-100**. [5]

Approximately one month after President Trump took office, consistent with new presidential and agency priorities, EPA terminated Plaintiffs' initial TCGMP grants, citing to the terms of the Cooperative Agreement governing the organization's initial grant *and* the applicable federal regulations governing grant termination. **EPA 580-81** (February 21, 2025, termination memorandum issued to Green & Healthy Homes Initiative, Inc.); **EPA 897-98** (February 21, 2025, termination memorandum issued to Minneapolis Foundation);[6] **EPA 1078-79** (February 22, 2025, termination memorandum issued to Philanthropy Northwest). The termination memoranda noted

---

[5]    At the time of the subsequent awards, the regulation cited in the EPA grant General Terms and Conditions permitted termination "pursuant to the terms and conditions of the Federal award, ***including***, to the extent authorized by law, ***if an award no longer effectuates the program goals or agency priorities***." 2 C.F.R. § 200.340(a)(4) (effective October 1, 2024) (emphasis added). This revised language effectively combined the provisions in sections (2) and (5) of the prior version of 2 C.F.R. § 200.340(a).

[6]    As noted in the index accompanying the administrative record, the February 21, 2025, termination memorandum issued to Minneapolis Foundation exists within EPA's records as a Word (*e.g.*, .doc or .docx) file with a template date field. For purposes of compiling and filing the administrative record pursuant to the Court's May 6, 2025, Order (ECF No. 29), EPA converted this document into PDF format to comply with the Court's CM/ECF filing system requirements. Conversion of the document to PDF resulted in the template date field updating to the date of conversion, *i.e.*, May 8, 2025. In its original version, this document is dated February 21, 2025.

that the TCGMP awards made to the Plaintiffs were no longer consistent with funding goals and priorities and explained that one of EPA's priorities was to "eliminate discrimination in all programs" and cited to the EPA Administrator's determination that diversity, equity and inclusion ("DEI") initiatives, including "environmental justice initiatives," may "conflict with the Agency's policy of prioritizing merit, fairness, and excellence." **EPA 580, 897, 1078**.

Between May 1, 2025, and May 8, 2025, EPA notified the EJCP Grantmakers that their subsequent grants had been terminated. **EPA 582-90** (May 1, 2025, correspondence with termination memorandum issued to Green & Healthy Homes, Initiative, Inc.); **EPA 899-908** (May 1, 2025, correspondence with termination memorandum issued to Minneapolis Foundation); **EPA 1086-93** (May 8, 2025, correspondence with termination memorandum issued to Philanthropy Northwest). The subsequent grant termination memoranda again cited to 2 CFR 200.340 and the Termination General Terms and Conditions and explained that the subsequent grants were "terminated effective immediately on the grounds that the remaining portion of the Federal award will not accomplish the EPA funding priorities for achieving program goals" and "[t]he objectives of the award are no longer consistent with EPA funding priorities." *Id*. The termination memoranda further explained:

> The EPA Administrator has determined that, per the Agency's obligations to the constitutional and statutory law of the United States, this priority includes ensuring that the Agency's grants do not conflict with the Agency's policy of prioritizing merit, fairness, and excellence in performing our statutory functions. In addition to complying with the law, it is vital that the Agency assess whether all grant payments are free from fraud, abuse, waste, and duplication, as well as to assess whether current grants are in the best interests of the United States.

The termination notices provided the recipients with information regarding how to file a dispute of the termination with the EPA, "no later than 30 calendar days from the date this termination notice is electronically sent to you. *See e.g*., **EPA 589-90**. The notice cites to 2 C.F.R. §1500.15

and describes the method by which a dispute can be submitted, consistent with the dispute procedures in 2 C.F.R. part 1500, Subpart E. *Id.* In fact, all of the Plaintiffs have filed disputes regarding the termination of the "initial grants" which have been acknowledged by the receiving official. EPA has not yet received disputes for the subsequent grants, but as noted in the procedures cited above, per 2 C.F.R. §1500.15 they have 30 calendar days from the date of the termination notice to do so.

## III.    LEGAL FRAMEWORK

### A.    Motions to Dismiss for Failure to State a Claim Under Rule 12(b)(6) or for Summary Judgment under Rule 56.

A defendant may test the legal sufficiency of a complaint by way of a motion to dismiss under Rule 12(b)(6) when the plaintiff fails to state a claim for relief. *In re Birmingham*, 846 F.3d 88, 92 (4th Cir. 2017). In analyzing a Rule 12(b)(6) motion, the court must view all well-pleaded allegations in the light most favorable to the plaintiff. *Ibarra v. United States*, 120 F.3d 472, 474 (4th Cir. 1997). However, "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-6 (2007). A pleading that "offers labels and conclusions or a formulaic recitation of the elements of a cause of action" also will not do. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) citing *Twombly*, 550 U.S. at 555, 557. A court also is not required to accept legal conclusions drawn from the facts. *See Papasan v. Allain*, 478 U.S. 265, 286 (1986); *Glassman v. Arlington Cty.*, 628 F.D.A. 140, 146 (4th Cir. 2010).[7]

---

[7]    Under some circumstances, a court may rely on extrinsic materials to determine a motion to dismiss without converting the proceeding into a motion for summary judgment. *See* FRCP 12(d). A court may properly consider documents that are "explicitly incorporated into the complaint by reference and those attached to the complaint as exhibits." *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 166 (4th Cir. 2016). A document submitted by *the movant* that was not attached to or expressly incorporated in a complaint may also be considered, so long as the document was integral to the complaint and there is no dispute about the document's authenticity. *Id.*

Summary Judgment under Rule 56 is appropriate when the pleadings and the evidence demonstrate that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Burwell*, No. GJH-15-852, 2015 WL 3442013, at *5 (D. Md. May 27, 2015) (citing *Roberts v. United States*, 883 F. Supp. 2d 56, 62–63 (D.D.C. 2012)).

In an APA case, summary judgment thus serves as a mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and is otherwise consistent with the APA standard of review. *Nat'l Fed'n of the Blind v. U.S. Abilityone Comm'n*, 421 F. Supp. 3d 102, 114 (D. Md. 2019), citing *Richards v. INS*, 554 F.2d 1173, 1177 & n. 28 (D.C. Cir. 1977). Under the APA, the Court may set aside agency action which is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "A disputed action also may be set aside as arbitrary and capricious if the agency has acted 'without observance of procedure required by law.'" *Safari Club Int'l v. Zinke*, 878 F.3d 316, 325 (D.C. Cir. 2017) (quoting 5 U.S.C. § 706(2)(D)). "Review under this standard is highly deferential, with a presumption in favor of finding the agency action valid." *Ohio Valley Envtl. Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 192 (4th Cir. 2009). The court is not empowered to substitute its judgment for that of the agency." *Id.* (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971)).

Judicial review is foreclosed if "the agency action of which plaintiff complains fails to raise a legal issue which can be reviewed by the court by reference to statutory standards and legislative intent." *Nat'l Fed'n of the Blind v. U.S. Abilityone Comm'n*, 421 F. Supp. 3d 102, 118 (D. Md. 2019), citing *Inova Alexandria Hosp. v. Shalala*, 244 F.3d 342, 346 (4th Cir. 2001). When APA review is not available, Defendant is entitled to summary judgment. *Nat'l Fed'n of the Blind v. U.S. Abilityone Comm'n*, 421 F. Supp. 3d 102, 126 (D. Md. 2019).

Even if the Court determines that it has jurisdiction to review the Agency decision, its function is to "determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *Air Transp. Ass'n of Am. v. U.S. Dep't of Agric.*, 303 F. Supp. 3d 28, 38 (D.D.C. 2018) (quoting *Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 90 (D.D.C. 2006)).  If it determines that additional notice or further explanation is required, the proper remedy is remand. if the court finds that the agency has failed to sufficiently explain its rules, the proper course, is to remand to the agency for additional investigation or explanation. *Food & Drug Admin. v. Wages & White Lion Invs., L.L.C.*, 145 S. Ct. 898, 930 (2025).

