# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
(Northern Division)

| | |
|---|---|
| GREEN & HEALTHY HOMES INITIATIVE, INC., ET AL., <br><br>         Plaintiffs, <br><br>    v. <br><br> ENVIRONMENTAL PROTECTION AGENCY, ET AL., <br><br>         Defendants. | Civil Action No. 1:25-cv-01096-ABA |

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS, FOR TRANSFER TO THE COURT OF FEDERAL CLAIMS, OR IN THE <u>ALTERNATIVE, FOR SUMMARY JUDGMENT</u>**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION ........................................................................................................... 1

ARGUMENT .................................................................................................................. 3

I.    This Court, not the U.S. Court of Federal Claims, has jurisdiction over the Plaintiff
      Organizations' claims. ........................................................................................... 3

      A.    Plaintiffs' claims for equitable relief are not subject to the Tucker Act. ................. 4

      B.    Plaintiffs' grants are not contracts, and the source of Plaintiffs' rights is not
            contractual. ............................................................................................................. 5

      C.    Plaintiffs seek prospective equitable injunctive relief, not money damages. ....... 10

      D.    The COFC lacks jurisdiction over Plaintiffs' constitutional claims. .................... 13

      E.    EPA's termination of grants exceeds its statutory authority and constitutes
            *ultra vires* action that is not subject to Tucker Act jurisdiction. ........................... 14

II.   EPA may not terminate congressionally mandated "environmental justice" grants on
      the basis of keyword searches or its purported adoption of an "Agency priority" not
      to fund "programs or organizations that promote or take part in environmental
      justice," and the Administrative Record discloses no other basis for EPA's actions. ....... 15

      A.    EPA's actions were arbitrary and capricious. .......................................................... 17

      B.    EPA actions were contrary to law and exceeded its statutory authority under
            the Clean Air Act. ................................................................................................... 18

      C.    EPA's actions violated the First Amendment and were contrary to
            constitutional right. ................................................................................................ 19

      D.    EPA failed to adhere to OMB's Uniform Guidance and therefore acted
            contrary to law and without observance of procedure required by law. .............. 20

III.  EPA's actions are reviewable. ................................................................................. 21

IV.   Remand without vacatur, even if theoretically permissible, would be wholly
      unwarranted here. .................................................................................................... 22

V.    The Plaintiff Organizations have demonstrated their entitlement to a permanent
      injunction. ................................................................................................................ 23

# TABLE OF AUTHORITIES

## Cases

*Am. Ass'n of Colleges for Teacher Educ. v. McMahon*,
No. 1:25-cv-00702 (D. Md. Mar. 3, 2025)........................................................ 12

*Am. Ass'n. of Colleges For Teacher Educ. v. McMahon*,
No. 25-1281 (4th Cir., Apr. 10, 2025).........................................................11, 12

*Am. Near E. Refugee Aid v. U.S. Agency for Int'l Dev.*,
703 F. Supp. 3d 126 (D.D.C. 2023) ............................................................... 5

*Am. Sci. & Eng'g, Inc. v. Califano*,
571 F.2d 58 (1st Cir. 1978) ......................................................................... 4

*Am. Sci. & Eng'g, Inc. v. Califano*,
571 F.2d 58 (1st Cir. 1978) ......................................................................... 13

*Armstrong v. Exceptional Child Center, Inc.*,
575 U.S. 320 (2015).................................................................................. 4

*Bevevino v. United States*,
87 Fed. Cl. 397 (Fed. Cl. 2009) ............................................................... 13, 14

*Bowen v. Massachusetts*,
487 U.S. 879 (1988)............................................................................. *passim*

*Coleman v. Kendall*,
74 F.4th 610 (4th Cir. 2023)..................................................................... 12

*Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*,
603 U.S. 799 (2024)................................................................................. 23

*Department of Education v. California*,
145 S. Ct. 966 (2025)......................................................................9, 10, 11, 12

*Direx Israel, Ltd. v. Breakthrough Med. Corp.*,
952 F.2d 802 (4th Cir. 1991)..................................................................... 24

*Encino Motorcars, LLC v. Navarro*,
579 U.S. 211 (2016)................................................................................. 16

*Ginsberg v. United States*,
707 F.2d 91 (4th Cir. 1983)...................................................................... 14

*Ingersoll-Rand Co. v. United States*,
780 F.2d 74 (D.D.C. 1985)....................................................................... 9

*Jimenez-Cedillo v. Sessions*,
    885 F.3d 292 (4th Cir. 2018) ................................................................. 16

*Johnson v. Bergland*,
    586 F.2d 993 (4th Cir. 1978) ................................................................. 25

*Leaders of Beautiful Struggle v. Balt. Police Dep't*,
    2 F.4th 330 (4th Cir. 2021) ................................................................... 25

*Lincoln v. Vigil*,
    508 U.S. 182 (1993) ......................................................................... 21, 22

*Maine v. USDA*,
    25-cv-00131, 2025 WL 1088946 (D. Me. Apr. 11, 2025) .................... 11, 12

*Megapulse, Inc. v. Lewis*,
    672 F.2d 959 (D.C. Cir. 1982) ....................................................... *passim*

*Milk Train, Inc. v. Veneman*,
    310 F.3d 747 (D.C. Cir. 2002) ......................................................... 21, 22

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) ........................................................................... 16, 17

*Mullane v. Central Hanover Bank & Trust Co.*,
    339 U.S. 306 (1950) ............................................................................. 20

*New York v. Trump*,
    No. 25-cv-39 (D.R.I. Apr. 14, 2025) ..................................................... 12

*Normandy Apartments, Ltd. v. U.S. Dep't of Hous. & Urb. Dev.*,
    554 F.3d 1290 (10th Cir. 2009) ........................................................... 8, 9

*Pol'y & Rsch., LLC v. U.S. Dep't of Health & Hum. Servs.*,
    313 F. Supp. 3d 62 (D.D.C. 2018) ........................................................ 22

*San Antonio Hous. Auth. v. United States*,
    143 Fed. Cl. 425 (2019) ......................................................................... 5

*SEC v. Chenery Corp.*,
    332 U.S. 194 (1947) ............................................................................. 16

*Shawnee Tribe v. Mnuchin*,
    984 F.3d 94 (D.C. Cir. 2021) ............................................................... 21

*Solutions in Hometown Connections v. Noem*,
    No. 25-CV-00885, 2025 WL 1103253 (D. Md. Apr. 14, 2025) ........... 6, 7, 9, 12

*St. Bernard Parish Gov't v. United States*,
  134 Fed. Cl. 730 (2017) ................................................................................................ 5

*Suburban Mortg. Assocs., Inc. v. U.S. Dep't of Hous. & Urb. Dev.*,
  480 F.3d 1116 (Fed. Cir. 2007) .................................................................................... 4

*Sustainability Inst. v. Trump*,
  2:25-cv-02152-RMG (D.S.C. May 20, 2025)......................................................... 17, 18

*Sustainability Institute v. Trump*,
  25-cv-02152 (D.S.C. May 20, 2025) ..................................................................... 25, 26

*Texas v. United States*,
  126 F. 4th 392 (5th Cir. 2025)...................................................................................... 23

*Trauma Serv. Grp. v. United States*,
  104 F.3d 1321 (Fed. Cir. 1997) ..................................................................................... 5