### B.     Rule 12(b)(1) Motion to Dismiss for Lack of Subject Matter Jurisdiction.

A court should dismiss claims under Rule 12(b)(1) when it lacks subject-matter jurisdiction to decide the claims presented. Before a court may rule on the merits of a claim, it must first determine if "it has the jurisdiction over the category of claim in suit (subject [] matter jurisdiction)." *Sinochem Int'l Co. Ltd. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 430-31 (2007) (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 93-102 (1998)).  "The plaintiff has the burden of proving that subject matter jurisdiction exists." *Evans v. B.F. Perkins Co.*, 166 F.3d 642, 647 (4th Cir. 1999).  "When a defendant challenges subject matter jurisdiction pursuant to Rule 12(b)(1), 'the district court is to regard the pleadings as mere evidence on the issue and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment.'" *Id*. (quoting *Richmond, Fredericksburg & Potamic R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991)). Challenges to the Court's subject matter jurisdiction may be raised at any time. *Henderson ex rel. Henderson v. Shinseki*, 562 U.S. 428, 434-35 (2011).  Under the *Tucker Act*, 28 U.S.C. § 1491, the Court of Federal Claims, and not the district court, has exclusive jurisdiction over monetary contract claims against the federal government over $10,000.

C.    **A preliminary injunction is an extraordinary, disfavored, remedy.**

A preliminary injunction is "extraordinary" relief that may "only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 22, 24 (2008). Plaintiffs must satisfy four elements to show entitlement to a preliminary injunction: (1) that they are likely to succeed on the merits; (2) that they will likely experience irreparable harm unless the court grants relief; (3) that the balance of equities weighs in their favor; and (4) that an injunction is in the public interest. *Frazier v. Prince George's Cnty.*, 86 F.4th 537, 543 (4th Cir. 2023). The last two factors – balance of equities and the public interest – "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

IV.    **ARGUMENT**

The Court should dismiss this case or transfer it to the Court of Federal Claims as it clearly lacks subject matter jurisdiction over Plaintiffs' claims regarding termination of their grant agreements; the entire Complaint is subject to the exclusive jurisdiction of the Court of Federal Claims pursuant to the Tucker Act. Even if that issue is found not to present a bar to their claims, it is clear that Plaintiffs are not entitled to a preliminary injunction because they are unlikely to succeed on the merits of their claims, they have not established irreparable harm, and the balance of equities does not weigh in their favor. For those same reasons, and in light of previous briefing, the Administrative Record, and the summary judgment briefing, it is clear that the Defendants are entitled to summary judgment as a matter of law.

A.    **Plaintiffs' grant termination challenges clearly fall under the Tucker Act, depriving this Court of subject matter jurisdiction.**

The essence of Plaintiffs' Complaint is that their grant contracts with EPA were improperly terminated. Such claims clearly fall under the Tucker Act; as such, this Court lacks subject matter

jurisdiction over them, and they should be dismissed, or in the alternative, the case should be transferred to the Court of Federal Claims.[8]

To sue a federal agency, a plaintiff must identify an express waiver of sovereign immunity in the text of a federal law and show that its claim falls within the waiver's scope. *See Fed. Aviation Admin. v. Cooper*, 566 U.S. 284, 290 (2012) ("a waiver of sovereign immunity must be 'unequivocally expressed' in statutory text"). Here, Plaintiffs rely on the APA, which includes a limited waiver of sovereign immunity for claims "seeking relief other than money damages." 5 U.S.C. § 702. However, invocation of the APA is improper where Plaintiffs seek to challenge the Agency's decision to terminate their contract via a motion seeking an order requiring that the Agency reinstate the grant contract and resume federal grant funding under the contract. Under these circumstances, relief under the APA is inappropriate and Plaintiffs' claim instead must be brought under the Tucker Act. 28 U.S.C. § 1491. Because the Court of Federal Claims has *exclusive jurisdiction* over claims brought under the Tucker Act, this Court does not have subject matter jurisdiction to issue a preliminary injunction or determine whether the government properly terminated the contract. 28 U.S.C. § 1491(a)(1).

---

[8]    Defendants have moved to transfer the case to the Court of Federal Claims under 28 U.S.C. § 1631, which applies to transfer for want of jurisdiction. Once such a motion has been filed, under 28 U.S.C. § 1292(d)(4)(B), "no further proceedings shall be taken in the district court until 60 days after the court has ruled upon the motion. If an appeal is taken from the district court's grant or denial of the motion, proceedings shall be further stayed until the appeal has been decided by the Court of Appeals for the Federal Circuit. The stay of proceedings in the district court shall not bar the granting of preliminary or injunctive relief, where appropriate and where expedition is reasonably necessary. However, during the period in which proceedings are stayed as provided in this subparagraph, no transfer to the Court of Federal Claims pursuant to the motion shall be carried out."

1.    **Plaintiffs' challenge to their grant terminations is a contract-based action subject to the exclusive jurisdiction of the Court of Federal Claims.**

Where a party asks the Court to interpret a contract, make a finding that the termination of the contract was improper, and then restore funding provided in that contract, the Court of Federal Claims has exclusive jurisdiction. *Spectrum Leasing Corp. v. United States*, 764 F.2d 891, 895 (D.C. Cir. 1985) ("Congress intended the jurisdiction and remedies of the Tucker Act to be exclusive in cases based on government contracts."). The Plaintiffs' request for injunctive relief does not alter that conclusion. *See Sys. Application & Techs., Inc. v. United States*, 691 F.3d 1374, 1382 (Fed. Cir. 2012), citing *Turner Const. Co. v. U.S.*, 645 F.3d 1377, 1387 (Fed. Cir. 2011).

The Tucker Act provides that the "United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded" on "any express or implied contract with the United States." 28 U.S.C. § 1491(a). Where such a claim "seek[s] monetary relief in excess of $10,000," the Tucker Act "vest[s] subject matter jurisdiction exclusively in the Claims Court." *Portsmouth Redev. & Hous. Auth. v. Pierce*, 706 F.2d 471, 473 (4th Cir. 1983). *See also* 28 U.S.C. § 1491(a)(1). Because the claims here are based on Plaintiffs' grant agreements with the EPA and seek to invalidate the government's attempts to terminate s those contracts, and restore the grant funding, the Tucker Act applies.

Courts apply a two-part test to determine whether the Tucker Act applies: the source of the rights upon which the plaintiff bases its claims, and the type of relief sought. *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982). Where the source of rights is a contract, the plaintiff seeks a finding that the contract was improperly terminated, along with restoration of contract payments, the claim falls under the Tucker Act. *Id.* As such, both prongs of the two-part test are satisfied, the Tucker Act applies, and the Court of Claims has exclusive jurisdiction.

### a. The source of Plaintiffs' rights is a contract.

Plaintiffs' claims clearly rely on and are derived from their grant agreements, without which, they would have no right to relief. As a result, the source of their rights is their written grant agreement with the EPA.

Courts have routinely held that grants are contracts under the Tucker Act, holding, "grant agreements [are] contracts when the standard conditions for a contract are satisfied." *Columbus Reg'l Hosp. v. United States*, 990 F.3d 1330, 1338 (Fed. Cir. 2021); *see also San Juan City Coll. v. United States*, 391 F.3d 1357, 1360-62 (Fed. Cir. 2004) (treating a "Program Participation Agreement" and related grants under the Higher Education Act as a contract). The Federal Circuit has held that "grant agreements [are] contracts when the standard conditions for a contract are satisfied, including that the federal entity agrees to be bound." *Columbus*, 990 F.3d at 1338.