*U.S. Conference of Catholic Bishops v. United States Dep't. of State*,
  No. 25-cv-00465, 2025 WL 763738 (D.D.C. Mar. 11, 2025);.......................................11

*United States v. Connolly*,
  716 F. 2d 882 (Fed. Cir. 1983) .................................................................................... 14

*United Steel v. Mine Safety & Health Admin.*, 925 F. 3d 1279, 1287 (D.C. Cir. 2019) ............... 23

*Va. Carolina Tools, Inc. v. Int'l Tool Supply, Inc.*,
  984 F.2d 113 (4th Cir. 1993) ....................................................................................... 24

*Volk v. United States*,
  111 Fed. Cl. 313 (2013) .............................................................................................. 14

*Wells Am. Corp. v. Ziff-Davis Publ'g Co.*,
  No. 89-1568, 1990 WL 33532 (4th Cir. Mar. 20, 1990) ............................................... 24

*Woonasquatucket River Watershed Council v. U.S. Dep't of Agric.*,
  No. 25-CV-00097, 2025 WL 1116157 (D.R.I. Apr. 15, 2025)................................. *passim*

**Statutes**

5 U.S.C. § 702.................................................................................................................. 4, 6

5 U.S.C. § 704.................................................................................................................. 4, 6

5 U.S.C. § 706.............................................................................................. 17, 18, 19, 22

28 U.S.C. § 1346................................................................................................................ 14

28 U.S.C. § 1491............................................................................................................. 4, 9

41 U.S.C. § 7102 ................................................................................................ 9

42 U.S.C. § 7438 ...................................................................................... *passim*

**<u>Regulations</u>**

2 C.F.R. § 200.340 ............................................................................................ 21

2 C.F.R. § 200.341 ............................................................................................ 20

The Plaintiff Organizations oppose the Defendants' motion to dismiss, to transfer to the Court of Federal Claims, or in the alterative, for summary judgment.

## INTRODUCTION

This Court—not the United States Court of Federal Claims ("COFC")—is the proper forum for resolving the Plaintiff Organizations' claims, and Defendants' request for dismissal or transfer on jurisdictional grounds should be denied. This result is compelled by *Bowen v. Massachusetts*, 487 U.S. 879 (1988), controlling authority that Defendants fail even to cite in their memorandum. *Bowen* holds that challenges to an agency action seeking equitable relief, like the Plaintiff Organizations' challenge to the grant terminations at issue in this case, are properly asserted under the Administrative Procedure Act ("APA") in district court, even when the challenged agency action concerns monetary relief. In so holding, the Supreme Court rejected the very same "restrictive interpretation" of the APA that Defendants have advanced here. *See id.* at 904.

Meanwhile, although Defendants acknowledge that the decision of the D.C. Circuit in *Megapulse, Inc. v. Lewis* provides an appropriate framework to determine whether Plaintiffs' action should be regarded as a "disguised contract action" that must be brought in the COFC, 672 F.2d 959, 968 (D.C. Cir. 1982), Defendants misapply the analytical framework set forth in that case. On both prongs of the *Megapulse* analysis, Plaintiffs' claims are APA and constitutional claims, not "disguised contract" claims. First, in challenging EPA's termination of their grants, Plaintiffs have invoked, as the source of the substantive rights they seek to vindicate, the Clean Air Act, the U.S. Constitution, certain federal grant regulations, and the APA, not the terms of any contract or agreement. In fact, the grants at issue are not even contracts, as they do not entail any exchange of consideration. Second, Plaintiffs have sought from this Court only prospective equitable and declaratory relief, not money damages, or even the payment of any

particular sum of money. Contrary to Defendants' arguments, "the mere fact that a court may have to rule on a contract issue"—or, here, an issue related to the award of a federal grant—"does not, by triggering some mystical metamorphosis, automatically transform" a case into a contract action subject to the Tucker Act. *Id*.

On the merits, Defendants' arguments for dismissal or for summary judgment are trained on imagined agency actions, not the grant terminations actually at issue in this case. Now that the Administrative Record has been filed, there is no genuine dispute about the nature of the agency actions at issue, nor is there any dispute about the arbitrary and unlawful basis on which those actions were taken. As confirmed by the materials in the Administrative Record, which EPA never cites, the EPA did not redefine the term "disadvantaged communities," nor did it make a decision to use Thriving Communities funding to "subsidize" certain types of activities but not others. Rather, EPA searched its grant database for the term "environmental justice," identified the Plaintiff Organizations' Thriving Communities grants through that search, and, without any further consideration or analysis, terminated the grants, issuing form termination memoranda in which the Agency asserted that it had adopted an "Agency priority" to withdraw support from "programs or organizations that promote or take part in . . . 'environmental justice' initiatives." It is no defense of those actions for EPA to theorize that it might have achieved the same result by taking some different set of actions based on a different purported rationale.

The agency actions actually at issue here, in addition to being arbitrary and capricious, are directly contrary to the provisions of the Clean Air Act under which the grants were awarded. Those provisions direct EPA to award "environmental and climate justice block grants" and therefore squarely foreclose the agency's reliance on "environmental justice" as a basis for terminating such grant funding. EPA's actions just as plainly amount to viewpoint discrimination

in violation the First Amendment, in that EPA has terminated the Plaintiff Organizations' grant funding on the ground that the agency perceives the organizations or their subgrantees as having "promot[ed] or take[n] part in . . . 'environmental justice' initiatives." As discussed below, EPA's principal argument on the merits, repeated in various forms throughout its memorandum—that the law "contains *no guarantees* of funding to any *particular grant recipient*," Defs.' Mem. at 2 (emphasis in original)—is not responsive to the claims that the Plaintiff Organizations have made in this case. The law may not "guarantee" grant funding to the Plaintiff Organizations, but it assuredly protects them from having their grant funding terminated by EPA on arbitrary, unlawful, and unconstitutional grounds.

Finally, and significantly, EPA knows the terminations at issue here are improper and indefensible. Last week, EPA conceded it had acted arbitrarily and capriciously in its termination of grants, like those at issue here, that it awarded pursuant to the "environmental and climate justice block grants" provisions of the Clean Air Act in the *Sustainability Institute* case pending in the District of South Carolina. Its position in that case, and its position here, cannot be reconciled; EPA's concession in South Carolina is fatal to its position here.

## ARGUMENT

### I.    This Court, not the U.S. Court of Federal Claims, has jurisdiction over the Plaintiff Organizations' claims.

Notwithstanding Defendants' attempt to reframe this case as a contractual dispute for monetary damages, Plaintiffs have challenged an improper agency action: the EPA's invocation of an alleged arbitrary, unlawful, and unconstitutional "Agency priority" that runs directly counter to the Agency's statutory mandate as defined in the Clean Air Act. *See* 42 U.S.C. § 7438(a), (b)(1) (mandating that the EPA Administrator "shall use" appropriated funds to establish a program of "environmental and climate justice block grants"). Defendants argue that

Plaintiffs' claims should be dismissed because the COFC has exclusive jurisdiction over this action pursuant to the Tucker Act, 28 U.S.C. § 1491(a). But because the grants at issue do not satisfy the elements of a contract (as there is no consideration), and because Plaintiffs do not request money damages, the COFC has no jurisdiction and cannot hear this case.