There can be no genuine dispute that the grants at issue here are grant agreements. EPA selected Plaintiffs to be regional Grantmakers, Plaintiffs accepted, EPA and Plaintiffs mutually agreed into binding grant agreements with specific terms and conditions, and EPA then awarded money in exchange for performance of the grant program from Plaintiffs. ECF 2-1 at 11–19.

As this Court has already concluded, where plaintiffs base their right to relief on the government's violation of the terms of grant awards, the source of rights is the grant agreements. *Solutions. in Hometown Connections v. Noem*, No. 25-cv-00885-LKG, 2025 WL 1103253, at *1 (D. Md. Apr. 14, 2025).[9] In *Solutions*, Judge Griggsby found the court lack subject matter jurisdiction in a case involving grant contract termination. *Id*. The Court noted that even though

---

[9]    A second motion for Injunctive relief was filed in that case, a hearing was held on May 20, 2025, at 10:00 a.m. *See* Docket in 8:25-cv-00885-LKG, *Solutions in Hometown Connections et al v. Noem et al*. At the conclusion of the hearing, Judge Griggsby ruled from the bench, and again denied the motion for preliminary injunction "for the reasons stated in the record." *See* Order at 8:25-cv-00885-LKG, ECF 68.

the plaintiffs in that case also alleged APA violations regarding the contract termination, their rights and obligations were *defined by the contract terms*, and the reference of other laws and regulations within the contract, and/or regulations that apply to such contracts, did not alter that conclusion. *Id.* at *10 (given that plaintiffs' APA challenge to the termination of their grant agreements is entirely based on those agreements, the Court is not persuaded by the plaintiffs' argument that the source of their APA claims in this case is statutory, regulatory and constitutional in nature).

The same applies here. Plaintiffs repeatedly rely on the grant contract terms and assert both contract violations and regulatory and constitutional arguments based on those contracts, in their other claims. *See, e.g.*, ECF 2-1 at 13-15, 37-39. They have attached both the General Terms and Conditions appliable to EPA grant contracts, their own grant agreements and awards, as well as the notices of termination of the agreements to their Complaint, Motion for Preliminary Injunction, and subsequent Notices, and have explicitly relied on those agreements, and asked that the Court examine and interpret them. *See, e.g.*, ECF Nos. 2-4, 2-5, 2-7, 2-10. See also ECF 2-1 at 13 (each of the Agreements references the EPA's general grant Terms and Conditions).

Although Plaintiffs claim that their claims are not contractual in nature and seek to assert claims based on EPA's alleged violation of law, this argument lacks merit. An allegation that the government's breach of the contract also violates the law does not bring a claim out of the Tucker Act's purview where the alleged statutory violations do not themselves provide a "substantive right to the remedy" a plaintiff seeks. *Spectrum*, 764 F.2d at 894. Instead, where the plaintiff alleges that contracts with the government were impermissibly terminated and violated a regulation, statute or other law in doing so, the matter is still one that is derived in the first instance, from the contract between the parties; such claims are inherently contractual and should be decided in the

Court of Claims. *Id.* That is particularly true, where, as here, they seek payments due under the contract, and "[t]he right to payments is created in the first instance by the contract," the claim is based in contract and falls within the Tucker Act. *Id.* (holding government's violation of the Debt Collection Act did not entitle plaintiff to its requested payments or money owed, but only the contract between plaintiff and the government provided that entitlement). Similarly, in *Ingersoll-Rand* the court was asked to evaluate an APA claim under the Contract Disputes Act where plaintiff claimed the government's termination of a contract for "convenience" was arbitrary and capricious in violation of the APA. *Ingersoll-Rand Co. v. United States*, 780 F.2d 74-77 (D.D.C. 1985). The Court held that where "[t]he contract included a termination-for-convenience clause" and the government invoked that clause to terminate the contract, a challenge to the termination was a contractual dispute. *Id.* at *78 (the fact that termination of the contract "arguably violates certain other regulations" does not transform the action into one "based solely on those regulations.").

In this case, not only did the EPA act consistently with the law, but Plaintiffs cite to no statute that gives them any *substantive* right to relief independent of their grant agreements. *See also* Section IV.B.1–2 (arguing EPA's grant terminations did not violate the Clean Air Act or run afoul of the First Amendment). As a result, the grants provide the source of Plaintiffs' rights.

The Supreme Court recently addressed this issue. *Dep't of Educ. v. California*, 145 S. Ct. 966, 604 U.S. ___, 1 (April 4, 2025) (per curiam). The *California* plaintiffs brought an Administrative Procedure Act ("APA") challenge to the Government's termination of their grants, just like the instant Plaintiffs. *Id.* The District Court entered a temporary restraining order (TRO) "enjoining the Government from terminating" the grants and essentially reinstating the grants. *Id.* The Supreme Court then granted the Government's emergency application to vacate entry of the

TRO. *Id.* In so doing, the APA's limited waiver of immunity does not extend to orders "to enforce a contractual obligation to pay money" along the lines of what the district court did, and instead was covered by the Tucker Act, which grants the Court of Federal Claims jurisdiction over suits based on "any express or implied contract with the United States." *California*, 145 S. Ct. at 968, citing 28 U.S.C. § 1491(a)(1). As such, the majority held that the Government was likely to show that "the Tucker Act grants the Court of Federal Claims jurisdiction" over such suits. *Id.* (citing 28 U.S.C. § 1491(a)(1)).[10] The instant case is indistinguishable from *California* in any meaningful sense. Thus, this Court lacks jurisdiction over Plaintiffs' whether couched as direct challenges to interpretation of the grant agreements, or as actions for relief on APA, regulatory, statutory or Constitutional grounds. However cast, the Tucker Act clearly governs the Plaintiffs' challenges to termination of their agreements, and the government's interpretation of the termination provisions in them.

### b. The relief Plaintiffs seek is contractual and monetary: revocation of the grant terminations, and continued funding.

Plaintiffs request several kinds of relief in the form of an order: (1) holding that the EPA's termination of the Plaintiffs' was unlawful and be set aside (ECF 1 at Prayer for Relief, ¶ B, C); (2) reinstating all terminated grants and restoring Plaintiffs' access to the funds awarded; and (3) requiring that the government continue to make payments under the grant agreements, and enjoining the government from "terminating, or suspending, or any of the Plaintiffs' Thriving Communities grants" refraining "from pausing, freezing access to, or blocking the disbursement of funds under any of the Plaintiffs' Thriving Communities grants" and refraining from "imposing

---

[10]    *But see Woonasquatucket River Watershed Council v. U.S. Dept. of Agric.*, 1:25-cv-00097-MSM-PAS, 2025 WL 1116157 (D.R.I. Apr. 15, 2025) (declining to follow *California*), Notice of Appeal filed, U.S. Court of Appeals for the First Circuit, Case No. 25-1428.

conditions on the grants that were not in place prior to February 21, 2025." ECF 33-1 (Amended Proposed PI Order).  Courts have consistently held that claims like these which are couched as APA claims but seek monetary relief under a contract or agreement are in essence a claims for monetary damages exceeding $10,000.  *See, e.g.*, *Great-West*, 534 U.S. at 210; *Portsmouth*, 706 F.2d at 474 (4th Cir. 1983) (vacating district court order); *Ganiszewski v. Austin*, No. 23-cv-2195-BAH, 2024 WL 4227759, at *9 (D. Md. Sept. 17, 2024).  To determine whether a claim seeks monetary damages, *courts look beyond the label a plaintiff gives to the relief requested. James v. Caldera*, 159 F.3d 573, 579 (Fed. Cir. 1998).