District courts have jurisdiction in suits, like this one, seeking relief "other than money damages" for "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. §§ 702, 704. With respect to this Court's equitable jurisdiction to hear constitutional claims, "[t]he ability to sue to enjoin unconstitutional actions by . . . federal officers is the creation of courts of equity, and reflects a long history of judicial review of illegal executive action." *Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320, 327 (2015). Here, Plaintiffs seek to enforce substantive rights sourced in federal statutes and the Constitution, not in any contract. Furthermore, Plaintiffs seek an injunctive remedy—relief that is not available to it under the COFC's Tucker Act jurisdiction—and not monetary damages. Accordingly, this lawsuit is properly before this Court under the APA and does not fall within the jurisdiction of the COFC under the Tucker Act.

### A.    Plaintiffs' claims for equitable relief are not subject to the Tucker Act.

The Tucker Act vests the COFC with jurisdiction over "express or implied contract[s] with the United States." 28 U.S.C. § 1491(a)(1). In determining whether the Tucker Act applies, courts "must look beyond the form of the pleadings to the substance of the claim," *Suburban Mortg. Assocs., Inc. v. U.S. Dep't of Hous. & Urb. Dev.*, 480 F.3d 1116, 1124 (Fed. Cir. 2007), to determine whether "the essence of the action is in contract." *Am. Sci. & Eng'g, Inc. v. Califano*, 571 F.2d 58, 63 (1st Cir. 1978).

As discussed above, the two-prong analysis set forth in the D.C. Circuit's *Megapulse* decision focusing on (1) the "source of the rights upon which the plaintiff bases its claims" and

(2) "the type of relief sought," 672 F.2d at 968, is the appropriate framework for this Court to

determine whether the Plaintiff Organizations' claims belong in this Court or the COFC. Under

the correct and proper application of this analysis, Plaintiffs' claims belong in this Court.

**B.    Plaintiffs' grants are not contracts, and the source of Plaintiffs' rights is not contractual.**

In certain circumstances, federal financial assistance awards such as grants may be

considered "contracts" enforceable under the Tucker Act. However, for grants to be so construed,

they must contain "the four required elements of offer, acceptance, consideration, and proper

government authority." *Am. Near E. Refugee Aid v. U.S. Agency for Int'l Dev.*, 703 F. Supp. 3d

126, 132 (D.D.C. 2023); *San Antonio Hous. Auth. v. United States*, 143 Fed. Cl. 425, 463 (2019);

*Trauma Serv. Grp. v. United States*, 104 F.3d 1321, 1326 (Fed. Cir. 1997).

Plaintiffs' grants are not contracts, because they do not entail the crucial element of

consideration. Defendants gloss over this point, merely stating that "EPA then awarded money in

exchange for performance of the grant program from Plaintiffs." Defs.' Mem. at 13. This

conclusion ignores extensive caselaw specifying that consideration must render a "tangible" and

"direct" benefit to the government, not merely a "generalized" benefit to advance "policy

interests" or an "agency's overall mission." *Am. Near E. Refugee Aid*, 703 F. Supp. 3d at 133

(finding no consideration or "direct, tangible benefits" to the government resulting from

nonprofit plaintiff's cooperative agreement with USAID to increase "access to water, sanitation

and other small and medium scale community infrastructure"); *see, e.g., St. Bernard Parish

Gov't v. United States*, 134 Fed. Cl. 730, 735–36 (2017), aff'd on other grounds, 916 F.3d 987

(Fed. Cir. 2019) (finding no consideration and only indirect benefits to the federal government in

the context of a grant agreement with a local parish to clear sediment from area watersheds after

Hurricane Katrina, even where the government received "the restoration of a natural resource and a reduction in the amount of emergency funds" required for future flooding emergencies).

Here, Plaintiffs' grants provide no direct, tangible benefits to EPA and, therefore, lack the required consideration to be considered contracts for purposes of Tucker Act jurisdiction. Plaintiffs' Thriving Communities grants are born of the Inflation Reduction Act of 2022, under which Congress amended the Clean Air Act and appropriated funding specifically to "award grants . . . that benefit disadvantaged communities." 42 U.S.C. § 7438(a), (b)(1). The grant activities eligible for support under the Act include "community-led air and other pollution monitoring, prevention, and remediation," "investments in low- and zero-emission and resilient technologies and related infrastructure," and "mitigating climate and health risks from urban heat islands, extreme heat, wood heater emissions, and wildfire events." 42 U.S.C. § 7438(b)(2). Any generalized benefit that may inure to the advancement of broader statutory goals are neither direct nor tangible to EPA and do not satisfy the consideration prong for purposes of COFC review. Plaintiffs' grants, thus, cannot be considered contracts covered by the Tucker Act and its claims cannot be brought at the COFC. As a result, this Court must take jurisdiction over Plaintiffs' claims, otherwise there would be "no other adequate remedy in a court." *See* 5 U.S.C. §§ 702, 704.

In an attempt to bolster their argument that the grants are contracts, Defendants cite the recent ruling in *Solutions in Hometown Connections v. Noem*, No. 25-CV-00885, 2025 WL 1103253 (D. Md. Apr. 14, 2025), asserting that, where a claimant bases "their right to relief on the government's violation of the terms of grant awards, the source of rights is the grant agreement." Defs.' Mem. at 13. However, that case is neither binding nor persuasive here—and is distinguishable on several critical grounds, including because the court did not account for

whether grants should be considered contracts under the Tucker Act due to lack of consideration, as Plaintiffs assert here.

In *Solutions*, the court treated the plaintiffs' grant agreements as contracts and found the "essence" of the dispute to be contractual—based largely on the plaintiffs' request for reimbursement of expenditures made in reliance on the grant at issue. But Plaintiffs here seek no such relief. Their claims do not hinge on reimbursement, breach, or any contractual entitlement. Instead, the claims in this case challenge the Agency's failure to act in accordance with the statutory mandate of the Clean Air Act, the Agency's failure to provide a rationale for termination of a statutorily-imposed program under the APA, and the Agency's violation of the Constitution, including the First Amendment.

Moreover, and crucially, even if the grants at issue were contracts, the "essence" of Plaintiffs' claims are not contractual in nature. The Court in *Megapulse* specifically rejected the notion that "any case requiring some reference to or incorporation of a contract is necessarily on the contract and therefore directly within the Tucker Act." 672 F.2d 959 at 967–68. Instead, determining whether a claim "is or is not 'at its essence' a contract action" requires a "more deliberate . . . examination" of the specific claims at issue, ultimately turning on the "source of the rights upon which the plaintiff bases its claims, and upon the type of relief sought." *Id*.

The circumstances in *Megapulse* illustrate how the "source of rights" analysis should apply in this case. In *Megapulse*, the plaintiff, a government contractor, claimed that the government mishandled information provided under various contracts, violating the Trade Secrets Act and the contractor's due process rights. The D.C. Circuit recognized that, although the contractor's claims factually arose from its contracts with the government, the "sources of rights" the contractor sought to vindicate were the Trade Secrets Act and the due process clause,

not the contracts themselves. *Id.* at 969. Furthermore, the fact that the contracts imposed

obligations on the government regarding the proper handling of the information, *id.* at 961–62,

and could have been a "source of rights" for potential claims, did not alter the court's analysis.