Challenges like those presented here, to agreements terminated under the regulations included in the EPA grant contract language (2 C.F.R. § 200.340), are monetary where a plaintiff "wants the Government to keep paying up." *U.S. Conf. of Catholic Bishops v. U.S. Dept. of State*, No. 1:25-cv-00465 (TNM), 2025 WL 763738 (D.D.C. Mar. 11, 2025).  Where an action "seeks the classic contractual remedy of specific performance," only the Court of Federal Claims may resolve the dispute.  *Id.* (quoting *Spectrum*, 764 F.2d at 894.

The District Court for the District of Columbia recently dismissed a similar complaint for lack of subject matter jurisdiction where the plaintiff's contract was terminated pursuant to 2 C.F.R. § 200.340.  *See generally Catholic Bishops*, 2025 WL 763738.  The court held that it "lacks the power" to "cancel the termination, pay money due, and reinstate the contracts."  *Id.* at 12. Judge Griggsby of this Court came to the same conclusion in another grant termination case. *Solutions,* 2025 WL 763738, * ____. Judge Griggsby found that even though Plaintiffs framed their claims as an APA challenge, the essence of their grant termination claim was monetary.  *Id.* at *____.  Plaintiffs in this matter attempt precisely such avoidance framing here.  Despite reference to the APA and the Constitution, the heart of Plaintiffs' desired remedy is monetary.

They seek to reinstate their initial and subsequent grant awards but argue that this is still an entirely equitable claim. not ECF 2-1 at 42-48.

But even where a complaint purports to seek only equitable relief on its face, courts must still consider the "essence" of the claim to decide if it is monetary or not. *Randall v. United States*, 95 F.3d 339, 347 (4th Cir. 1996). *See also James*, 159 F.3d at 579 ("Our inquiry, however, does not end with the words of the complaint, however instructive they may be, for we still must look to the true nature of the action in determining the existence or not of jurisdiction." (internal quotation omitted)). Where a complaint effectively seeks "declaratory or injunctive relief . . . in the form of specific performance" against the government, Tucker Act jurisdiction is exclusive and "the APA thus does not waive sovereign immunity for such claims." *Robbins v. U.S. Bureau of Land Mgmt.*, 438 F.3d 1074, 1082 (10th Cir. 2006). Seeking an order finding that termination of the grant agreements was improper, and that they should be reinstated, and cannot be terminated is essentially a request for specific performance.

Both the Supreme Court and the Fourth Circuit have signaled their intention to reverse district courts that exercise jurisdiction over grant termination cases that essentially seek to have the district court adjudicate the interpretation of grant contracts, and their termination under similar circumstances. In addition to the *California* case discussed above, the Fourth Circuit recently granted the Government's motion to stay the District of Maryland's entry of a preliminary injunction in a grant termination case after the district court twice considered and rejected the Government's Tucker Act arguments. *Am. Ass'n of Colleges for Tchr. Educ. v. McMahon*, No. 25-1281, 2025 WL 1232337, at *1 (4th Cir. Apr. 10, 2025) ("*AACTE*"). Again, there can be no serious dispute that Plaintiffs' claims here mirror those in *AACTE* and *California*. Indeed, Plaintiffs cite to both cases repeatedly in support of their motion for preliminary injunction. *See,*

ECF 2-1 at 4 (table of authorities, listing both cases as "*passim*"), at 9 (noting EPA's action "here is strikingly similar to" both *AACTE* and *California*).

The result as in *California* should follow here – this Court has no subject matter jurisdiction and dismissal (or transfer) is mandatory.  Plaintiffs' most likely counterarguments – the presence of constitutional claims and *ultra vires* allegations – are both unavailing.  First, Constitutional claims do not negate Tucker Act jurisdiction.  Second, there is no real dispute that the EPA did not act *ultra vires* because the applicable statute, regulations, and EPA grant agreement Terms and Conditions gave EPA the authority to terminate grants.

### 2.    Alleging First Amendment or Fifth Amendment violations does not alter the fundamental contractual nature of Plaintiffs' claims.

Plaintiffs allege that their First Amendment Claim alleging that the contract terminations are illegal "viewpoint discrimination" and their Fifth Amendment alleging that the termination violates their due process rights preclude application of the Tucker Act.  ECF 1, at ¶¶ 99-105.  This argument lacks merit.  Claims fall under the Tucker Act even where they include Constitutional challenges. Where resolution of Constitutional claims is "peripheral to the core determination of whether a breach of contract had occurred," a claim is still monetary, still requests monetary relief, and is therefore subject to the Court of Federal Claims' exclusive jurisdiction.  *Am. Sci. & Eng'g, Inc. v. Califano*, 571 F.2d 58, 61 (1st Cir. 1978) (plaintiff's characterization of claims as "ultra vires" actions that violated agency regulations and their Fifth Amendment due process rights were insufficient to confer district court jurisdiction where "it is clear that this is essentially a contract dispute" where it was clear that "resolution of those claims was peripheral to the core

determination of whether a breach of contract had occurred").[11] Where the plaintiff seeks enforcement of an allegedly breached agreement, courts find even Constitutional claims should come under the jurisdiction of the Tucker Act. *Am. Sci. & Eng'g, Inc*., 571 F.2d at 62-64.

Plaintiffs here demand reversal of the grant terminations, reinstatement of grant funding, and an order requiring that the government continue such funding.  ECF 2-1 at 47 (asking the Court to "vacate and set aside the EPA's unlawful termination of their . . . grants," secure "access to subsequent grant funds," and "prohibit Defendants from terminating or suspending access to any of the organizations' . . . grants or freezing access to funding under any of the grants." Although Plaintiffs also request declaratory relief which the Court of Federal Claims could not grant, this request does not change the monetary character of their complaint or the exclusive nature of the Court of Federal Claims' jurisdiction.  *Bevevino v. United States*, 87 Fed. Cl. 397, 407 (2009) ("Notwithstanding the request for declaratory relief, their suit primarily seeks money damages and falls within this court's jurisdiction."); *Am. Sci. & Eng'g, Inc*., 571 F.2d at 62 (fact that Court of Claims cannot provide the immediate injunctive or declaratory relief sought in the district court does not provide the district court with jurisdiction over the claim). It is well-established that the inability of the Court of Federal Claims to "provide the precise relief requested is no grounds for denying its jurisdiction over the claim." *Ginsberg*, 707 at 93–94 (quoting *Am. Sci, supra*).

---

[11]    *See also Ginsberg v. United States*, 707 F.2d 91, 93-94 (4th Cir. 1983) (Tucker Act claim was only remedy even though plaintiff was also seeking possession of the premises); *Portsmouth*, 706 F.2d at 474-75 (Claims Court jurisdiction cannot be avoided by framing an essentially monetary contract claim in injunctive or declaratory terms).

**3.** **Plaintiffs' allegations that the EPA termination is *ultra vires* do not defeat Tucker Act jurisdiction.**

Plaintiffs seek to escape Tucker Act jurisdiction by arguing that the agency acted "in excess of statutory authority" – these *ultra vires* arguments are meritless. ECF 1 at 24. The allegations are simply insufficient to establish EPA's actions were *ultra vires*. *Am. Sci. & Eng'g, Inc*., 571 F.2d at 61 (characterization of claims as 'ultra vires' actions that violated agency regulations did not confer district court jurisdiction over contract dispute clearly governed by the Tucker Act).

A government agent's action is *ultra vires* if it is not "within the normal scope of an agent's duties." *Americopters, LLC v. United States*, 95 Fed. Cl. 224, 230-31 (2010). The distinction is between "conduct that is unauthorized and conduct that is authorized but unlawful for other reasons." *Id.* at 231. Where government agents are "mistaken in applying the law, but they were acting within the scope of their duties to interpret the law," they do not act *ultra vires*. *See, e.g.*, *Eyherabide v. United States,* 345 F.2d 565, 570 (Ct. Cl. 1965) (government officials do not act without authorization "merely because they may have been mistaken, imprudent, or wrongful").