The D.C. Circuit rejected the government's argument that "an agency action may not be enjoined

simply because that same action might also amount to a breach of contract." *Id.* at 971.

Defendants' argument here directly contradicts this holding in *Megapulse*. In this case,

Plaintiffs have challenged EPA's termination of their grants, arguing that the agency's actions are

arbitrary and capricious, exceed its authority, are unlawful under the Clean Air Act, violate the

Constitution, and do not comply with the Uniform Guidance on federal grant awards. Similarly,

the contractor in *Megapulse* challenged the government's actions on statutory and constitutional

grounds. As a matter of settled law, the fact that EPA's actions "might also amount to a breach"

of its cooperative agreements with the Plaintiff Organizations, *id.*, does not render the claims

"disguised contract claims" and, importantly, does not deprive this court of jurisdiction to enjoin

EPA's actions on the grounds that those actions violate the other sources of rights the Plaintiff

Organizations seek to vindicate. *See also Woonasquatucket River Watershed Council v. U.S.*

*Dep't of Agric.*, No. 25-CV-00097, 2025 WL 1116157, at *13 (D.R.I. Apr. 15, 2025) (finding the

"essence" of an action was not contractual where "the gravamen" of plaintiff nonprofits'

allegations "does not turn on terms of a contract between the parties; it turns on federal statute

and regulations put in place by Congress and the agencies" (cleaned up)), *appeal filed*, 25-1428

(1st Cir. May 1, 2025); *Normandy Apartments, Ltd. v. U.S. Dep't of Hous. & Urb. Dev.*, 554 F.3d

1290, 1300 (10th Cir. 2009). ("[w]hen the source of rights asserted is constitutional, statutory, or

regulatory in nature, the fact that resolution of the claim requires some reference to contract does

not magically 'transform [the] action . . . into one on the contract and deprive the court of

jurisdiction it might otherwise have.'"); *see also Woonasquatucket*, 2025 WL 1116157, at \*13 ("To be clear: the fact that there are underlying contractual relationships between the Nonprofits and the Government does not automatically 'convert a claim asserting rights based on federal regulations into one which is, at its essence, a contract claim.'") (citing *Normandy Apartments*, 554 F.3d at 1299).

Solutions fails to account for this distinction, and Defendants ignore *Megapulse* and its progeny on this issue. Instead, the Defendants refer to *Ingersoll-Rand Co. v. United States*, 780 F.2d 74, 75, 76–77 (D.D.C. 1985), which is of limited guidance here, as that case addressed the ability of government contractors to recover termination costs under the Contract Disputes Act ("CDA"), 41 U.S.C. § 7102. Disputes pursuant to the CDA are exclusively appealed to the COFC.

Similarly, the Supreme Court's recent non-precedential ruling in *Department of Education v. California*, 145 S. Ct. 966 (2025), does not negate the applicability of *Megapulse* and its progeny, nor does it govern or address the issues before this Court. If anything, the Supreme Court's ruling emphasizes the importance of distinguishing between "suits based on 'any express or implied contract with the United States'" and suits—including the present case— where the source of rights asserted is constitutional, statutory, or regulatory in nature; a distinction that *Megapulse* addresses directly. *California*, 145 S. Ct. at 968 (quoting 28 U.S.C. § 1491(a)(1)). The Supreme Court's passing references to jurisdictional issues in *California* certainly do not settle all jurisdictional questions here. This Court must instead examine Plaintiffs' source of rights and the essence of Plaintiffs' claims based on the specific facts in this case. Those facts make clear that neither are contractual.

**C.    Plaintiffs seek prospective equitable injunctive relief, not money damages.**

The second step in determining whether a claim is a contract action requires an analysis of "the type of relief sought." *Megapulse*, 672 F.2d at 968. Where the relief sought is money damages stemming from a contract claim, a claim falls under the exclusive jurisdiction of the COFC. But where the relief sought is equitable in nature, as here, jurisdiction is proper in district court. For example, as recently recognized by the Supreme Court, "a district court's jurisdiction 'is not barred by the possibility' that an order setting aside an agency's action may result in the disbursement of funds." *California*, 145 S. Ct. at 968 (quoting *Bowen*, 487 U.S. at 910). More plainly, just because "a judicial remedy may require one party to pay money to another" does not necessarily "characterize the relief as 'money damages.'" *Bowen*, 487 U.S. at 893.

Rather than seeking "money damages" as that term is used in the Tucker Act, Plaintiff Organizations here seek equitable or specific relief, which *Bowen* defined as relief that orders a defendant to do or not do a specific thing. *Id.* at 893–94. That is precisely the relief Plaintiffs seek here: to prevent the "increasingly severe and irreparable harm" that will occur because of EPA's unlawful agency actions. ECF 2-1 at 31.

In *Bowen,* the Court held that a state could challenge the Secretary of Health and Human Services' disallowance of Medicaid reimbursements under the APA in district court, even though the relief sought would require the federal government to pay money. The Court drew a clear distinction between claims for money damages, which fall within the exclusive jurisdiction of the COFC, and claims for specific relief—such as an order compelling compliance with statutory obligations—which fall within the APA's waiver of sovereign immunity and the jurisdiction of district courts. *Bowen*, 487 U.S. at 893–94, 910.

As in *Bowen*, Plaintiffs are not seeking retrospective monetary damages or compensation for services rendered, but rather equitable relief to set aside EPA's unlawful termination and

suspension decisions and to reinstate their eligibility for participation in a statutory grant

program. As in *Bowen*, the possibility that compliance with an APA-based injunction might lead

to the payment of money is not dispositive. What matters is the character of the remedy, and

Plaintiffs here seek only to compel lawful agency action on a prospective basis.

      Defendants' continuing silence on *Bowen*—a foundational decision that is binding on this

Court and that has been reaffirmed repeatedly by the Supreme Court and Courts of Appeals—

speaks volumes. The failure to confront *Bowen* or distinguish it suggests that EPA is aware its

position cannot be reconciled with controlling law. Recent district court decisions addressing

similar agency actions have recognized *Bowen* as dispositive on the jurisdictional issue. *See*

*Woonasquatucket*, 2025 WL 1116157, at *15 (*Bowen* "directly controls" and Defendants fail to

provide any persuasive reason to depart from its clear rule); *Maine v. USDA*, 25-cv-00131, 2025

WL 1088946, at *19 n.8 (D. Me. Apr. 11, 2025) (relying on *Bowen* to uphold jurisdiction over

equitable APA claims related to grant terminations).

      Defendants' attempt to utilize decisions such as *United States Conference of Catholic*

*Bishops v. United States Department of State*, No. 25-cv-00465, 2025 WL 763738 (D.D.C. Mar.

11, 2025); *California*, 145 S. Ct. at 966; and *American Association of Colleges For Teacher*

*Education v. McMahon*, No. 25-1281, Doc. 30 (4th Cir., Apr. 10, 2025), to avoid the outcome of

*Bowen* is unavailing.

      In *U.S. Conference of Catholic Bishops*, plaintiffs challenged the suspension and

subsequent termination of two cooperative agreements with the State Department's Bureau of

Population, Refugees, and Migration. The relief the plaintiffs pursued in that case centered on

retrospective compensation for services rendered. In contrast, Plaintiffs here seek a forward-

looking correction of agency action under administrative law principles. This is a critical

distinction: jurisdiction under the APA is proper where a plaintiff seeks to halt ongoing violations of law, even if compliance with such a ruling may incidentally lead to the release of previously obligated funds.