Here, there is no genuine dispute that the EPA had the authority to terminate the Plaintiffs' grants based on the Administrator's ability to determine and define a disadvantaged community, and the Code of Federal Regulations which permits grant termination "[i]f the award no longer effectuates the program goals or agency priorities." 42 U.S.C. § 7438(a), (b)(1); 2 C.F.R. § 200.340. Plaintiffs argue that the EPA terminated their grants without properly following the procedures allowing them to do so. ECF 2-1 at 23. This does not amount to an *ultra vires* action. Plaintiffs offer no support for their contention that "the Clean Air Act . . . afforded no discretion to the agency to terminate or suspend such grants on the basis of a new 'Agency priority' not to fund 'environmental justice.'" *Id.* To the contrary, the Clean Air Act leaves the award of grants up to the EPA Administrator's discretion *and does not mandate that any particular organization*

receive grant money. *See* 42 U.S.C. § 7438(a).  Moreover, the terms and conditions of Plaintiffs'
initial grants allow EPA to terminate the grants if "EPA determines that the objectives of the award
are no longer consistent with funding priorities for achieving program goals."[12]

Plaintiffs concede that EPA had the authority to terminate their grants under the terms and
conditions of those agreements and 2 C.F.R. §200.340 but argue that EPA exercised that authority
illegally.  Since they cannot show that the Agency's actions resulted from an *ultra vires* action, the
Tucker Act still applies to their claims.

### B. Plaintiffs are not entitled to a preliminary injunction because they are unlikely to succeed on the merits of their claim.

Even if the Court exercises jurisdiction over this case, Plaintiffs are still not entitled to a
preliminary injunction because they are unlikely to succeed on the merits of their claims.  *First*,
the EPA's decision to terminate the Plaintiffs' grants did not violate the Clean Air Act or any other
government regulations because the Act contains no specific requirements regarding *which*
grantees should receive funds, nor does it limit EPA's ability to terminate grants.  *Second*, no First
Amendment right is implicated by the decision of a government agency to cancel a federal grant
based on a change in agency priorities as determined by discretion clearly granted to the EPA
Administrator.  *Third*, the grant terminations were not arbitrary and capricious – EPA is permitted
to terminate grants for reasons consistent with the applicable OMB regulations, applicable EPA

---

[12]     Plaintiffs appear to argue that the October 2023 Terms and Conditions applicable to their initial
grants present three requirements, all of which must be satisfied before a termination is lawful.  ECF 2-1 at
13-14.  This reading is *fully at odds* with the plain text of the grant terms and conditions.  The 2023 Terms
and Conditions the Termination provision makes clear by its language that the three listed situations are
**nonexclusive examples** of situations that would allow EPA to terminate a grant award based on Agency
priorities. ("Situations in which EPA **may** terminate an award under this provision **include** when…"
(emphasis added)).  The listed alternative exemplar situations, some of which suggest the decision must
rely on some kind of "new evidence" *are not cumulative*, each stands alone.  Termination does not require
that all three examples provided be satisfied.  As such, there is no documentary or logical support for
Plaintiffs' contention that EPA may only terminate a grant if it "obtains evidence" that was not considered
in making the award.

EPA Grant Master Terms and Conditions, and grant agreements. *Fourth*, the Clean Air Act specifically gives the EPA Administrator discretion to define which disadvantaged communities should benefit from grants; such discretionary determinations are outside of the reach of the APA. *Finally*, even if EPA's decision could be deemed arbitrary and capricious, the proper remedy is remand, *not grant reinstatement of the grants*.

> 1. **The grant terminations did not violate the Clean Air Act; the relevant provision provides the EPA Administrator the discretion to determine or modify the definition of "disadvantaged communities" and does not prevent EPA from terminating the grants awarded to these Plaintiffs.**

Plaintiffs argue that EPA violated the Environmental and Climate Justice Block Grant provision of the Clean Air Act when it terminated their grants. ECF 2-1 at 30-32, citing 42 U.S.C. § 7438. However, § 7438 provides funding for grants which include five separate enumerated types of activities designed to address pollution and air quality issues, that benefit "disadvantaged communities," ***as defined by the EPA administrator***. 42 U.S.C. § 7438(b) (emphasis added). The statute does not define "disadvantaged communities" and makes it clear that the definition of that term is left to the discretion of the EPA Administrator. *Id*.

Where Congress does not appropriate funds *to a specific recipient* but rather appropriates funding "on a lump-sum basis," an agency maintains the discretion "to allocate its resources elsewhere as it sees fit." *Palomino v. Fed. Bur. of Prisons*, 408 F. Supp. 2d 282, 291 (S.D. Tex. 2005). Here, the statute cannot be read to require the EPA Administrator to continue to disburse funds to the Plaintiffs in this case, or to organizations or activities that the previous EPA Administrator found to serve the then-current definition of a "disadvantaged community." The most that can be said is that the statute mandates that the "Administrator shall use amounts made available under subsection (a)(1) to award grants … that benefit disadvantaged communities, as defined by the Administrator." 42 U.S.C. § 7438(b)(1). 42 U.S.C. § 7438 does not require that

the EPA Administrator continue grant contracts made to organizations that the prior EPA Administrator found to serve the then-current definition of a "disadvantaged community."[13]  The legislative history of this provision underscores the discretion granted to the Administrator and lack of any fixed meaning of this term: as Tennessee Senator Marcia Blackburn observed in the debate, the bill did not identify which "environmental justice communities" would benefit from the grants, allowing for political discretion.  168 Cong. Rec. S4154-01, 168 Cong. Rec. S4154-01, S4163.  Given the broad discretion afforded the EPA administrator under 42 U.S.C. § 7438 (b)(1), Plaintiffs are unlikely to prevail on their claim that the EPA's decision to terminate their grants violates § 7438 of the Clean Air Act.

> ### 2.    The grant terminations were violated EPA or other government regulations, thereby rendering them Arbitrary and Capricious under the *Accardi* doctrine.

Similarly, Plaintiffs cannot prevail with respect to their claim that the EPA violated the APA in allegedly failing to comply with 2 C.F.R. §§ 200.340, 341.  In support of that claim, Plaintiffs invoke the *Accardi* doctrine, which has come to stand for the proposition that an agency's violations of its own regulations and procedures is evidence of arbitrary decision making.  *See United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954).  First and foremost, a failure to follow a regulation, alone is generally insufficient to establish that an otherwise discretionary decision is arbitrary capricious.  *See Lopez v. Fed. Aviation Admin*., 318 F.3d 242, 246-48 (D.C. Cir. 2003), as amended (Feb. 11, 2003) (failure to follow agency regulations that limit otherwise discretionary actions would have to fall *substantially short* of the applicable departmental

---

[13]    Moreover, the statute contains no language addressing or modifying the EPA's regulatory power to terminate grants under 2 C.F.R. § 200.340.

regulations, *and* result in *prejudice* to the plaintiff, in order to provide sufficient grounds to mount a challenge to the Agency action).