Similarly, unlike the plaintiffs in *Solutions in Hometown Connections*, Plaintiffs here are not asking for reimbursement for costs incurred and do not seek contractual relief of any sort.

Finally, Defendants argue that because "Plaintiffs' claims here mirror those in *AACTE* and *California*," recent cases where the Fourth Circuit and the Supreme Court, respectively, granted stays of preliminary injunctions related to grant terminations, the same result should follow here. Defs.' Mem. at 17; *see Order, Amer. Assoc. of Coll. For Teacher Educ. v. McMahon*, No. 25-1281 (4th Cir., Apr. 10, 2025), ECF 30 ("*AACTE*"); *California*, 145 S. Ct. at 966. Unlike the plaintiffs in *AACTE*, however, Plaintiffs here seek prospective equitable relief rather than an order to provide "reimbursement for all otherwise allowable expenditures incurred between the date of termination and the Court's order," *American Ass'n of Colleges for Teacher Educ. v. McMahon*, No. 1:25-cv-00702 (D. Md. Mar. 3, 2025), ECF 1. And unlike the plaintiffs in *California*, Plaintiffs cannot provide interim funding of their programs through alternative means; moreover, the non-precedential, per curiam *California* decision did not analyze the application of *Bowen*, let alone overrule it.[1]

---

[1] Neither *AACTE* nor *California* overruled *Bowen* or *Coleman,* both of which remain binding and govern the issue of prospective, equitable injunctive relief involving payments made under the APA. *See Bowen,* 487 U.S. at 893; *Coleman v. Kendall,* 74 F.4th 610, 615 (4th Cir. 2023); *see also Woonasquatucket,* 2025 WL 1116157, at *15 (holding *California* did not divest the court of jurisdiction where *Bowen* "directly controls"); *Maine,* No. 1:25-CV-00131-JAW, 2025 WL 1088946, at *19 n.8 (relying on "well-established precedent in concluding" district court had jurisdiction to hear APA claims even where the TRO would likely result in monetary payments); Order, *New York v. Trump,* No. 25-cv-39 (D.R.I. Apr. 14, 2025), ECF 182 at 5–9 (denying motion for reconsideration where "*Bowen* makes clear that the Court has jurisdiction" to hear APA claims).

In short, Plaintiffs' claims are not claims for money damages, retrospective or otherwise. Their suit "is not a suit seeking money in compensation for the damage sustained by the failure of the Federal Government to pay as mandated; rather, it is a suit seeking to enforce the statutory mandate itself, which happens to be one for the payment of money." *Bowen*, 487 U.S. at 900. *Bowen* directly controls any question of "money damages" here and makes clear that Plaintiffs' claims do not fall under the exclusive jurisdiction of the Tucker Act.

### D.    The COFC lacks jurisdiction over Plaintiffs' constitutional claims.

Defendants attempt to preempt counterarguments regarding EPA's APA and Constitutional—including First and Fifth Amendment—violations, by asserting that "where [constitutional] claims are peripheral to the core determination of whether a breach of contract had occurred," the COFC still retains exclusive jurisdiction. Defs.' Mem. at 19. But such assertions do not alter the reality that, for all of the reasons described above, Plaintiffs' allegations are not contractual claims for money, the EPA's unconstitutional actions are not "peripheral," and this case is properly heard by this Court.

Defendants' reliance on various cases to argue otherwise is misplaced. In *American Science & Engineering, Inc. v. Califano*, 571 F.2d 58 (1st Cir. 1978), a scientific research and development corporation entered into a contract with the government to develop an x-ray scanner. Plaintiff sought damages of $100,000,000 after the government canceled a domestic license agreement and sold licenses to other developers. The plaintiff used APA and civil rights claims as alternative bases for jurisdiction. In contrast, Plaintiffs' claims here are not contractual in nature or brought as alternative bases for jurisdictional purposes.

In *Bevevino v. United States*, 87 Fed. Cl. 397 (Fed. Cl. 2009), the COFC considered backpay claims by employees of the federal correctional institution in Pennsylvania. The court found that "[a]lthough plaintiffs' prayer for relief may have been awkwardly phrased, their back

pay claims are clearly within this court's jurisdiction." *Id.* at 407. Once again, this is inapposite to the facts of this case, where Plaintiffs are only seeking forward-looking relief.

And in *Ginsberg v. United States*, 707 F.2d 91 (4th Cir. 1983), a landlord brought an action against United States in a dispute under a lease with the United States as tenant. The court acknowledged that the Tucker Act remedy in the then-Court of Claims was the landlord's only remedy in a dispute arising under a lease with United States, even though landlord was seeking possession of premises due to provisions in 28 U.S.C. § 1346(a)(2), (f). *Id.* at 93–94. That case has no bearing here, as the Plaintiff organizations are not attempting to quiet title.

The Federal Circuit and the COFC have long held that, because certain constitutional claims, including the First Amendment and Fifth Amendment claims, do not mandate the payment of money damages, such claims fall definitively outside the Tucker Act and cannot be heard by the COFC. *See, e.g., United States v. Connolly*, 716 F. 2d 882, 886-87 (Fed. Cir. 1983); *Volk v. United States*, 111 Fed. Cl. 313, 326 (2013). The same rule applies here.

### E.    EPA's termination of grants exceeds its statutory authority and constitutes *ultra vires* action that is not subject to Tucker Act jurisdiction.

Defendants' argument that the EPA's termination of grants falls under the exclusive jurisdiction of the COFC overlooks the fundamental nature of the Plaintiffs' claims and attempts to collapse two separate issues, a merits issue and a jurisdiction issue, into one. Here, the core issues are whether the EPA's actions were arbitrary, unlawful, and unconstitutional, and whether it acted beyond its statutory authority. The Clean Air Act and relevant regulations do not provide the EPA with unfettered discretion to terminate grants without adhering to statutory mandates and procedural requirements. The *ultra vires* nature of the EPA's actions undercuts the legality of the Agency's decision-making process, which is distinct from the jurisdictional issues under the Tucker Act. Accordingly, the Government's claims to the contrary and its attempts to collapse the

14

two issues into one quasi-jurisdictional argument have no bearing on the jurisdictional issues before this Court.

## II. EPA may not terminate congressionally mandated "environmental justice" grants on the basis of keyword searches or its purported adoption of an "Agency priority" not to fund "programs or organizations that promote or take part in environmental justice," and the Administrative Record discloses no other basis for EPA's actions.

The administrative record establishes that there is no genuine dispute concerning the nature of, or the basis for, the agency actions at issue here. In February and May, EPA (a) claimed to have adopted an "Agency priority" to "ensur[e] that the Agency's grants do not support programs or organizations that promote or take part in . . . 'environmental justice' initiatives," albeit without defining the term "environmental justice" or articulating the substance of any policies or priorities with which "environmental justice initiatives" are assertedly inconsistent; (b) labelled the Plaintiff Organizations or their subgrantees as "Environmental Justice," based only on keyword searches in a grants database, and without any assessment of Plaintiffs, their subgrantees, their programs, or the grants at issue; and, (c) on this basis alone, terminated $180 million in grants that the agency had previously awarded to the Plaintiff Organizations and to which the Plaintiffs had by then dedicated more than a year of executive planning, staff and capacity building, partnership development, and broad public outreach. As EPA acknowledges in its memorandum, the agency actions at issue here are based solely on "the EPA Administrator's determination that diversity, equity and inclusion ("DEI") initiatives, including 'environmental justice' initiatives, *may* 'conflict with the Agency's policy of prioritizing merit, fairness, and excellence.'" Defs.' Mem. at 6 (quoting termination memoranda) (emphasis added).