Here, in order to rely on *Accardi* in support of their APA claim, Plaintiffs would first have to establish that the EPA's termination of their grants violates *specific procedural regulations*. The arguments made by Plaintiffs do no such thing and are entirely circular.  First, Plaintiffs contend that EPA failed to comply with the Office of Management and Budget regulations at 2 C.F.R., § 200.340, *et seq*., which are incorporated in the EPA's FY 2024 and FY 2025 Grant Terms and Conditions, as well as the individual grant agreements.  Section 200.340 provides default grounds for the termination of a government grant.  2 C.F.R. § 200.340(a).[14]  The version of § 200.340 in effect from August 13, 2020, to September 30, 2024, provided that an award could be terminated by the awarding authority, *inter alia.*, (2) "to the greatest extent authorized by law, if an award no longer effectuates the program goals or agency priorities" or (5) "pursuant to termination provisions included in the Federal award." *See* 2 C.F.R. § 200.340 Effective: August 13, 2020, to September 30, 2024 (emphasis added).[15]  The April and October 2024 changes resulted a combination of the former sections 340(a)(2), and (a)(5) into a single provision.  Former §200.340(a)(2) permitting termination consistent with agency priorities, and §200.340(a)(5) which permitted termination pursuant to the terms of the award, were combined into a new section (a)(4) which now states that an agency may terminate an award "pursuant to the terms and conditions of the Federal award, ***including***, to the extent authorized by law, if an award no longer effectuates

---

[14]    To further complicate things, the regulation was modified or affected by several regulatory changes in 2024, including 89 FR 30108, 30136, 30152 (April 22, 2024); 89 FR 79732 (Oct. 1, 2024); and 89 FR 101463 (Dec. 16, 2024).  These changes, in turn, resulted in changes to the FY 2025 EPA General Grant Terms and Conditions applicable to grants effective October 1, 2024, or later.

[15]    *See* Westlaw, 2 C.F.R. § 200.340 Effective: August 13, 2020 to September 30, 2024, available at https://-www.-westlaw.-com/-Document/-N563B45C0D-D6211EA9392C8A76C5DD292/-View/-Full-Text-.html?-transition-Type=Default&-contextData=(sc.Default)&VR=3.0&RS=cblt1.0.

the program goals or agency priorities." 2 C.F.R. § 200.340(a)(4) (emphasis added).  Plaintiff has

not established that the Agency violated either provision.  Both provide the Agency wide authority

to terminate an award where it no longer effectuates current program goals or agency priorities.

Plaintiffs' Complaint also alleges violation of § 200.341, which requires written notice of

termination.  Plaintiffs argue that the written notice provided here was insufficient and failed to

comply with §200.340, and 341.  However, the regulations require only that the Agency provide

written notice in writing, and that such notice include "the reasons for termination, the effective

date, and the portion of the Federal award to be terminated, if applicable."  *Id*.  Plaintiffs contend

that the notices provided here are insufficient, since they "failed to provide a meaningful statement

of its reasons for termination." ECF 1 at ⁋ 117.  However, this reading of the regulations is entirely

inconsistent with their plain language – no *advanced* notice, "meaningful statement" or additional

level of detail is required by the regulations.[16]

Plaintiffs also contend that the language in the EPA's General Terms and Conditions for

Grant Agreements also support their claim that additional notice and supporting information were

required.  *See* ECF 1, at ¶¶ 5, 27, 28, 52-53, 85, 116-122.  These contract interpretation claims

merely serve to further support the Agency's contention that their claims sound in contract, and

that the case should be dismissed for lack of subject matter jurisdiction or transferred to the Federal

Court of Claims.

---

[16]    *But see, Climate United Fund v. Citibank, N.A.*, Chutkan, J., No. 25-CV-698, 2025 WL 842360, at
*3 (D.D.C. Mar. 18, 2025) (EPA must also take certain procedural steps before it can terminate federal
awards, including written notice of termination that includes "the reasons for termination, the effective date,
and the portion of the Federal award to be terminated[.]" under 2 C.F.R. § 200.340, .341, an opportunity to
object and provide information challenging the action under § 200.342, and compliance with any
requirements for hearings, appeals, or other administrative proceedings to which the recipient is entitled
under § 200.342, and any statute or regulation applicable to the action involved), appeal filed D.C. Circuit
Case No. 25-5122, Order granting in part motion to stay, 2025 WL 1123856 (April 16, 2025), oral argument
held 5/19/2025 at 9:30 a.m.

**3.    The Plaintiffs' claims that the grant terminations violate the First and Fifth Amendments are without merit; neither of these constitutional protections are implicated in the terminations of Plaintiffs' grants.**

Because the Government may engage in selective funding in support of its policy priorities without violating the First Amendment and Plaintiffs have no protected due process right to continued grant funding, they are not likely to succeed on their First or Fifth Amendment challenges.

Government spending is not subject to traditional First Amendment scrutiny. *Rust v. Sullivan*, 500 U.S. 173, 193 (1991). Rather, "[t]he Government can, without violating the Constitution, selectively fund a program to encourage certain activities it believes to be in the public interest, without at the same time funding an alternative program which seeks to deal with the problem in another way." *Id.* at 193 ("In so doing, the Government has not discriminated on the basis of viewpoint; it has merely chosen to fund one activity to the exclusion of the other.").

The Supreme Court has held that the Government does not penalize, prohibit, restrict, or otherwise infringe on speech simply because it chooses not to pay for it. *See, e.g., Ysursa v. Pocatello Educ. Ass'n*, 555 U.S. 353, 358 (2009) (explaining that government "is not required to assist others in funding the expression of particular ideas"); *Leathers v. Medlock*, 499 U.S. 439, 450 (1991) (government "is not required to subsidize First Amendment rights"). "As a general matter, if a party objects to a condition on the receipt of federal funding, its recourse is to decline the funds. This remains true when the objection is that a condition may affect the recipient's exercise of its First Amendment rights." *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.* (*AID*), 570 U.S. 205, 213 (2013). The Fourth Circuit recently reaffirmed this conclusion when it granted a stay in *National Association of Diversity Officers in Higher Education v. Trump*

("*NADOHE*"),[17] finding the Government was likely to succeed on the merits of a First and Fifth Amendment challenge to grant termination-related provisions of a Presidential Executive Order. Order, *NADOHE*, No. 25-1189, Doc. 29, at 7 (4th Cir. Mar. 14, 2025) (Harris, C.J., concurring) ("Nor do the orders authorize the termination of grants based on a grantee's speech or activities outside the scope of the funded activities. Rather, the 'Termination' provision directs the termination of grants . . . based only on the nature of the grant-funded activity itself."). In addition, EPA's grant termination and grantmaking decisions do not provide a forum for free speech. Rather, given the discretion granted to the EPA Administrator EPA's decisions about which entities will be awarded funds controlled by the relevant provisions of the Clean Air Act constitute a form of government speech and are therefore not subject to the First Amendment. *See, e.g., Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 467 (2009) (the First Amendment's free speech clause restricts government regulation of private speech; *it does not regulate government speech*); *Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 208 (2015) (as a general matter, when the government speaks it is entitled to promote a program, to espouse a policy, or to take a position).

Because federal funding is a privilege and not a right, and because the funding terminations based on the EPA Administrator's right to define the program activity consistent with the statute is itself a form of government speech, Plaintiffs are unlikely to succeed on their First Amendment claim.

---

[17] The district court's decision in *NADOHE*, No. 1:25-cv-00333-ABA, can be found at 2025 WL 573764 (D. Md. Feb. 21, 2025), opinion clarified, 2025 WL 750690 (D. Md. Mar. 10, 2025) (finding the Government was likely to succeed on the merits of a First and Fifth Amendment challenge to grant termination-related provisions of a Presidential Executive Order), Order to Stay Appeal by 4th Circuit, *NADOHE*, Appeal No. 25-1189, Doc. 29, at 7 (4th Cir. Mar. 14, 2025).