EPA's arguments in defense of its actions founder on a fundamental principle of administrative law: "that an agency's action must be upheld, if at all, on the basis articulated by

the agency itself." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50 (1983); *see also SEC v. Chenery Corp.*, 332 U.S. 194, 196-97 (1947). On judicial review, "[i]t is not the role of the [reviewing court] to speculate on reasons that might have supported an agency's decision," *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 224 (2016), and the reviewing court "may not supply a reasoned basis for the agency's action that the agency itself has not given." *Id*. (quoting *Motor State Farm*, 463 U.S. at 43); *see also Jimenez-Cedillo v. Sessions*, 885 F.3d 292, 299 (4th Cir. 2018). Thus, the grant terminations at issue here may be upheld only if EPA may lawfully terminate "environmental justice" block grants on the ground that grantees "promote or take part in environmental justice."

During the preliminary injunction briefing, in which EPA posited wide-ranging alternative rationales for terminating Plaintiffs' grants, this principle imposed a major barrier to EPA's arguments. Now, after the filing of the administrative record, this principle forecloses EPA's speculative arguments. If there is a basis for upholding EPA's termination of the grants at issue, it must be the basis on which EPA took those actions.

EPA ignores this fundamental principle. The Agency's lead argument, repeated in various forms throughout its memorandum, is that the law does not require EPA "to fund specific grants under the Thriving Communities program," Defs.' Mem. at 2, "contains *no guarantees* of funding to any *particular grant recipient*," *id*. (emphasis in original), and "contains no specific requirements regarding which recipients should receive funds," *id*. at 22, and that "EPA is permitted to terminate grants for reasons consistent with [the law]," *id*. All of that may be true, but it is beside the point. The fact that, in theory, there might exist some non-arbitrary and lawful basis on which EPA could terminate the grants at issue does not mean that *every* basis on which it could terminate those grants is non-arbitrary and lawful or that the agency has plenary

authority to terminate grants. Again, the actions at issue here may be upheld, "if at all, [only] on the basis articulated by the agency itself," *State Farm*, 463 U.S. at 50, not on a basis that EPA imagines *post hoc* in judicial review proceedings, and certainly not based on EPA's claim that it might in the future be able to imagine a lawful and non-arbitrary basis for terminating the grants.

      **A.**      **EPA's actions were arbitrary and capricious.**

      With respect to the actions here being arbitrary and capricious, *see* 5 U.S.C. § 706(2)(A), EPA's only defense is a variation on the argument just described: that, in theory, it may "terminate grants for no other reason besides an award no longer effectuates agency priorities." Defs.' Mem. at 30. EPA seems to claim that, merely by invoking the term "agency priorities," and without pointing to any evidence in the administrative record, it may terminate any grant for any reason. However, the term "agency priorities" is invested with no such magic. Under the APA, an agency action—even an agency action purportedly based on "agency priorities"—must be "set aside" if it is arbitrary and capricious. 5 U.S.C. § 706(2). This means that both (a) the "agency priority" must itself be non-arbitrary, and (b) the agency's application of that "priority" to the circumstances at issue must also be non-arbitrary. Here, EPA is unable to muster any argument on either point. Indeed, as discussed in the Plaintiffs' opening memorandum, *there is no evidence in the administrative record that EPA even adopted a relevant "agency priority."* Rather, EPA conducted keyword searches for the term "environmental justice" in a grants database and, without any further policymaking or analysis, terminated the Plaintiff Organizations' grants just because those searches yielded "hits." That is arbitrary and capricious agency action in textbook form.

      Notably, in the *Sustainability Institute* case pending in the District of South Carolina, EPA conceded last week that it acted arbitrarily and capriciously in its termination of grants, like those at issue here, that it awarded pursuant to the "environmental and climate justice block grants"

provisions of the Clean Air Act. *See* Order, *Sustainability Inst. v. Trump*, 2:25-cv-02152-RMG (D.S.C. May 20, 2025), ECF 157 at 6-7. EPA's concession there is fatal to its position here.

**B.    EPA actions were contrary to law and exceeded its statutory authority under the Clean Air Act.**

The Plaintiff Organizations' grants were awarded pursuant to congressional direction in the Clean Air Act that EPA's Administrator "shall use" appropriated funds to award "[e]nvironmental and climate justice block grants," 42 U.S.C. § 7438, and it is undisputed that EPA terminated the grants at issue on the ground that the Plaintiff Organizations, their subgrantees, their programs, or the Thriving Communities program itself are "environmental justice initiatives." Defs.' Mem. at 6. Thus, EPA's actions plainly exceeded its statutory authority and were contrary to law. *See* 5 U.S.C. § 706(2)(A). When Congress directs an agency to award "environmental justice" block grants, the agency may not terminate such a grant on the ground that the grantee is engaged in "environmental justice."

Here, EPA makes two arguments, both irrelevant to the validity of the agency's actions. First, EPA makes yet another variation of the argument addressed above: that the Clean Air Act "cannot be read to require the EPA Administrator to continue to disburse funds to the Plaintiffs in this case." Defs.' Mem. at 23. Again, the fact that there might in theory be some basis consistent with the Clean Air Act upon which EPA could discontinue funding the grants it previously awarded to the Plaintiff Organizations does not mean, and cannot mean, that EPA may terminate Plaintiffs' grants on *any* basis, and does not mean that EPA may terminate congressionally-designated "environmental justice" grants, whether awarded to Plaintiffs or to anyone else, on the ground that the grantee allegedly "promotes or takes part in environmental justice."

For its second argument, EPA identifies a potential statutory basis on which it claims that it could terminate the grants at issue: that the Administrator could exercise his authority under

the statute to redefine the statutory term "disadvantaged communities." Defs.' Mem. at 23. But the administrative record contains no evidence that the Administrator has exercised this authority, and it is undisputed that EPA's termination of the grants at issue was *not* based on any such redefinition of the term "disadvantaged communities." And even if the Administrator had redefined the term, it would be difficult to conceive of a non-arbitrary basis for excluding from that definition the hundreds of rural, suburban, urban, and tribal communities benefited by the grants at issue here.[2]

### C.    EPA's actions violated the First Amendment and were contrary to constitutional right.

With respect to the Plaintiff Organizations' constitutional claims, which are asserted under both the APA, *see* 5 U.S.C. § 706(2)(B), and the Court's inherent equitable authority to enjoin unlawful actions by government officials, EPA again elects to defend, not its actions actually at issue, but hypothetical actions it might have taken. EPA states that a government agency "may engage in selective funding in support of its policy priorities." Defs.' Mem. at 27. Like EPA's other hypothetical agency actions discussed above, this argument bears no relationship to what actually occurred in this case. There is not a shred of evidence in the administrative record that EPA or its Administrator "select[ed]" certain activities for funding, different than the ones that the Plaintiff Organizations anticipate funding, with the money that Congress appropriated for "environmental and climate justice block grants."