Plaintiffs also cannot prevail on their Fifth Amendment due process claims. These claims appear to be entirely based on their contention that they were due some additional notice or opportunity to respond to the grant terminations. However, they cannot establish that any such right has been violated. As noted above, the grant agreements, general Terms and Conditions, and regulations at 2 C.F.R. § 200.340 do not provide Grantmaker Plaintiffs with any right to advanced notice of termination, or consideration of any dispute before funding is terminated. Rather, they are merely entitled to written notice which includes the Agency's reasons for termination. *Id.* Post termination, they then have the right to file a dispute, consistent with 2 C.F.R. §1500.15. No other process is due. As such, they cannot allege that their due process rights were violated, and that allegation cannot be used to support their entitlement to relief under the APA.[18]

### 4.    The grant terminations were not arbitrary or capricious.

Plaintiffs are unlikely to succeed on their APA claim, to the extent this Court has jurisdiction over their case. "Arbitrary and capricious" is a "narrow" standard of review in which EPA's action is presumed valid. *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989) (narrow standard); *Nat. Res. Def. Council, Inc. v. Envtl. Prot. Agency*, 16 F.3d 1395, 1400 (4th Cir. 1993) (presumed validity). The Court merely "consider[s] whether the agency considered the relevant factors and whether a clear error of judgment was made." *Hoffler v. Mattis*, 677 Fed. Appx. 119, 120 (4th Cir. 2017) (quoting *Ohio Valley Envtl. Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 192 (4th Cir. 2009)). In other words, courts ask if "the agency has acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained the decision." *Fed. Commc'ns Comm'n v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). The

---

[18]    Moreover, the post-termination dispute procedures available to Plaintiffs afford them any process they are due. 2 C.F.R. §1500.15.

APA is not a mechanism for judicial policy revision, because "courts lack authority 'to impose upon [an] agency its own notion of which procedures are 'best' or most likely to further some vague, undefined public good.'" *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 102 (2015) (quoting *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.,* 435 U.S. 519, 549 (1978)).

Federal regulations explicitly allow agencies to terminate grants for no other reason besides "an award no longer effectuates . . . agency priorities." 2 C.F.R. § 200.340. This language came from Office of Management and Budget (OMB) changes to Uniform Guidance in the year 2020.[19] The comments to this change to the Uniform Guidance note that the language is meant to allow "awarding agencies [to] prioritize ongoing support to Federal awards that meet program goals" and "terminate the Federal award" where it does not. *Id.*

Because Plaintiffs' "arbitrary and capricious" argument is likely to fail, a preliminary injunction is unwarranted.

     **5.**     **The grant terminations were discretionary and thus fall outside the scope of judicial review under the APA.**

Plaintiffs' APA claims seek to challenge the termination decisions as final agency actions under the APA. However, where a challenged "agency action" is "committed to agency discretion by law" it falls outside the scope of judicial review under the APA. 5 U.S.C. §701(a)(2). The Court therefore lacks jurisdiction because the EPA's decisions here—which concerned how best to re-allocate funds to align with its policy objectives—were quintessential decisions committed to agency discretion by law.

---

[19]    Guidance for Grants and Agreements, Published Doc. No. 2020-17468, 85 FR 49506 (Aug. 13, 2020), at https://www.federa-lregister.-gov/-documents-/2020/08-/13/2020-17468/guidance-for-grants-and-agreements (last visited Mar. 11, 2025).

In *Lincoln v. Vigil*, 508 U.S. 182 (1993), the Supreme Court held that the Indian Health Service's decision to discontinue a program it had previously funded and to instead reallocate those funds to other programs was committed to agency discretion by law and thus not reviewable under the APA's reasoned decision-making standards. *See id.* at 185-88. The Court explained that the "allocation of funds from a lump-sum appropriation is another administrative decision traditionally regarded as committed to agency discretion," because the "very point of a lump-sum appropriation is to give an agency the capacity to adapt to changing circumstances and meet its statutory responsibilities in what it sees as the most effective or desirable way." *Id.* at 192.

Indeed, "an agency's allocation of funds from a lump-sum appropriation requires 'a complicated balancing of a number of factors which are peculiarly within its expertise': whether its 'resources are best spent' on one program or another; whether it 'is likely to succeed' in fulfilling its statutory mandate; whether a particular program 'best fits the agency's overall policies'; and, 'indeed, whether the agency has enough resources' to fund a program 'at all.'" *Id.* at 193. "Congress may always circumscribe agency discretion to allocate resources by putting restrictions in the operative statutes." *Id.* But if the agency abides by the relevant statutes (and whatever self-imposed obligations may arise from regulations or grant instruments), the APA "gives the courts no leave to intrude." *Id.*

Here, EPA's terminations abided by applicable statutes, regulations, and the grant terms and conditions. Congress explicitly delegated to the EPA Administrator the power to define which grants would "benefit disadvantaged communities." 42 U.S.C. § 7438. The EPA Administrator exercised that power in terminating Plaintiffs' grants; their termination letters explained that the EPA Administrator exercised that Congressionally delegated discretion to determine that the terminated grants "conflict with the Agency's policy of prioritizing merit, fairness, and

excellence." The terminations were also consistent with the Office of Management and Budget's Uniform Grant Guidelines in the Code of Federal Regulations, which allows EPA to terminate grants solely because they are no longer consistent with agency priorities.  2 C.F.R. § 200.340.

Finally, the initial grants' Terms and Conditions themselves allow EPA to unilaterally terminate funding if "EPA determines that the objectives of the award are no longer consistent with funding priorities for achieving program goals." Oct. 2023 TAC at 4.  EPA not only terminated funding consistently with these guardrails, but also provided several paragraphs of clear and unambiguous explanation, noting that DEI initiatives and "environmental justice" as the previous administration defined it directly "conflict with the Agency's policy of prioritizing merit, fairness, and excellence in performing our statutory functions" and thus "no longer effectuates[] Agency priorities."

Because Plaintiffs are unlikely to show arbitrary and capricious action, their APA claim is unlikely to succeed.

### 6.    The remedy for an APA violation is remand, not reinstatement.

To the extent the Court considers granting a preliminary injunction, Defendants respectfully request the Court instead remand the matter back to EPA to provide a more detailed explanation for each grant termination on an expedited schedule.  Armed with a more grant-specific explanation, Plaintiffs could then determine whether they still wish to pursue legal action, and the Court could then reconsider the matter with a more fulsome record.  Courts allowed for similar remands in other challenges to grant terminations.  *See, e.g.*, *Prometheus*, 592 U.S. at 422; *AIDS Vaccine Advocacy Coal. v. U.S. Dept. of State*, No. 25-cv-402, 2025 WL 752378, at *13 (D.D.C. Mar. 10, 2025).

**C.      Plaintiffs cannot establish irreparable harm.**

Plaintiffs are not entitled to a preliminary injunction because they cannot show that they are likely to be irreparably harmed absent an injunction.  A preliminary injunction may not issue absent this showing.  *Winter*, 555 U.S. at 22.  Conclusory or speculative allegations do not establish a likelihood of irreparable harm.  *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 812 (4th Cir. 1991).  Here, Plaintiffs allege three categories of harm: per se harm resulting from infringement on their First Amendment rights; "serious programmatic and operational harms;" and reputational harms.  ECF 2-1 at 43-46.  Plaintiff fails to establish likelihood of irreparable harm at every turn.

As discussed above, Plaintiffs have not experienced a First Amendment injury merely because the EPA terminated a grant in order to align with new agency priorities and articulated a different vision.  The Fourth Circuit rejected an analogous argument about threats to speech posed by grant termination language in Presidential Executive Orders in *NADOHE*. *See* Order Granting Motion to Stay Pending Appeal, *NADOHE*, Case No. 25-1189, ECF 29, at 7 (4th Cir. Mar. 14, 2025) (Harris, C.J., concurring) (finding no First Amendment infringement where funding termination was not threatened due to "speech or activities outside the scope of the funded activities").  Thus, there is no per se irreparable harm resulting from the violation of First Amendment rights.