---

[2] Whether the Agency had a right to define the term "disadvantaged community" also is in dispute. In designating the Plaintiffs as regional grantmakers with broad authority to, among other things "design and implement their own competitive application and submission policies [and] award subgrants," Defs.' Mem. at 3, EPA delegated its authority to the designated grantmakers.

Rather, it is undisputed that EPA, through keyword searches, did what it said it did in its memoranda terminating the Plaintiffs' initial grants: it withdrew funding from "programs or organizations that"—it believed based on the keyword searches—"promote or take part in . . . 'environmental justice' initiatives." *See, e.g.*, EPA 000580. That is viewpoint discrimination. EPA makes no attempt to defend the constitutionality of the actions it took in this case.

### D.    EPA failed to adhere to OMB's Uniform Guidance and therefore acted contrary to law and without observance of procedure required by law.

EPA's defense of its failure to adhere to OMB's Uniform Guidance for federal grant awards is more of the same. It states that an agency has "wide authority" to terminate an award on the grounds of consistency with program goals or agency priorities under the Uniform Guidance and that the requirement of notice at 2 C.F.R. § 200.341 does not require "advanced notice" or an "additional level of detail." Defs.' Mem. at 26. None of those statements are responsive to Plaintiffs' claims. Ignoring section 200.341's notice requirement, which requires agencies to set forth, in any notice of grant termination, the agency's "reasons for termination," EPA urges this Court to hold that an agency may satisfy this requirement even if its statement of reasons is not "meaningful." 2 C.F.R. § 200.341(a). The Court should reject that argument. Meaningless notice is not notice at all. *See, e.g.*, *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950) (requiring that "notice be of such nature as to reasonably convey the required information").

Unsurprisingly, EPA makes no attempt to claim, and cannot claim, that it provided a meaningful statement of its "reasons for termination" in the boilerplate grant termination memoranda it sent to the Plaintiff Organizations. The administrative record reveals that the termination memoranda were simply forms generated by agency leadership and "special government employees" for the termination of grants *en masse*. EPA 000164-67, EPA 000299-

302. The record further reveals that EPA staff were directed to send these forms to hundreds of grantees operating not only under the Thriving Communities program, but under a wide variety of other agency programs. If such memoranda could satisfy the Uniform Guidance requirement that grantees be afforded a "statement of reasons" for grant termination, then that requirement would itself be meaningless.

With respect to the provisions of the Uniform Guidance limiting the permissible grounds for grant termination to those "clearly and unambiguously specif[ied] . . . in the terms and conditions of the Federal award," 2 C.F.R. § 200.340(b), EPA says nothing at all. Termination of "environmental justice" grants on grounds of "environmental justice" is not a ground for termination clearly and unambiguously specified in the terms and conditions applicable to the grants. EPA makes no effort to claim otherwise.

**III.    EPA's actions are reviewable.**

This Court should reject EPA's sweeping assertion that its actions here are unreviewable. For support, EPA relies on *Lincoln v. Vigil*, 508 U.S. 182 (1993). Defs.' Mem. at 31. But *Lincoln* forecloses judicial review only in situations where courts "have no meaningful standard against which to judge the agency's exercise of discretion." 508 U.S. at 191.

That is not the case here. Rather, this is a case in which "Congress has circumscribed agency discretion to allocate resources by putting restrictions in the operative statute." *Shawnee Tribe v. Mnuchin*, 984 F.3d 94, 100 (D.C. Cir. 2021) (cleaned up). Thus, there is "no presumption of non-reviewability." *Id*. (distinguishing *Lincoln* on this basis and holding that agency funding decision was subject to judicial review under APA); *see also Milk Train, Inc. v. Veneman*, 310 F.3d 747, 751–52 (D.C. Cir. 2002) (holding that Secretary of Agriculture's determination of amount of subsidy for milk producers was subject to judicial review where Congress provided "statutory reference point" for evaluating agency's action, and distinguishing *Lincoln* on this

basis). Congress dedicated the funds at issue here to "[e]nvironmental and climate justice block

grants," and it described in some detail the types of projects it intended to support, 42 U.S.C.

§ 7438, thus establishing a clear "statutory reference point," *Milk Train*, 310 F.3d at 752, against

which a reviewing court can evaluate the lawfulness of EPA's decision to withdraw such support

from "programs or organizations that promote or take part in . . . 'environmental justice'

initiatives" after conducting keyword searches for the term "environmental justice."

Moreover, as the U.S. District Court for the District of Rhode Island recently recognized,

and as Justice Jackson recognized when she served on the district court, "agencies themselves

frequently cabin their own discretionary funding determinations by generating formal regulations

or other binding policies that provide meaningful standards for a court to employ when

reviewing agency decisions under the APA." *Woonasquatucket*, 2025 WL 1116157, at *16

(D.R.I. Apr. 15, 2025) (quoting *Pol'y & Rsch., LLC v. U.S. Dep't of Health & Hum. Servs.*, 313

F. Supp. 3d 62, 76 (D.D.C. 2018) (Jackson, J.)). Unlike *Lincoln*, which concerned "appropriated

but not-yet-awarded funds," the "funds at issue here were already awarded to" the Plaintiff

Organizations. *Woonasquatucket*, 2025 WL 1116157, at *16. The regulations governing

termination of already-awarded grants, discussed above, further cabined EPA's discretion and

thus supply additional meaningful standards by which to evaluate the agency's actions. *See id.*

## IV.   Remand without vacatur, even if theoretically permissible, would be wholly unwarranted here.

Although the APA directs reviewing courts to "set aside" agency actions that, like the

EPA actions at issue, are arbitrary and capricious, not in accordance with law, contrary to

constitutional right, in excess of statutory jurisdiction, or without observance of procedure

required by law, *see* 5 U.S.C. § 706(2), EPA argues that the Court should not "set aside" its

actions here but instead merely "remand the matter back to EPA." Defs.' Mem. at 32. As an

initial matter, EPA fails to acknowledge that the permissibility of "remand without vacatur" under the APA is a subject of current judicial debate. *See, e.g.*, *Corner Post, Inc. v. Board of Governors of Federal Reserve System*, 603 U.S. 799, 836-37 n. 6 (Kavanaugh, J., concurring).

At best, remand without vacatur is available as a remedy only in "rare cases" where the deficiencies in the agency's actions are not very serious and the consequences of vacatur would be particularly disruptive. *See, e.g.*, *United Steel v. Mine Safety & Health Admin.*, 925 F. 3d 1279, 1287 (D.C. Cir. 2019); *Texas v. United States*, 126 F. 4th 392, 418 (5th Cir. 2025). EPA has not attempted to satisfy this demanding standard, and it cannot do so. The agency actions at issue are self-evidently arbitrary, as well as patently unlawful and unconstitutional, and it would not be disruptive in any sense for this Court to vacate those actions.