Nor have plaintiffs established that their operational harms rise to the level of irreparability. "Loss of profits and of business opportunities" are not irreparable.  *Wells Am. Corp. v. Ziff-Davis Pub. Co., a Div. of Ziff Commc'ns Co.*, 900 F.2d 258 (4th Cir. 1990).  *See also Va. Carolina Tools, Inc. v. Int'l Tool Supply, Inc.*, 984 F.2d 113, 120 (4th Cir. 1993) ("[L]oss of distributor agreements, loss of sales, expenses incurred in relocation, injury to reputation, loss of profits, and loss of volume discounts—were not irreparable.").  The Supreme Court found plaintiffs' similar

allegations of harm in *California* were not irreparable where a loss in funding would not cause the organizations to stop operating. 604 U.S. __ at 2. The Court further observed that if the organizations chose to shut down their programs, "then any ensuing irreparable harm would be of their own making." *Id.* (noting such costs are "self-imposed" (quoting *Cuomo v. U.S. Nuclear Reg. Comm'n*, 772 F.2d 972, 977 (D.C. Cir. 1985) (per curiam)). Similarly, here, Plaintiffs aver that they are using alternative funding to continue running their programs. ECF 2-1 at 42. They also note that their programs "will soon cease to exist *in their envisioned form* and likely altogether," underscoring both the speculative nature of any existential threat and indicating that the programs may still continue in a newly envisioned form. ECF 2-1 at 42. Moreover, Plaintiffs' allegation of reputational harm is speculative and assumes that their subgrantees will blame Plaintiffs, and not EPA, for the grant terminations. ECF 2-1 at 43. This is tenuous at best.

Ultimately, the gravamen of Plaintiffs' claim is monetary and, if they prevail, they will receive funds to the extent required by law. *Dennis Melancon, Inc. v. City of New Orleans*, 703 F.3d 262, 279 (5th Cir. 2012) (the "possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, [weighs] heavily against a claim of irreparable harm") (citation omitted), *cert. denied*, 569 U.S. 994 (2013).

In contrast, the Government will suffer irreparable harm from the entry of a preliminary injunction. *California*, 604 U.S. at 2. As in *California*, Plaintiffs have made no representation that they will give potentially tens of millions of dollars back to the Government in the likely event they lose this litigation. Indeed, the opposite is true – Plaintiffs argue that they should not be required to post any kind of bond at all, or that they post a nominal bond. ECF 2-1 at 48. This is approximately .001% of their initial $8 million grant and is hardly meaningful. *Id.* at 12–13.

**D.    The balance of equities and public interest do not favor Plaintiffs.**

Plaintiffs must also show that the balance of equities and public interest weigh in their favor.  These final two factors also weigh in the government's favor and compel denial of Plaintiffs' motion.

The balance of equities and the public interest "merge when the Government is the opposing party." *Miranda v. Garland*, 34 F.4th 338, 365 (4th Cir. 2022) (quoting *Nken*, 556 U.S. at 435).  To balance the equities, the Court considers "the relative harms to applicant and respondent, as well as the interests of the public at large." *Barnes v. E-Sys., Inc. Grp. Hosp. Med. & Surgical Ins. Plan*, 501 U.S. 1301, 1305 (1991) (Scalia, J., in chambers) (quoting *Rostker v. Goldberg*, 448 U.S. 1306, 1308 (1980) (Brennan, J., in chambers)).  Irreparable harm to Plaintiffs is not decisive.  *See Ass'n of Jewish Camp Operators v. Cuomo*, 470 F. Supp. 3d 197, 228–29 (N.D.N.Y. 2020) (finding irreparable harm to Plaintiffs from closure of overnight camps, but still finding important governmental interest weighed against preliminary injunction). As noted above, and consistent with *California*, if the Court were to grant an injunction requiring the funding of the terminated grants, the funds would be spent, and the government would be unable to recover them, as such, the balance of harm weighs in favor of declining to enter an injunction and simply proceeding to decide the case on the merits.

**E.    If an Injunction is entered, a meaningful bond is appropriate to protect the Government's interests.**

Defendants request that any preliminary relief ordered by the Court be accompanied by a bond under Fed. R. Civ. P. 65(c), which provides that "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." A bond is appropriate here given that any preliminary relief

would potentially mandate that the Executive spend money that may not be recouped once distributed.

The Supreme Court has acknowledged that, in grant termination cases like this one, the Government may be "unlikely to recover the grant funds once they are disbursed." *California*, 604 U.S. at 2 (noting district court declined to impose bond). There is approximately $60 million per Plaintiff at issue in this case. ECF 2-1 at 21-13. Thus, Defendants respectfully ask the Court to impose an amount sufficient to pay the "costs and damages sustained by any party found to have been wrongfully enjoined or restrained." FRCP 65(c). A bond is particularly appropriate here given that any preliminary injunctive relief in the form of an order requiring the government to send millions of dollars to the Plaintiffs would be spent, and likely not be recouped once distributed

### F.    Summary Judgment for Defendant is appropriate.

The arguments presented above regarding the inability of Plaintiffs to succeed on the merits of their claims are dispositive of summary judgment and can be resolved on the record before the Court. As such, the Court may proceed to a ruling not just on the merits of the requested injunctive relief, but also on the Plaintiffs' claims. *See Transcon. Gas Pipe Line Co., LLC v. 6.04 Acres, More or Less, Over Parcel(s) of Land of Approximately 1.21 Acres, More or Less, Situated in Land Lot 1049*, 910 F.3d 1130, 1148-49 (11th Cir. 2018) (after reviewing merits of motions for summary judgment and motions seeking injunctive relief, having found no genuine dispute of material fact as to the right of plaintiffs to condemn the property the district court properly considered whether the parties were entitled to summary judgment). In addition, FRCP 65(a)(2) provides that: "[b]efore or after beginning the hearing on a motion for a preliminary injunction, the court may advance the trial on the merits and consolidate it with the hearing." As such, the Court is permitted to determine the merits, if appropriate, through resolution of motions for summary judgment. *See Schiff v. Brown*, No. DKC 23-cv-338, 2023 WL 6878968, at *8 (D. Md. Oct. 18, 2023),

*reconsideration denied*, No. DKC 23-338, 2023 WL 8019022 (D. Md. Nov. 20, 2023), aff'd in part, appeal dismissed in part, No. 23-2219, 2024 WL 414121 (4th Cir. Feb. 5, 2024) (considering both request for injunction and motion for summary judgment in action seeking to challenge the constitutionality of Maryland laws that criminalize harassment where court found that plaintiff had not clearly established likelihood of success on the merits or that he was entitled to summary judgment on his First Amendment claims). Where the court has considered dispositive issues through motions for preliminary injunction, discovery is not necessary, and there are no disputes of material fact, the court can proceed to summary judgment. *See Kipke v. Moore*, No. GLR-23-1293, 2024 WL 3638025, at *4 (D. Md. Aug. 2, 2024) (holding that for the same reasons they were unable to succeed on the merits, court found there was no genuine dispute of material fact as to whether the regulations at issue violated the Second Amendment, and granted in part and denied in part the motions for summary judgment).

Here, as discussed in detail above, this case should be dismissed, or transferred to the Court of Claims as Plaintiffs' claims sound in contract, and the Court lacks jurisdiction to decide them. In the alternative, resolution of Plaintiffs' APA claims via cross-motions for summary judgment based on the Administrative Record is entirely appropriate, and it is clear that Plaintiffs cannot prevail. As such, the Court should grant summary judgment for Defendant on all claims.

## V.    <u>CONCLUSION</u>

For the foregoing reasons, the Court should dismiss this case or transfer it to the Court of Federal Claims, and/or deny the Plaintiffs' Motions for Preliminary Injunction, and Motion for Summary Judgment, and grant summary judgment for Defendants.

Respectfully submitted,

Kelly O. Hayes
United States Attorney

By:        /s/
          Ariana Wright Arnold (23000)
          Molissa H. Farber (802255)
          Assistant United States Attorney
          36 S. Charles St., 4th Floor
          Baltimore, Maryland 21201
          410-209-4813
          410-209-4862
          Ariana.Arnold@usdoj.gov
          Molissa.Farber@usdoj.gov

          *Counsel for Defendants*