## V.    The Plaintiff Organizations have demonstrated their entitlement to a permanent injunction.

In its most recent memorandum to this Court, EPA limits its arguments on equitable relief to the Plaintiff Organizations' previous request for a preliminary injunction and does not address Plaintiffs' entitlement to a permanent injunction. With respect to irreparable injury, there is no serious question of the irreparability of the harms GHHI, the Minneapolis Foundation, and Philanthropy Northwest have experienced and will experience as a result of EPA's actions, as detailed in the unrebutted declarations they have submitted. Plaintiffs have incurred—and will continue to experience—irreparable organizational, reputational, and constitutional harms as a direct result of EPA's unlawful grant terminations.

Contrary to EPA's characterization of Plaintiffs' harms as merely "operational," the grant terminations have and will severely damage Plaintiffs' ability to accomplish their respective missions through the destruction of the staffing, capacity, partnerships, and infrastructure that they developed in order to implement their Thriving Communities programs, *see* ECF 26 at 22–

23; the deterioration of the relationships and trust that they developed with communities across

the regions they serve, *see, e.g.*, ECF 2-1 at 35; ECF 26-2 at 4 (describing participation in the

Program as the "linchpin" to engaging in other regional and national environmental projects);

and through the chilling of their First Amendment rights to engage in "initiatives" that EPA

might for some reason deem to be "environmental justice." *See* ECF 2-1 at 32 (explaining that

without injunctive relief, Plaintiffs' work with EPA depends on their adherence to the agency's

strictures against the promotion of "environmental justice"). These are not "conclusory or

speculative allegations" as EPA claims. Defs.' Mem. at 33 (citing *Direx Israel, Ltd. v.

Breakthrough Med. Corp.*, 952 F.2d 802, 812 (4th Cir. 1991)). Rather, they constitute "actual and

imminent" harms warranting injunctive relief. *Direx Israel*, 952 F.2d at 812.

Further, EPA's reliance on cases concerning "[l]oss of profits and of business

opportunities" is misplaced. *See Wells Am. Corp. v. Ziff-Davis Publ'g Co.*, No. 89-1568, 1990

WL 33532 (4th Cir. Mar. 20, 1990) (considering plaintiff computer manufacturer's breach of

contract and antitrust claims against a defendant publisher where defendant refused to print the

plaintiffs' advertisements); *see also Va. Carolina Tools, Inc. v. Int'l Tool Supply, Inc*., 984 F.2d

113, 120 (4th Cir. 1993) (weighing whether to compel arbitration between private manufacturing

businesses based on a broad arbitration clause in a written option agreement). Unlike the private

business plaintiffs in those cases, GHHI, the Minneapolis Foundation, and Philanthropy

Northwest are nonprofit organizations and do not seek injunctive relief to prevent "highly

speculative and largely economic injuries," *Virginia Carolina Tools, Inc.*, 984 F.2d at 120, nor do

they seek any relief "compensable through money damages." *Wells Am. Corp*., 1990 WL 33532

at *2. Instead, Plaintiffs have provided concrete evidence that EPA's actions "have posed an

existential threat," ECF 41-2 at ¶ 40; "will undermine . . . current and planned efforts" core to

Plaintiffs' missions, ECF 26-2 at ¶ 7; and have "severely compromised" Plaintiffs' fundamental organizational goals. ECF 41-3 at ¶ 12. These irreparable harms, which flow down to the communities served by the Plaintiff Organizations and cannot be addressed by monetary damages, warrant permanent injunctive relief.

In addition to the extensive harms described above and in Plaintiffs' unrebutted declarations, the Plaintiff Organizations have experienced serious impairment of their rights under the First Amendment. Where "there is a likely constitutional violation, the irreparable harm factor is satisfied." *See Leaders of Beautiful Struggle v. Balt. Police Dep't*, 2 F.4th 330, 346 (4th Cir. 2021); *see also Johnson v. Bergland*, 586 F.2d 993, 995 (4th Cir. 1978) ("Violations of first amendment rights constitute per se irreparable injury."). Not only do the grant terminations chill Plaintiffs' First Amendment rights as grantees, but they also constrict Plaintiffs' future advocacy in areas that the government might deem to be "environmental justice"—even as Congress has explicitly designated funding for "[e]nvironmental and climate justice." *See* 42 U.S.C. § 7438. EPA has not proffered any substantial argument to the contrary.

Likewise, the balance of equities and the public interest strongly favor the entry of injunctive relief, particularly in view of the profound harm to the environment and public health that EPA's actions have caused and will continue to cause in the communities that benefit from the Thriving Communities program in the Mid-Atlantic, Great Lakes, and Northwest regions. Based on a similar set of considerations, the District of South Carolina recently entered a permanent injunction against EPA in the *Sustainability Institute* litigation. *See Sustainability Institute v. Trump*, 25-cv-02152 (D.S.C. May 20, 2025), ECF 157 at 24.[3] As is the case here, the

---

[3] EPA asserts that the Court should not exercise its discretion under Rule 65(c) to waive the requirement of a bond if it enters a preliminary injunction. Defs.' Mem. at 35-36. With respect to

Court in *Sustainability Institute* found, in granting injunctive relief, that the defendants'
arguments were undermined by the "clear statements of harm" expressed by the plaintiffs
regarding layoffs, plaintiffs' inability to honor agreements with sub-grantees, threats to plaintiffs'
ability to plan for the future, and the significant non-monetary and irreparable harms caused by
the ongoing lack of reliable access to promised funds. *See Sustainability Institute v. Trump*, 2:25-
cv-02152-RMG (D.S.C.), ECF 64 at 17-19; *see also id*. ECF 157 at 15 (extending permanent
injunctive relief based on disruptions in day-to-day operations, financial strain, and damage to
their credibility and reputation). The Plaintiff Organizations have similarly shown they are
entitled to permanent injunctive relief.

Dated: May 23, 2025                                         Respectfully submitted,


      /s/                                               /s/      

Lora A. Brzezynski (Bar No. 17837)          Andrew D. Freeman (Bar No. 03867)
Jessica C. Abrahams                         Joshua N. Auerbach (Bar No. 26108)
Faegre Drinker Biddle & Reath LLP           Neel K. Lalchandani (Bar No. 20291)
1500 K Street NW, Suite 1100                Brown, Goldstein & Levy, LLP
Washington, DC 20005                        120 E. Baltimore Street, Suite 2500
Phone: 202-230-5000                         Baltimore, MD 21202
Fax: 202-842-8465                           Phone: 410-962-1030
jessica.abrahams@faegredrinker.com          Fax: 410-385-0869
lora.brzezynski@faegredrinker.com           adf@browngold.com
                                            jauerbach@browngold.com
                                            nkl@browngold.com


*Attorneys for Plaintiff*                    *Attorneys for Plaintiff Green & Healthy*
*The Minneapolis Foundation*                 *Homes Initiative, Inc.*

---

this argument, Plaintiffs incorporate herein the arguments in their prior memoranda, ECF 2-1 at
39-40; ECF 24 at 23-24, though, if the Court contemplates a preliminary injunction, Plaintiffs
suggest a nominal bond of $1 to $500. Moreover, Rule 65(c)'s provisions regarding security
apply only to preliminary injunctions and temporary restraining orders. No bond is required for a
permanent injunction.

_____/s/_____
Charles M. English, Jr. (Bar No. 03621)
Jonathan A. DeMella
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
Phone: 206-757-8338
Fax: 206-757-7338
jonathandemella@dwt.com
chipenglish@dwt.com

*Attorneys for Plaintiff*
*Philanthropy Northwest*